IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

_____

)
UNITED STATES OF AMERICA              )
                                      )
                                      ) CRIMINAL ACTION NO.
VS.                                   ) B-12-005
                                      )
JUAN ROBERTO RINCON-RINCON            )
_____)


EXCERPT OF PROCEEDINGS
TESTIMONY OF RAFAEL CARDENAS VELA
BEFORE THE HONORABLE HILDA G. TAGLE
SEPTEMBER 20, 2012


APPEARANCES:

For the Plaintiff:          MR. ANGEL CASTRO
                            Assistant United States Attorney
                            Brownsville, Texas

For the Plaintiff:          MR. JODY YOUNG
                            Assistant United States Attorney
                            Brownsville, Texas

For the Defendant:          MR. RICHARD E. ZAYAS
                            3100 E. 14th Street
                            Brownsville, Texas  78521



Transcribed by:             BARBARA BARNARD
                            Official Court Reporter
                            600 E. Harrison, Box 301
                            Brownsville, Texas  78520
                            (956)548-2591

THE COURT:  Thank you.  Please be seated.

Your next witness?

MR. YOUNG:  Yes, Your Honor.  Rafael Cardenas Vela.

THE COURT:  Is the interpreter going to be sitting over there, or are you going to remain here?

Good afternoon, sir.

THE WITNESS:  Good afternoon.

THE COURT:  All right.  Have a seat in the witness chair.

THE WITNESS:  Thank you.

THE COURT:  And please speak into the microphone so that your voice is amplified.

THE WITNESS:  Thank you.

THE COURT:  You may proceed.

**RAFAEL CARDENAS VELA,**

the witness, having been previously duly cautioned and sworn to tell the truth, the whole truth and nothing but the truth, testified through an interpreter as follows:

**DIRECT EXAMINATION**

BY MR. YOUNG:

Q   Mr. Cardenas, for the record could you please state your full name.

A   Rafael Cardenas Vela.

Q   And do you speak English?

A   No.

Q   Okay.  I'm going to ask you in your responses, if you can, to try to speak as slowly as you can because the gentleman next to you is an interpreter.

A   Okay.

Q   And wait for him to finish his -- your response in English.

A   Okay.

Q   And then I'll ask another question.

A   Okay.

Q   Also if there is an objection by the defense, please do not answer the question until the judge has an opportunity to decide and make a ruling.

A   Okay.

Q   Okay.  Thank you.

    All right.  How old are you?

A   39-years-old.

Q   And where were you born?

A   In Matamoros, Tamaulipas, Mexico.

Q   Who are your parents?

A   In Matamoros as well.

Q   Okay.  And what are their names?

A   My father's name is Rafael Cardenas Guillen.  Sorry.  And my mother's name is Irma Delia Vela Sepulveda.

Q   What does your father do or did for a living?

A   My father has always worked for American companies, factories.

Q   Would that be similar to a maquiladora?

A   Yes.  Yes, maquilas.

Q   And your mother, what did she do?

A   My mom, no, she's never worked.  She's always taken care of us.

Q   And how many brothers do you have?

A   Two more.  A brother and a sister.

Q   Okay.  And do you know who Osiel Cardenas Guillen is?

A   Yes.

Q   Who is he?

A   He's my father's brother.  He's my uncle.

Q   And do you know who Ezequiel Antonio Cardenas Guillen was?

A   Yes.  As well, he was -- he was my father's brother, and he was my uncle.

Q   And did he have a nickname?

A   Yes, he was called Tony Storm, Tony Tormenta.

Q   And do you have nicknames?

A   I'm called Commander 900 or Junior.

Q   And how did you get the name Commander 900?

A   When you work for the cartel, taught not to use our real names.  We're assigned a code word, a code name.

Q   Is that Comandante 900 a name you assigned to yourself?

A   Yes.

Q   What is your education?

A   I got -- I studied as far as middle school.

Q    And I'm going to ask you in a little bit more detail later, but can you tell the jury what legitimate jobs, if any, you have had in your life?

A    When I was 16, I worked in Matamoros in a factory from 15 until when I was 18.  And then I came as an illegal alien to the United States.  I worked in Houston as a carpenter, and then I went to Oklahoma.  I worked there picking mushrooms for a company.  I was married there.  And then there were some problems with my wife, and there was a -- and there wasn't a lot of work.

Q    Let me stop you right there, I'm sorry.  And, Mr. Cardenas, we're going to try to -- will make it into a question/answer so that I will be asking you questions, please.

A    Okay.

Q    You mentioned you have a wife.  What is her name?

A    Rosa Icela Moreno Mata.

Q    And do you have children through her?

A    Yes.

Q    How many?

A    Three.

Q    What are their ages?

A    I have a 14-year-old daughter, a 12-year-old son, and another eight-year-old.

Q    Do you also have a child from another relationship?

A    Yes.

Q   And how old is that child?

A   I have a year-and-a-half daughter and a six-year-old son.

Q   I want to talk -- have you pled guilty in federal court for being a member of the Gulf Cartel?

A   Yes.

Q   And what I mean by pleading guilty, is have you pled guilty to conspiracy to possess with intent to distribute --

A   Yes.

Q   -- an amount of narcotics that's more than 5 kilos of cocaine?

A   Yes.

Q   And more than 1,000 kilos of marihuana?

A   Yes.

Q   Were you also charged with conspiracy to import those same drugs?

A   Yes.

Q   And were you also charged with possession of a fraudulent document?

A   Yes.

Q   And did you decide to plead guilty in your case?

A   Yes.

Q   And as part of this -- and is it correct that you pled to Count 1 of the indictment, which is conspiracy to possess more than 5 kilos of cocaine?

A   Yes.

Q   And Count 1 was also conspiracy to possess more than -- with intent to distribute more than 1,000 kilograms of marihuana?

A   Yes.

Q   And was there a plea agreement in that case, in your case?

A   Yes.

Q   And did -- was part of the plea agreement that the United States would recommend acceptance of responsibility?

A   Yes.

Q   And was part of that agreement that we would recommend a low end of the sentencing guidelines?

A   No.

Q   Okay.  Do you know what the sentencing guidelines are?

A   Yes.

Q   And do you know that there's a range of punishment that probation could give to you or recommend, excuse me, to the judge?

A   Yes.

Q   And do you recall that we agreed in court to the judge that the United States would recommend the low end of whatever that guideline range would be?

A   Yes.

Q   And do you recall that we also agreed, the United States, to dismiss the remaining counts in your case?

A   Yes.

Q   Now, are you aware that what you pled to carries a range of

punishment of a mandatory minimum of ten years?

A    Yes.

Q    Up to a maximum of life in prison?

A    Yes.

Q    It also carries the potential of a fine of up to $10 million?

A    Yes.

Q    And in exchange for that plea of guilty, you also agreed to do certain things.

A    Yes.

Q    And part of your agreement was that you would forfeit a house in Brownsville that was part of the indictment?

A    Yes.

Q    And you also agreed to a money judgment against yourself of $5 million?

A    Yes.

Q    Beyond that, why are you here today?

A    Well, what I want -- well, I wanted to -- I wanted to reduce my sentence a little.  To reduce my sentence a bit.  I'm still hoping.

Q    Have you been sentenced yet?

A    No, not yet.

Q    Okay.  And who is going to sentence you?

A    The judge.

Q    And are you agreeing to testify and cooperate today because

you hope that the United States will file a recommendation to the court for a reduction in your sentence?

A    Yes.

Q    Okay.  And have we explained to you, have I explained to you that any recommendation that I would make must be approved by my bosses?

A    Yes.

Q    In other words, my superiors in the United States Attorney's office?

A    Yes.

Q    And has it been explained to you that any recommendation that our office makes to the judge, the judge is free to accept?

A    Yes.

Q    Or reject the recommendation?

A    Yes.

Q    Or the judge could reduce your sentence by more than the United States asks?

A    Yes.

Q    Or the judge could reduce your sentence by less than what the United States asks.

A    Yes.

Q    So again, who will have the final say in how much time you will serve based on the crimes you've committed?

A    The judge.

Q    Were you explained what the consequences of lying would be

to you?

A   Yes.

Q   What consequences could happen to you if you lied here today?

A   That more charges can be filed against me.

Q   And was it explained to you what would happen to any possible reduction in your sentence if you lied here today?

A   Yes.

Q   What would happen if you lied here today with regards to any possible recommendation in your case?

A   Well, all my hope that I'm holding will be forgotten.

Q   All right.  I want to ask you about an individual named Juan Roberto Rincon-Rincon.  Do you know an individual by that name?

A   Yes.

Q   How long have you known that individual?

A   I've known him since we were children.

Q   Is the individual that I've referred to as Juan Roberto Rincon-Rincon in the courtroom today?

A   Yes, he's here.

Q   Could you please point to him and describe an article of clothing that he is wearing?

A   He's over there.  He's wearing a white shirt.  He's sitting down.

        MR. YOUNG:  Your Honor, will the record please reflect that the witness has identified the defendant, Juan Roberto

Rincon-Rincon?

THE COURT:  The record will so reflect.

BY MR. YOUNG:

Q   Do you know -- did you know the defendant's father?

A   Yes.

Q   And what did his father do for a living?

A   His father was -- he was a ministerial police officer for the state in Matamoros.

Q   Is his father still alive?

A   No.

Q   Do you know approximately when his father died?

A   When we were children, I realized he had died.

Q   Now, let's take you -- I want to take you back to the beginnings of your relationship with the defendant.  What location in Matamoros did you live?

A   In Buena Vista Subdivision.  (Speaking Spanish.)

Q   And where did the defendant's family live?

THE INTERPRETER:  I'm sorry.  Buena Vista Subdivision. On the street is Laguna Jaso between 14th and 16th Streets.

Sorry.  I apologize, Your Honor.

THE COURT:  Yes.

BY MR. YOUNG:

Q   And where did the defendant live, close or far from your house?

A   Near, right next to my house.  Right next to my house where

I lived.

Q   Can you describe the defendant's home?

A   He lived in the house with his parents.  It was a big house on a corner lot.  It was made of brick.  It was a good house.

Q   And I'm sorry.  Where did your family live?

A   They lived there.  There.  His family?  They lived there.

Q   And did you live next door, many houses away?  Where did you live?

A   I lived right next to him, in the lot next to his.  We were neighbors.

Q   Did you know his grandfather?

A   Yes.

Q   Does the defendant have any brothers or sisters?

A   Yes.

Q   Do you know the names of any of them?

A   Yes.  I remember we were both -- we were very young.  He has a brother called Pancho.

Q   Do you recall your uncle Tony Cardenas Guillen or Tony Tormenta having any relations or relationships with the defendant's family?

A   Yes.  They lived in that house there, lived at.  I don't remember whether it was their -- his sisters or cousins.  It was two women.  Their names were either -- were Dinorah and Teresa. I can't recall very well.  One of them was my Uncle Tony's girlfriend.

Q   How did you interact with the defendant's family?  Were you allowed in the house?  Were you not allowed in their house growing up?

A   Yes.  Since we were neighbors, we used to play soccer there. We played marbles.  We played with our bicycles.  We were six, seven-years-old.

Q   Tell me about playing marbles.  Would you play marbles with the defendant?

A   Yes, we played marbles.  And he always would cheat on me, and he would leave running.

Q   Were you very good at playing marbles?

A   We would play, get angry at each other, and then we would make up like children usually do.

Q   What about soccer?  You mentioned that.  Where would you play soccer in relation to both of your homes?

A   It's like this.  He lived on the corner.  Right next there's a street like this that goes like this.  Right next to it there's a small soccer place, and we would play soccer there.

Q   And let me back up.  I apologize.  Are your attorneys in the courtroom today, if you can see?

A   Si.

Q   And have you spoken to them about your cooperation in this case?

A   Si.

Q   And have they explained also the problems that you could

have if you do not tell the truth today?

A    Si.

Q    Thank you.

What about swimming?  Did you ever go swimming with the defendant and his family or friends in the neighborhood?

A    Si.

Q    Where was this at?

A    He has an aunt.  He has some cousins who went there to his house.  They're from a small farming community called La Gloria. In that small farming community, there are irrigation channels. And he would invite me to go there, over there with his cousins, and we would go over there swimming with his aunt.  There's a door.  There's a cement door, and that's where we would bathe.

Q    Do you recall the aunt's name?

A    I don't remember the aunt's name.  I don't remember.

Q    Do you remember another story back when you were a child involving another one of the defendant's aunts?

A    One time -- those streets are right next to the soccer pitch.  They were dirt, and they started paving them over.  When they paved the streets over there, they dig about 3 feet down. It had been raining.  And in the Buena Vista Subdivision, there's a little flooding whenever it rains.  One time my mother sent us down to -- you had to cross by there if you wanted to go to the store.

Q    What happened when you went out to go get the milk?

A   When I went across those two streets having the milk with me, his son was just arriving in the morning.  And he said, "Hey, son, please help me."  And it's like she was drunk.  She smelled of alcohol.  She had in her hand a cup of alcohol.  Then she took off her high heels.  She was wearing high heels.  She grabs me by my shoulder.  And I started on ahead up there, and she was behind me walking down to cross along the length of the streets to get there.  I helped her across, and then I came back to get the milk.

Q   Was there a time while you were in school that your family became separated from Rincon's family through a move?

A   Yes, when we moved to Reynosa.

Q   When did you move to Reynosa?  What grade in school were you approximately?

A   I had just finished second grade.

Q   And then in Reynosa, how -- why did you go to Reynosa?

A   Because my dad got a better job in another factory in Reynosa where he -- where he was paid more.

Q   Okay.  How long did you and your family stay in Reynosa? And use your elementary grades or your schooling if that helps.

A   Yes.  It's like I came to Reynosa.  I started -- we got there when I started third grade, and we came back when -- when I finished the 7th grade.

Q   And when you come back to Matamoros, where do you live?

A   Another subdivision where my father rented a home for us to

live.

Q   Now, when you had come back to Matamoros from Reynosa, was that about the approximate time that you had learned that the defendant's father had passed away?

A   Yes.  I knew about that already.

Q   When you came back and lived in Matamoros, did you see the defendant?

A   Yes.

Q   But did you see him while you were going to school?

A   When I came back to Matamoros from Reynosa, I saw -- I saw him later.

Q   Okay.  Tell the jury then the next time that you saw the defendant.

A   In a subdivision where I lived.  It's called Las Arboledas. I lived there with my parents.  And it's like the street, it comes down and it dead ends on my mother's house.  And right on the corner lives his -- and that's where his wife's brother-in-law lives.

Q   Okay.  And when did you start seeing him more regularly when you came back from Matamoros?

A   That's when I saw him frequently, because he would go there to his brother-in-law's house.

Q   Okay.  Do you know an individual by the name of Joel Alquicires?

A   Yes, that's the person I'm talking about.  That's where he

would go.  That's where he lived.

Q   Do you know the wife's name of Joel Alquicires?

A   Yes.

Q   What is her name?

A   I don't recall.  Gina, something like that.  I don't remember whether Gina is his wife or Joel Alquicires' wife.  I don't recall.

Q   When you see the defendant at Joel Alquicires' house, do you find out from him what he's doing, meaning the defendant?

A   Once I went out of my mother's house, and he was outside -- and I was outside, and I saw him come in.  And I started talking to him.  I met him.  I talked to him.  I recognized him, and we started talking.  We started talking, how are you and stuff like that.  Where do you work?  What have you been up to?  Stuff like that.

Q   Okay.  How old were you at this time when you saw the defendant?

A   About 16-years-old.

Q   Okay.  Prior to meeting -- seeing the defendant again, had you had legitimate -- did you have a legitimate job?

A   Yes.

Q   Where did you work?

A   I worked at a factory called Fisher Price.

Q   How long did you work there approximately?

A   Over there, the factory is where they -- three months.

Q   Do you recall working somewhere else after Fisher Price?

A   Yes.

Q   Okay.  How old were you at that factory?

A   Well, at Fisher Price, I was about 15.  And then I started working at Rimir, and I was about 16.  R-I-M-I-R.

Q   How were you able to get a job at the factory when you were 15-years-old?

A   Because I falsified the birth certificate so I could start working.

Q   Do you later get a job with the police in Matamoros?

A   Yes.

Q   How do you get that job?

A   A cousin -- a female cousin of my father's came to visit my parents.  And being there -- and while talking to my mother there, I was talking with her, and she told me that her husband was a federal judicial police officer.  He's from Mexico.  He's a Chilango, and he didn't know Matamoros.  And she asked me whether I could help her husband out as a driver because he didn't know Matamoros, and I started working with him there.

Q   What was the name of that police officer?

A   Ernesto Lopez Ayala.

Q   Through helping Ernesto Lopez, did you come into contact with the defendant at some point?

A   Yes.

Q   Approximately how old were both of you at that time?

A    About 16.  I was going to be 17, something around there.

Q    Who was the defendant working for?

A    He worked with Joel Alquicires, and I worked with Ernesto Lopez.

Q    What types of crimes or activities did Mr. Alquicires work in?  And I mean as a police officer.

A    They were two judicial federal police, two groups of them. One group was into drugs.  The other group worked detention orders.  I worked with Ernesto Lopez in the detention orders, and he worked with Joel Alquicires in the drugs.

Q    But we're talking about legitimate investigations, correct?

A    Yes.

Q    What kind of -- I'm sorry.  Is this about the time you start spending more time with the defendant because of the work that you're both doing?

A    Yes.

Q    And what hours did you work?

A    We worked 24 hours, and we rested 24 hours.

Q    Do you recall assisting with an incident involving Juan N. Guerra?

A    Yes.

Q    What happened?

A    Well, when we were working there at the federal police, it was a Sunday.  I recall a Sunday.  A group of federal judicial police officers was sent from Mexico with an arrest warrant for

Juan N. Guerra. And on that day, there was a horserace at his ranch. Then the federals arrived by surprise in the ranch. They arrested him. But I don't know. Suddenly they let him go. That was early in the afternoon.

Then about 8:00 or 9:00, they told us to go to the bridges, to close down the bridges, because supposedly -- because he lived on this side, and supposedly he was coming down that way, and they wanted us to arrest him.

Q   Now, let me ask you. After this incident with Juan N. Guerra, did you and the defendant provide security at the ranch of Mr. Guerra?

A   Yes.

Q   Shortly after this, is there a time when you leave the Police Department?

A   Yes.

Q   What happened?

A   Well, I had problems with my uncle. And the person I worked with, I used to call him uncle, and I had problems with him. I had problems with him, and I stopped working for him. And I started working with a female federal police officer. I worked for her for a time, and then I left for the United States.

Q   And just before we get into your time in the United States, can you tell the jury who Juan N. Guerra was back in the day that you were a police officer?

A   Juan N. Guerra was one of the people who created the Gulf

Cartel.

Q   All right.  Let's take you to approximately 1990.  Do you recall entering the United States to seek employment?

A   Yes.

Q   How did you enter the United States?

A   Through the -- on the -- crossing the river.

Q   Did you cross the river legally or illegally?

A   Illegal.

Q   Where did you go first when you entered the United States?

A   To Houston.  I left for Houston.  I went to Houston for work.

Q   How long did you stay in Houston approximately?

A   About a year and a half.

Q   And what was your employment in Houston while you were there?

A   I worked as a carpenter.

Q   Okay.  Where did you go after you left Houston?

A   I left for Oklahoma.

Q   And where did you work there?

A   There I worked harvesting mushrooms at a mushroom company.

Q   Okay.  And who did you meet in Oklahoma at this farm?

A   My wife.

Q   And is she a United States citizen or a resident of another country?

A   She's a U.S. citizen.

Q    And was she a supervisor or a regular worker?

A    She was a supervisor at the place where I worked.

Q    How long had you been working before you married your wife there in Oklahoma?

A    Before meeting her, I was working there from '93 until I married her in '95.

Q    Okay.  Did you receive any promotions while you were working at this mushroom farm?

A    Yes.  Since I was a hard worker and I was one of the best mushroom pickers, I was -- I was given -- I was promoted to supervisor -- to foreman supervisor.

Q    After you married your wife, did she become pregnant?

A    Yes.

Q    And what happened to that pregnancy?

A    As -- when we were just married in '95, she was pregnant, and she lost -- she was going to have two babies, and she lost them.  Because one -- one of them came in a different sac and the sac broke, and the other one was born dead.  One was born dead and the other was alive, so they had to take out the living fetus, and so she lost them both.

Q    How did you feel about that?

A    Well, really very upset.  Very upset.

Q    Did your family, did you and your wife incur any expenses because of the problems with the pregnancy?

A    Yes.

Q    And what kind of expenses did you have?

A    Well, in addition to the fact that there was less work, there wasn't a lot of work, we didn't even have enough money to pay to cover the rent or anything like that.  And she was sick and very sick.

Q    Do you recall during this time working elsewhere outside of Oklahoma as well?

A    Yes.  And since there was less work, I went to work to Indiana, to Geneva, Indiana.  I worked for three months at a tomato canning company.  They make the Taco Bell sauce and ketchup.

Q    Was there another state that you also worked during this period of time?

A    In Indiana.

Q    Also besides that?

A    Oh, yes.  Since there was less work in the mushroom farms, I would leave.  I would go to Indiana.  And the rest of the time I worked in Kansas, Arkansas in a chicken factory, at Tyson Chicken Farms.

Q    At some point did you decide to return to Mexico?

A    Yes.

Q    Do you recall approximately what year that was?

A    That was in '98.

Q    When you come back to Mexico, did your wife come with you, or did she stay in Oklahoma for a period of time?

A    No, she came with me.

Q    And at that point, did you have any children?

A    Yes.  Yes.  By then in '98, my first daughter was born.

Q    What is her name?

A    Abigail.

Q    And again, in -- did they come back with you at the same time, or did they come back shortly after that?

A    No, we came back together.

Q    When you come back to Mexico, what do you start doing?

A    I came to Matamoros, and I saw my Uncle Osiel.  I talked to him.  And he asked me, "How are you doing over there?  Where are you working?"  And I told him the story, right?  I didn't have a job and that I was having difficulties.  And he says, "Well, why don't you stay here with me.  I'll give you a job to help me -- to help me here with my family."

Q    Now, let me stop you there for a second.  At this time did you know what your uncle, Osiel Cardenas, what type of business he was in?

A    Yes.

Q    Who was he, and what business was he in?

A    He worked for the Gulf Cartel.  He was one of the bosses.  And Chava Gomez and he were two of the bosses.

Q    Initially what did Osiel Cardenas tell you about getting involved in the drug business with him?

A    He never wanted me there.  He wanted me to help him, but

with his family, grocery shopping, things -- the chores.
Personal things -- personal business of his, but not to be there
working with him.

Q   Why did he give you those errands?

A   Because he never wanted me to be with him, but instead he
told me to take care of his family, to take the children to
school.

Q   Is there a period of time in 1998 when Osiel gets in
trouble?

A   Yes.

Q   Okay.  Can you tell the jury what happened?

A   In '98 when I came and to work with him, I remember that he
had just escaped.  He was -- he had been detained along with
Chava Gomez.  They were in a detention house.  Both of them
escaped.  So that's what the problem -- that's what the problem
he had.

Q   And what happened to Chava Gomez?

A   Chava Gomez died.

Q   And what affect did that have on Osiel Cardenas and the Gulf
Cartel?

A   Well, he became the sole boss of the cartel.

Q   At this point, did your uncle Ezequiel Antonio Cardenas
Guillen also ask for work?

A   Yes.

Q   Did Osiel Cardenas attempt to give you legitimate work?

A    Yes.  He gave me a job doing that with his family.

Q    Okay.  What about any other particular job?

A    Then -- yes.  Then my Uncle Tony also came.  And that man Osiel bought ten trailers, the small ones, to create a trailer line for us so we won't be inside with him in the cartel.  For my Uncle Tony and myself to start working with the small trailers, and that way we could make a living.

Q    Were you successful in that job?

A    No, no, no.  There wasn't a lot of work for small trailers.  There was work, but for large trailers.

Q    All right.  Let's -- was there a time then that you left Matamoros and went somewhere else in Mexico?

A    Yes.

Q    Where did you go?

A    We left to Guadalajara.

Q    And who did you live with down there?

A    After what happened to Chava Gomez, over there I lived with -- Osiel decided to take his family, to move his family to Guadalajara.  And since I worked with his family, with his wife and his children, I had to go to Guadalajara with them.  We lived over there in Guadalajara.

Q    Approximately when was this?

A    In '98, December '98.  That's when we moved to Guadalajara.

Q    How long did you stay in Guadalajara?

A    We were living in Guadalajara all of '99 and part of 2000.

Q    Do you know an individual named Paquito?

A    Yes.

Q    What happened with regards to him that triggered another move for you?

A    Oh, he was one of the guys who worked with Osiel.  He was his personal assistant.  Wherever Osiel went, he went too.  Then they caught him.  He was arrested.  He became a protected witness, so we had to move from Guadalajara back again to Matamoros.

Q    When you -- when you first came back to Matamoros, what job did you have?

A    Osiel asked me to be there with his father -- with his father.  My grandfather has ranches, could help him there, my grandfather, to do -- to do farm work and cattle work, the farming and cattling.

Q    Okay.  How long did you stay at the ranch approximately?

A    Until 2001.

Q    Okay.  And at that point, what decision do you make and talk to Osiel about?

A    Oh, that is I didn't want -- I didn't want to be in farming.  I didn't want to do any of that.  I wanted to do the kind of work he was doing, and I asked him to give me the San Fernando Plaza.  There was nobody in San Fernando.  And I asked him if he -- to give me San Fernando, and he said he was going to think about it.

Q    Let me stop you right there.  Tell the jury, when you refer to work, you want to do the work that Osiel is doing, what type of work are you talking about?

A    Drug trafficker -- drug trafficking.  Becoming a member of the cartel.

Q    Does Osiel ultimately -- does he say yes or no ultimately to you going to San Fernando?

A    Yes.

Q    Okay.  And approximately when did you go to San Fernando to join the Gulf Cartel and become the plaza boss of San Fernando?

A    It was in 2001, in August 2001.

Q    Okay.  Now, can you describe to the jury San Fernando?  What state is it in Mexico?

A    San Fernando is a small city.  It's between Matamoros and Ciudad Victoria.  It's in the State of Tamaulipas.

        MR. YOUNG:  Your Honor, may I approach?

        THE COURT:  Yes.

BY MR. YOUNG:

Q    Mr. Cardenas, I'm going to hand you what has been marked for identification purposes as United States Exhibit 25.  And without telling the jury what this is, do you recognize this?

A    Yes.

Q    And does this picture accurately depict the contents therein?

A    Yes.

Q   Okay.  Okay.

MR. ZAYAS:  No objection, Your Honor.

THE COURT:  Are you making an offer of an exhibit then?

MR. YOUNG:  Yes.  We offer it, Your Honor.

THE COURT:  The number?

MR. YOUNG:  United States Exhibit 25.

THE COURT:  Admitted.

MR. YOUNG:  Thank you.

BY MR. YOUNG:

Q   Mr. Cardenas, I'm going to show you what has now been introduced into evidence as United States Exhibit 25 and ask if you recognize this.

A   Yes.

Q   Can you -- and you can use the screen with your finger to make certain points.  Can you please point to where San Fernando is on this map?

A   San Fernando is here.  (Indicating.)

Q   And what is this a map of?  I'm sorry.

A   This is a map of Tamaulipas, the Gulf Cartel plazas.

Q   And with regards to San Fernando with -- in drug trafficking, what is important about San Fernando?  Tell the jury what's important about this location.

A   San Fernando is very important for the Gulf Cartel because to get -- to get to the Tamaulipas border, there are points of entry to the north to the river, to part of the river.  It's

Monterrey and San Fernando.  All the drugs, all the undocumented -- all the illegal aliens have to go through there. That's why San Fernando and Monterrey is so -- is very important.

Q   I want to ask you some questions now about your early work for the Gulf Cartel.  Specifically I want to ask you about interactions that you had with the defendant, Juan Rincon-Rincon.  Do you know an individual named El Borracho?

A   Yes.

Q   Do you recall an incident involving El Borracho when you first started with the Gulf Cartel that created interaction with the defendant?

A   Yes.

Q   Okay.  Go ahead and talk about this.

A   When I came back from Guadalajara, well, I was working at the ranches, right?  Then my wife -- well, we lived in my mother-in-law's house.  My wife had our daughter, who was small, and she was pregnant.  She was by herself on that day.

   And people with weapons arrived, and they wanted to open the door and get inside the house.  And frightened, she wouldn't open the door.  She didn't open the door to them.  She calls me. She told me there were people --

        MR. ZAYAS:  Your Honor --

BY MR. YOUNG:

Q   Mr. Cardenas, let me ask you a question.

MR. ZAYAS:  Objection, Your Honor.  The information is based on hearsay.

THE COURT:  Is it being offered for the truth of the matter asserted?

MR. YOUNG:  No, Your Honor, only as it affected him as a listener.

THE COURT:  Overruled.

BY MR. YOUNG:

Q   Did you say that your wife called you after this incident?

A   Yes, my wife called me.  She was frightened.

Q   Let me stop you right there.  Based on what she told you, what did you do?

A   To see who they were, I called Costilla.

Q   Let me stop you right there.  When you are talking about Costilla, who are you referring to?

A   At the time, Costilla was -- was second to my boss.

Q   Okay.  And what did you -- what did you talk to him about?

A   I told him what was happening.

THE COURT:  Excuse me.  There's an objection.

MR. ZAYAS:  He's going to talk about hearsay.

THE COURT:  Is it being offered for the truth of the matter asserted?

MR. YOUNG:  No, Your Honor.

THE COURT:  Overruled.  You may answer the question.

THE WITNESS:  I called Costilla.  I called Costilla.  I

explained to him what was happening, what had happened.  And he said:  Go there.  Go to your mother-in-law's house.  I'm going to go there so you can explain to me.

I went to my mother-in-law's house.  I talked to my wife.  I told her, and she explained what had happened to me.  I go outside -- I step outside, and at the same time Costilla was just getting there.  I explained the thing to Costilla, hey, arms of people came here.  I told him everything.

BY MR. YOUNG:

Q   And what decision was made after speaking with Costilla?

A   What Costilla did was he took the frequency radio and started to give -- and started giving up orders to find out those trucks, to find out who they are.  And angry over the radio, he starts shouting, "Those trucks, let's see who they are."  Then he leaves and he tells me, "I'll call you in a while.  Let me check who they are."

Q   And at some point, did Costilla's forces find out who were the people that went to your wife's house?

A   Yes.

Q   And at some point did you go somewhere and encounter these people?

A   Yes.

Q   Tell the jury how that happened.

A   When Costilla leaves, a short while later, not even half an hour went by, he calls me.  And he tells me:  Go to X place, to

such-and-such place, to a house.  And I went there.

And he was just arriving at the same time, and we went in.  But when we went inside, I saw more people who were there.  They were Meme Cabezon, Arturo Decena.  Arturo Decena was Zeta One.

Q   Let me stop you there.  What does Zeta Uno mean?

A   Zeta One is a group Osiel Cardenas formed for his personal security of his.

Q   And the name Zeta Uno, what is that, or Zeta Ten?

A   Zeta One was the commander, the one who was in -- who was in command of the total group.

Q   Are you familiar with code names for individuals?

A   Yes.

Q   Is that what Zeta Uno is?

A   Yes.

Q   Okay.  Now, take us back to this house.  Tell us, who else do you see in this house?

A   Once I go inside, inside, I saw -- I see about ten, 15 people kneeling up against the wall with their heads -- with their faces to the wall.  And Arturo Decena, Zeta One was there, was scolding them, kicking them, hitting them.

MR. ZAYAS:  Judge, objection.  Relevance.

THE COURT:  What is the relevance?

MR. YOUNG:  If I -- the next question might satisfy that.

MR. ZAYAS:  Also, Judge, I was not given any 404(b)

notice of anything like that.

THE COURT:  Okay.  Is there going to be testimony that this defendant was there?

MR. YOUNG:  Yes, Your Honor.

THE COURT:  Mr. Young, your response to that objection?

MR. YOUNG:  Oh, this is within the approximate dates of the conspiracy.  The conspiracy started in 2002, but I believe that this was, you know, on or about.  It's not 2002, but it's very close in time to the overall conspiracy, and it is an interaction within the Gulf Cartel.

THE COURT:  I'll overrule the objection.  You may proceed.

BY MR. YOUNG:

Q   Who did --

THE COURT:  We're going to recess at 5:00 or as close as possible to it, and it's now 4:45.

MR. YOUNG:  Yes, Your Honor.

THE COURT:  4:48 actually, more accurate.

MR. YOUNG:  Yes, Your Honor.

BY MR. YOUNG:

Q   Who else is at this house?  Who do you see here in the courtroom who was in the house?

A   Of those people who were kneeling at the wall, whose faces were turned to the wall, there was Juan Rincon, Roberto Rincon.

Q   Again, just to be very clear, the individual you're talking

about as Juan Rincon-Rincon, the person you saw there, is that individual in the courtroom today?

A    Yes.

Q    Is that the person you identified previously in your testimony?

A    Yes.

Q    And do you have any interaction with the defendant?

A    No.

Q    Okay.  Did you make eye contact with him?

A    Yes.

Q    Did you speak to him at the scene?

A    Yes.

Q    And how -- was this the first time you had seen him in a long time?

A    Yes.

Q    And who ultimately -- what decision was made on what to do with these individuals in this house?

A    Costilla spoke to Osiel on the phone.  After that, he told them it was --

        THE COURT:  You need -- the translator needs to repeat the answer.

        THE WITNESS:  "It was -- it had been the people who were there.  It was El Borracho."

        MR. ZAYAS:  Objection, your Honor.

        THE COURT:  Just a second.  Stop.

MR. ZAYAS:  That information is hearsay.  It is offered for the truth of the matter asserted.

THE COURT:  What is the purpose of the offer?

MR. YOUNG:  It is to describe information relayed to Costilla and the decision made whether to release these individuals or not.  In other words, it's still an effect on the listener because there's a decision on what's going to happen to these individuals.

THE COURT:  Overruled.

BY MR. YOUNG:

Q   What was the explanation of what happened at your house?

A   When I got there, when Arturo Decena was talking to them, when Costilla and I got there, Costilla asked them:  Why did you do this?  By then, El Borracho was in charge of the little stores that sold drugs.

"You're in charge of the drugs selling -- drug selling houses.  You're not there to break up houses -- to break up houses.  You're not -- you don't -- you are not allowed to go kidnapping people and to" -- and he scolded him.  And then Omar, El Borracho, explained to him why he had done that.

Q   And after receiving the explanation, what happened to the defendant and the other individuals that were at this house that were being detained?

A   They told them not to do that again, to behave; that the next time there was going to be a punishment.

Q    And did the defendant talk to you as they were being released?

A    Yes.

Q    What did he tell you?

A    They -- they apologized for what had happened.

Q    Okay.  I want to go to a second meeting that occurs, and it involves an office that Osiel had.  Was there another time -- and we're talking about 2001.  Was there a second meeting or sighting that you had of the defendant?

A    Yes.

Q    Can you tell the jury about that?

A    I was already in San Fernando in charge of the plaza, the San Fernando Plaza.  I came to Matamoros, and I went to see my Uncle Osiel.  And there at the office when I went to see my Uncle Osiel, Rincon was there; Costilla was there.  And there were a lot of people there from the Zetas and the different cartel members.

Q    Where was Rincon during this meeting?  Was he outside the building or inside the building?

        MR. ZAYAS:  Judge, objection, Your Honor.  This time period is 2001.  It's outside the indictment period.  We're talking '02.

        THE COURT:  From at least in or about?

        MR. YOUNG:  Correct.

        THE COURT:  What's your argument?

MR. YOUNG: In or about means approximately 2002. It traditionally incorporates the statute of limitations either before or after. It's well within.

THE COURT: Overruled.

BY MR. YOUNG:

Q Let me ask you again, where did Rincon stay during this time that you were at Osiel's office? Was he inside the office, outside the office, coming and going?

A Outside. He was outside.

Q Was there a vehicle there that you recognized as being Costilla's?

A Yes.

Q What type of -- what type of vehicle was that?

A There was -- there were in a Chevrolet truck, two and a half -- a cabin and a half Chevrolet truck.

INTERPRETER 1: Green.

INTERPRETER 2: "Green." Sorry. I apologize, Your Honor.

BY MR. YOUNG:

Q Where was Costilla, inside or outside the office?

A Costilla was inside, inside the office.

Q Do you recall seeing anyone else specifically that was inside the office?

A Yes.

Q Who was that?

A    I saw my Uncle Osiel.  He was the first one I saw.  I was talking with him.  When I finished talking to him, I exited outside.  But there inside the house, I saw my Uncle Tony, there was Costilla, Meme, Zeta One.

Q    Now, let me ask you, did Costilla have a nickname for you?

A    Yes.

Q    What was that nickname?

A    Costilla called me The Big Dog.

Q    When you go back outside after meeting with Osiel, do you have any conversation with the defendant?

A    Yes.

Q    And what do you talk about?

A    Well, we talked about how he was or what he was doing, what San Fernando was like, things like that.

Q    Did he -- did -- at this point were you the plaza boss of San Fernando?

A    Yes.

Q    And was that known to other members of the Gulf Cartel?

A    Yes.  Yes.

Q    All right.  Let's go to plaza boss duties; in other words, responsibilities of a plaza boss.  You testified about San Fernando being an important thoroughfare for narcotics to pass through for the Gulf Cartel.  Why is that?  Is there something that is south of San Fernando that can at times be an impediment or problem to transport drugs?

A    Yes.

Q    Okay.  And what is that?

A    Before you get to San Fernando coming from south to north, there's a Mexican Army checkpoint, so it's very -- it's very hard.  When the drug comes, we have to -- we have to take it among the bush or by planes, bring the planes down in San Fernando, because sometimes at the -- on the border, Matamoros, Rio Bravo, Reynosa, planes can't land, so we have to take -- we have to bring them down in San Fernando.

Q    Okay.  Mr. Cardenas, directing your attention back to the screen -- and this is again United States Exhibit 25, which has been introduced into evidence -- can you place a small marker approximately, at least, the location of the checkpoint, if you can fit it on the map, but at least general direction if you cannot.

A    I can't see anything below this.

Q    But can you point to at least the general direction using San Fernando as the guide?

A    Here where -- over number 29 -- where No. 29 is, I don't know whether 29 goes to the highway.  I can't see it very clearly.  But it's this way.  This is the Victoria -- the Ciudad Victoria Highway.

Q    Okay.  And are there any checkpoints north of San Fernando?

A    Before you get to San Fernando, there are.

Q    Correct.  But are there any checkpoints north of San

Fernando as you travel to Matamoros or Reynosa?

A   No.

Q   Okay.  And how does that affect the ability to transport narcotics north of San Fernando?  Is it easier or harder than it is south of San Fernando?

A   Well, it's easier.

Q   Let's talk about the checkpoint.  Are you aware of the -- are you aware of how corruption or bribery can assist the Gulf Cartel in its functions?

A   Yes.

THE COURT:  All right.  I'm going to recess at this time.

Members of the jury, at this time you will be in recess until 8:00 tomorrow morning.  During this recess, you are under my continuing admonishment that you must not form or express any opinion about the facts of this case and cannot do so until it has been submitted to you for your deliberation.

If you'll just go ahead and take him down first, please, and then the jury will be in recess.

MARSHAL:  Yes, Your Honor.

THE COURT:  All right.  Members of the jury, you will be in recess.  Thank you.

(Jury leaves courtroom)

THE COURT:  Thank you.  Please be seated.

Counsel, as for that alternate, I didn't notice any

distraction.  We'll just see how things go tomorrow.  And if there's a problem or if there's something else that suggests to me that it would be better to take some action in releasing him, I will.  Thank you.

(Court adjourned.)

                              * * *

    (End of requested transcript)

                              -oOo-

    I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date:  October 31, 2012

                              /s/_____
                              Signature of Court Reporter
                              Barbara Barnard