IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

_____

                                        )
UNITED STATES OF AMERICA                )
                                        )
                                        ) CRIMINAL ACTION NO.
VS.                                     ) B-12-005
                                        )
JUAN ROBERTO RINCON-RINCON              )
_____)


EXCERPT OF PROCEEDINGS
TESTIMONY OF RAFAEL CARDENAS VELA
BEFORE THE HONORABLE HILDA G. TAGLE
SEPTEMBER 21, 2012, P.M.


APPEARANCES:

For the Plaintiff:          MR. ANGEL CASTRO
                            Assistant United States Attorney
                            Brownsville, Texas

For the Plaintiff:          MR. JODY YOUNG
                            Assistant United States Attorney
                            Brownsville, Texas

For the Defendant:          MR. RICHARD E. ZAYAS
                            3100 E. 14th Street
                            Brownsville, Texas  78521




Transcribed by:             BARBARA BARNARD
                            Official Court Reporter
                            600 E. Harrison, Box 301
                            Brownsville, Texas  78520
                            (956)548-2591

(Jury enters courtroom)

THE COURT:  Good afternoon.  Please be seated.

Please bring in the witness.

THE INTERPRETER:  One moment, Your Honor.

Yes, Your Honor.  Thank you.

THE COURT:  You may proceed.

MR. YOUNG:  Thank you, Your Honor.

**RAFAEL CARDENAS VELA**,

the witness, having been previously duly cautioned and sworn to tell the truth, the whole truth and nothing but the truth, testified through an interpreter as follows:

**DIRECT EXAMINATION** (Continued)

BY MR. YOUNG:

Q   Mr. Cardenas, are you the same Rafael Cardenas Vela who testified under oath this morning in this trial regarding United States versus Juan Roberto Rincon-Rincon?

A   Yes.

Q   And are you the same individual -- same Rafael Cardenas Vela that testified yesterday late afternoon in this trial under oath?

A   Yes.

Q   And are you aware that you are still under oath to tell the truth?

A   Yes.

Q   I want to go back to -- I think we left off with regards to

the San Fernando landing strips.

A   Yes.

Q   And these were strips, I believe you testified, that were operated under your control from the period of time of approximately -- after your uncle was arrested in 2003 up until you left in 2009?

A   Yes.

Q   I'm going to ask you a series of questions about these landing strips that are different from what were asked before. And at various times, I'm going to ask you to draw your attention specifically to any interactions you may have had with the defendant as it pertains to the landing strips.

A   Yes.

Q   All right.  First off I want to ask you again briefly about the checkpoint that you testified was south of San Fernando. You have testified --

A   Yes.

Q   -- that bribery was a key element of the Gulf Cartel.

A   Yes.

Q   Were there any challenges or problems with having open access to the checkpoint south of San Fernando with regards to the transportation of narcotics?

A   I didn't understand very well.

        THE COURT:  There may be some technical difficulty. Let's sort this out first before continuing.

THE INTERPRETER:  Yes, ma'am.

THE COURT:  Okay.  Would you please repeat the question?

MR. YOUNG:  Yes, Your Honor.

BY MR. YOUNG:

Q   Were there -- did you encounter any problems at the checkpoint south of San Fernando that affected how you transported narcotics through the State of Tamaulipas?

A   Yes.

Q   What -- tell the jury, what sort of problems were there at the checkpoint for the Gulf Cartel?

A   The checkpoint that you're talking about, that checkpoint was a very hard one and very hard to get through, and so we had to go and take the drugs through on some roads, rough roads. And if we weren't able to get them through those rough roads, then we would use the airplanes.

Q   Was it more difficult to bribe officials at the checkpoint than it was in the towns north of San Fernando?

A   Yes.

Q   And why was that?

A   Because the soldiers that are there at the checkpoint, they're changing them out every month, every three months.  Yes, there was -- there were times when the person who was in charge of the checkpoint was corrupt; and then another one would arrive, and he didn't want to work with us.  And then, yes, it would vary.  Sometimes there were opportunities to go and work

through them and sometimes not.

Q   Okay.  All right.  Let's get to the landing strips again in approximately 2003 to 2009.  When you received a call from Tampico, I believe you testified often from Jota Ce, about a planeload coming, what were your responsibilities with regards to that planeload?

A   I was responsible for getting the plane, making sure it got there to San Fernando and getting the drugs and getting it to San Fernando, because the airplane landing strips were on the outside of San Fernando.  And they were all around San Fernando, on the ranches, on the outskirts of San Fernando, as I told you earlier.

Q   When a plane would land, who would be there to receive it?

A   I personally would go with my people.

Q   How many people would go with you approximately to receive the airplane?

A   Some ten people.  Three trucks would go in just on the inside.

Q   When the plane would land, what would happen?

A   And the plane would come down and land, and I was waiting for it and would get to one side, and then we would get the truck there to one side and then open the little door of the little plane.  And they would get the suitcases off as fast as they could.  We would get them off; the door was closed.

And then if we were going to work again, the pilot would

say, hey, I'll be right back, as long as it takes me -- as fast as it takes me to go and come.  And then the little plane would take off again and go back to Tampico.

And then the drugs, I would take the drugs with me to San Fernando to some warehouses that I had there as an office.

Q   Okay.  Let me stop you there.  At the landing strip, would you count or would your -- the people working for you, would they count the number of suitcases or the number of bricks at the landing strip, or would you wait until you got to the warehouse or office?

A   We would count them very fast there.

Q   And if it was accurate in terms of the amount, what would you do?

A   Well, I would call J.C.  First I had to count the drugs.  And then, for instance, if one or 2 kilos was missing, then I would be taking the blame and be accused of stealing it.  And so at the same time that we're getting the drugs out, at that same time that the little plane was taking off, we were counting it really fast.  And then I would call J.C. and say:  Okay, it's all right.  There's 500.  Each trip was always about 500 kilos.

Q   Okay.  Now, while you were at the landing strip with your people, were any other people that didn't work for you but may have been in the Gulf Cartel present, or was it only your people that would be there to count the cocaine at the landing strip?

A   Just me and my people.

Q    Okay.  At times would there be a second flight with some of the other members of the Gulf Cartel that would arrive on some of these loads?

A    Yes.

Q    Who would fly in on this second flight?

A    Sometimes Costilla would get there with J.C. and Cococho.

Q    When you took the 500 kilos, let's use one example, of cocaine into San Fernando, again, what type of places would you take this to be delivered elsewhere?

A    From the landing strip, we would take them there to the warehouses, the office that we had.

Q    Okay.  And who would arrive to pick up the cocaine?

A    The boss from Matamoros, from Rio Bravo would get there, Costilla's people, Mario Pelon, Toño Galarza, Guerra, Juan Rincon, all of those that I put there.  All of Costilla's lieutenants would arrive there and get the drugs.

Q    Now, would all of Costilla's lieutenants be there for every load, or would some come and some not be there and vice versa?

A    They would all go.

Q    And when you go to the warehouse and you see these individuals, what occurs inside the warehouse?

A    I was there at the warehouse with the drug, and they would call me and say:  Hey, where are you going to be?  And I'd say I was here or there at such a place or here at the warehouse.

    And they would arrive, go into the warehouse, and I would

tell my guys to put the drugs on the floor. And then I'd tell Costilla's lieutenants that to count the drugs because I was no longer responsible for it, for them to count it. They were the ones responsible for taking it to the border.

Q   Okay. Now, tell the jury when these lieutenants and others come from the north to come down to the warehouse, describe -- I mean, how many cars are there, how many people that come down as part of this convoy?

A   Yes. And since they were coming from the border and then they were going down to the San Fernando area, they had to come with all of their people so to make sure that everything was secure, the drugs were secure so that they could make it to the border with it.

So all of that, if they were coming, say, from Matamoros to San Fernando, they had the whole highway all checked out. They had all their people there, all their people. They had their people all along the highway, all their people armed, checking out the cars so that no one else could come along, say, from another cartel or from the army or from the marines.

Q   Okay. Let me stop you there. At the warehouse, how many cars would show up at the warehouse that were part of the convoy more or less?

A   Well, just alone, about 20 to 25 cars would come to the warehouse, all of them armed.

Q   Now, would everyone that were in these 20 cars go into the

warehouse and meet with you and count the cocaine, or would only some people come into the warehouse and meet with you?

A   Everybody else remained on the outside.  Only those people who were trustworthy would go in, Costilla's lieutenants.

Q   Were there times during these cocaine loads that you saw the defendant there?

A   Yes.

Q   Okay.  Describe to the jury what his duties would be when you saw him there during some of these cocaine loads.

A   When they got there to pick up the drugs, I would talk to them:  And how are you, and how's it going?  Everything come out okay?

And then they would stand there and count the cocaine kilos. And sometimes it would take a long day; sometimes that day, all that night until the following day, but the time it took them to get there and count.  Because they could -- sometimes couldn't go back right away because there was like a checkpoint put around them.  Until the highway was free and clear, that was when they were able to return.

Q   Okay.  Over the span of the six years approximately that we're talking about, 2003 until 2009 when you left Rio Bravo, how many times approximately did you see the defendant come down to assist in this convoy of 500 kilos at a time for the Gulf Cartel?

A   Well, really I don't know how many times, but it was quite a

few.

Q   When the defendant and the other lieutenants were there, would you have interactions with them?  Would you talk to them or just be quiet and -- how would that -- describe that.

A   No, we would talk.  And sometimes they would say, "Hey, I'm hungry," so I would send out for food.  And we were standing there talking and waiting until everything was clear, and then they could go back.

Q   Was Costilla there on every occasion, or was he there only on some occasions?

A   Costilla hardly ever went, but sometimes he would sometimes come on those planes when they would come on in with the cocaine.

Q   Prior to you leaving to Rio Bravo at some point in 2009, I want you to think before then.  When was the last time you saw the defendant at one of the warehouses for one of the coke loads?  Months, years, days before you left?

A   Well, yes, like -- I don't recall how many months exactly. Several months.  Months.

Q   During the years that you were the plaza boss in San Fernando, would you monitor radio traffic and be advised if and when Costilla and the defendant would be in your plaza area?

A   Yes.

Q   Tell the jury about that.  What were your responsibilities, and what would you hear from your people about that when that

would happen?

A   Well, for instance, say Costilla, who was the head of the cartel, if he was going to go through San Fernando, he was going to arrive to San Fernando, he needed to let us know that he was going to be there, to the person who was in charge of the guards.  And then the person who was in charge of all the guards through the radio would let all my people know.  And that's how I'd find out that he was -- that he was going to be there or he was going to go through San Fernando; or if he was going to be there, to give him something.

Q   So while Costilla and the defendant were in the San Fernando area, if you didn't see them, were you still responsible for security?

A   Yes.

Q   Did you -- let me ask you, during this period of time from again, about 2003 to 2009, the times that you saw the defendant, Rincon, what did it involve?  Did it involve just saying hello, or was -- when did you see him there?  When did you see the defendant in San Fernando?

A   When he was going to pick up the drugs.

Q   Okay.  And at the warehouse again, did you personally see the defendant take part in counting the cocaine at the warehouse from time to time?

A   Yes.

Q   And when it was laid out on the floor, was it in plain view,

taken out of the suitcases?

A   Yes.  We would get the cocaine out of the suitcases.  Each suitcase would hold 20 kilos.  And my guys would get all the cocaine out and lay it on the floor.  They would count them one by one, and then they would put them in the suitcases, and they would put those into the trucks.  They would put the suitcases in with the drug.

Q   All right.  Now, let's go to what you just testified to previous to that about times that Costilla and when you heard on the radio the defendant were in your area that you did not see them.  If they were not there to pick up cocaine, why would they be in the San Fernando area?

A   Costilla had ranches over to one side of Mendez.  And then when he was there on the border and there was a lot of government, they would come over and hide on this side.

Q   Is it important when you're the head of the Gulf Cartel, is it better for that person to stay in one place for many months or years, or is it better for them to move around?

A   They have to be moving around from place to place for their own safety.

Q   What were the rules if -- was there an issue once between Gaby Montes' people and Karis' people?

A   I didn't understand that very well.

Q   Was there ever a problem between the people working for Gaby Montes and the people working for Karis that made new rules for

how you're to announce yourself in a plaza?

A    Yes.

Q    Okay.  Just briefly tell the jury what that was.

A    Well, for instance, the person who's in charge of one plaza has to let the person in charge of the other plaza know if they're going over there.  Say, for instance, I'm over at that plaza with my people.  And, for instance, Gaby would arrive there with his people, and he didn't let us know that he was there.  And so we would say, my people and I, "Hey, who are those people?  Stop them, stop them."

And so my people would be armed and their people would be armed, and there might have been like a battle.  That was why they -- we had to let each other know.

Q    And so would you tell -- if you were going to another plaza, would you tell -- announce on the radio how many cars were going?

A    Yes.  I had to let them know if I was coming in, say, with 20 cars or 30 trucks.

Q    What about how many days that you were going to be in the area?  Would you have to announce that?

A    Yes.

Q    Now I'd like to focus on, separate and apart from the cocaine loads that you saw the defendant at at your warehouses in San Fernando between 2003 and 2009, I want to focus on any meetings or interactions you had with the defendant in other

places outside of San Fernando during that same period of time. For instance, in Matamoros.  Would you travel to Matamoros occasionally?

A    Yes.

Q    Would you ever see the defendant in Matamoros?

A    Yes.

Q    Okay.  Can you tell the jury what type of locations or places might you see the defendant during that time?

A    We -- the both of us, he and I, have a friend named Siji, and he has a mini super called -- where they sell alcohol and beer, and then the little supermarket is called El Caribe.  And on the corner is a cantina called Villas.  And he's the same owner of Siji, and it's open 24 hours.

And sometimes I'd go by there, and he'd be there at times. And sometimes I was there and he wasn't there, and then he'd arrive there and I'd see him there.

Q    When you would meet with the defendant at these places, what kind of conversations would you have?  Would it be about drugs, or would it be about family or gossip?

A    We would talk like how's Fernando and how's it going there. We'd talk about that.

Q    How would -- I'm sorry.  Was it clear when you met with him in Matamoros and was it clear through your conversations with many of the people that you've talked about today what role the defendant had in the Gulf Cartel while you were in San Fernando?

A   Yes.

Q   And what was his role?

A   He was Costilla's lieutenant.

Q   Do you remember meeting individuals at mechanic's shops in Matamoros?

A   (No response.)

Q   That's fine.  Then we'll move on.

    Let's go to 2009 -- well, let me stop you for a second. Approximately how many times in Matamoros approximately did you meet and see the defendant when you were -- during your visits back during 2003 to 2009 approximately?

A   Several times.

Q   All right.  Let's go to 2009.  At some point do you receive new orders to go somewhere and leave San Fernando?

A   Yes.

Q   Okay.  And who did you receive those orders from?

A   Costilla.

Q   Who did you -- who was your ultimate boss?

A   Costilla.

Q   All right.  And what did he tell you to do?

A   What did he --

Q   Where did he tell you to go in 2009?

A   For me to go and be in charge of the plaza from Rio Bravo.

Q   Now, let me ask you, before you left, were you comfortable or uncomfortable in San Fernando?

A   Well, yes.

Q   "Yes" meaning what, comfortable or uncomfortable in San Fernando?

A   Yes.

Q   I'm sorry.  "Yes" means were you comfortable or not comfortable in San Fernando?

A   If I was okay in San Fernando?

Q   Si.  Yes.

A   Well, they changed me to Rio Bravo.

Q   Were you happy to go to Rio Bravo?

A   Oh, yes.

Q   All right.  Why were you told to go to Rio Bravo?  Was there something that happened that made Costilla send you to Rio Bravo?

A   Yes.

Q   What was that that happened that caused you to be moved to Rio Bravo?

A   Beto Fave was -- Beto Fave -- excuse me, Guapo.  Guapo was the one in charge of Matamoros.  And he started fighting with El Guapo's people, and there was problems between them.  And as punishment, he took Guapo away and sent him to Rio Bravo.  And then -- Guapo, they sent him to San Fernando as punishment, and they sent me to Rio Bravo.

Q   Now, describe Rio Bravo from the standpoint of is that a busier plaza then San Fernando or a more calm plaza than San

Fernando?

A    Rio Bravo is a better plaza.  It's on the border.  All of the plazas that have a river and they're on the border, they're better.  There's more work, more money.

Q    And were you placed as the plaza boss at Rio Bravo?

A    Yes.

Q    And where is Rio Bravo in relation to Matamoros?

A    Rio Bravo is between Reynosa and Matamoros.

Q    And what are the plazas along the river, starting with Matamoros if you could name, say, the first three or four back in 2009?

A    The plaza that's over by the sea is Matamoros, and then Control is next, then Rio Bravo, and then Reynosa.

          MR. YOUNG:  Your Honor, may I approach the exhibit?

          THE COURT:  Yes.

          THE INTERPRETER:  He can't hear very well.  May I give him another one, Your Honor?

          THE COURT:  Sure.

          THE WITNESS:  Can barely hear.

          THE COURT:  Do we -- do we only have two?

          THE INTERPRETER:  No, Your Honor.  Let me just check.  One moment, please, if you'd allow me.

          THE DEFENDANT:  But I can hear better.  Yes.

          THE COURT:  All right.  Go ahead.

          MR. YOUNG:  Thank you, Your Honor.

BY MR. YOUNG:

Q   Mr. Cardenas, are you familiar with the general boundaries of the plazas that you have just talked about:  Matamoros, Control, Rio Bravo, and Reynosa?

A   Yes.

Q   I'm going to show you what has been marked for identification purposes as United States Exhibit 27A.  Do you recognize this?

MR. ZAYAS:  Your Honor, I object on the basis of leading.

THE COURT:  On the basis of what?

MR. ZAYAS:  Leading.  The exhibit already has some markings on it that have not been testified to.

THE COURT:  The question, first of all, is not complete. But if the question were complete and the question was, "Do you recognize this," he can ask the question, and he can claim or state whether he agrees or disagrees as to the accuracy.  So the objection is overruled.

BY MR. YOUNG:

Q   Mr. Cardenas, do you recognize this map?

A   Yes.

Q   Okay.  And does this map -- is this map accurate with regards to the location of various places as well as the designation of the various plazas based on your experience?

A   Yes.

Q    Does this accurately reflect the plazas as well as the relationship of the cities based on your experience?

A    Yes.

Q    I'm sorry.  Based on your experience?

A    Yes.

MR. YOUNG:  Your Honor, let the record reflect the United States is offering into evidence United States Exhibit 27A.  It has previously been tendered to the defense.

THE COURT:  Mr. Zayas, your objection?

MR. ZAYAS:  Object that the actual document that has been offered into evidence, the actual exhibit was not testified to by the -- by the -- other than its accuracy.  There is some -- there is some writing on the exhibit that suggests certain boundaries that he did not testify to and has not brought into evidence yet.  It's leading, Your Honor.

THE COURT:  Overruled.  The exhibit is admitted.

BY MR. YOUNG:

Q    And, Mr. Cardenas, are you familiar with the plaza boundaries that we just discussed?

A    Yes.

Q    All right.

MR. YOUNG:  May the witness step down, Your Honor?

THE COURT:  Yes.

BY MR. YOUNG:

Q    Mr. Cardenas, can you approach the map, please?

Go ahead and tell the jury about the various plazas here in 27A.

A   This is the plaza Matamoros.  That's why it's -- it's green because they call the plaza in Matamoros green key.  Oh, excuse me, this is blue.  It's blue, red, green and red.

For instance, I'm here, over here in Rio Bravo.  And I talked to my second in command, and I tell him, "Where are you?  Don't tell me you're over here at plaza for Matamoros."  And he's going to tell me, for instance, "I'm in the blue."  And then I know that blue is referencing Matamoros.

Q   Why did you call the various plazas by colors?  Was there a reason for that?

THE COURT:  Excuse me, Mr. Young.  Excuse me.  I want to make sure, first of all, that all of the jurors can see, even the farthest one.  But also I think if there's a way to make that exhibit higher, I'm not sure how, maybe that would help.

COURT CLERK:  If the witness can step back, Your Honor, we can adjust it.

THE COURT:  And I think if it's pushed over a little bit, if he can use the laser pointer, that might also make it less crowded over there.  I want to make sure that everybody, the furthest juror can see.

All right.  I'm getting nods, so I'm assuming so.

THE WITNESS:  From here?  Okay.

THE INTERPRETER:  One moment, please.

BY MR. YOUNG:

Q   Mr. Cardenas, I believe my question was why would you refer to the plazas by a color?  Was there a reason for that?

A   So we wouldn't say like "I'm here in Matamoros, Rio Bravo, or Reynosa."  That's why all the plazas were denominated by color.

Q   What do the triangles along the river mean?  And I'm going to point to you starting with Brownsville, these triangles right here.  Could you point to those, please, and tell the jury what those represent?

A   Those are the bridges.  The new bridge, the old bridge, Los Indios Bridge.

Q   All right.  Let me ask you about the characteristics of Rio Bravo.  How big or small is Rio Bravo in terms of population and the size of the area in terms of the city relative to Matamoros or Reynosa?

A   It's a little smaller than Reynosa or Matamoros.

Q   Are there any points of entry or bridges into the United States in your -- in Rio Bravo?

A   Yes.

Q   Could you point to them?

A   The one from Progreso and the one from Donna.

Q   And with regards to from Progreso to Reynosa, what type of contraband was typically smuggled through there while you were in control of Rio Bravo?

A    When I got to the Rio Bravo Plaza, I divided the river from the bridge over on the Progreso side to here to the dividing line between the plazas.  All of this zone was to use to pass -- cross drugs.

From here to the bridge to this point over here up above, it's Rio Rico.  It's an ejido, little ranch.  And from Rio Rico to Progreso, and that's where a lot of illegal aliens go through.

And then I did that because when the illegal aliens cross over to this side, the American government, the Border Patrol, and it's easier for them to catch the illegal aliens than the drugs, because the drugs can't be mixed with the illegal aliens because then the crossings would heat up.  That's why I did that.

Q    And what would you charge in Rio Bravo as plaza boss for a piso for an illegal alien to go through the particular area you're talking about?

A    For an illegal alien who would be a Mexican, just to get to Rio Bravo, from 250 to $300.  But if he's from Central America, he would pay from 500, 600 to $700.  And if you're a person from Asia, Europe, and they would be paying 1,500, 1,200.  Say if they were from Asia or Europe, that's just to get there to the plaza from Rio Bravo.

Now, this zone here from Rio Rico to Progreso, and there are people there that are dedicated solely to the job of passing or

crossing people over to this side.  And they on their own also charge the illegal alien to cross the river.  And so in order for me to allow them to work so they could cross those people over, they need to pay 10 percent.

Q   Okay.  Then what sort of fee would that be approximately, the 10 percent?

A   Whatever they charged.

Q   Now, with regards to the area from Progreso over towards Reynosa, while you were plaza boss in Rio Bravo, were there specific individuals whose role within the cartel was simply to cross the marihuana?

A   Yes.

Q   How many of those, if you will, those who were in charge of crossing, how many of those individuals were in Rio Bravo approximately while you were the plaza boss?

A   From ten to 15 people that would cross.

Q   Okay.  And then what would you charge them for the opportunity or the ability to cross the marihuana?

A   They were also charged 10 percent.

Q   Is Rio Bravo and the plazas on the river, do they tend to be more or less violent than in San Fernando while you were there?

A   Yes, more violent.  The plazas in the north were.

Q   Is it more busy or less busy than San Fernando?

A   More work.

Q   When you received your orders from Costilla in 2009 to take

over the plaza leadership of Rio Bravo, to accomplish this, did you do many of the same things that you testified to earlier today that you did in San Fernando to take control?

A   Yes.

Q   Very briefly what were some -- what were the things that you did to take control of Rio Bravo?

A   Well, since Rio Bravo is a bigger plaza, there's no Rio Bravo there, and here there is (sic).  More illegal aliens arrived there, more drugs arrived there, more quotas were charged.  There are a lot of retail sellers of drugs in the stores.  There are -- more quotas are charged and more amounts so that they can pay the police more money.

Q   When a plaza boss in Rio Bravo under the Gulf Cartel, specifically you yourself while you were there and anyone else who was a plaza boss in Rio Bravo, would part of their responsibilities be to collect the piso?

A   Yes.

Q   Would part of their responsibilities be to train and arm security people under their control?

A   Yes.

Q   Would part of their responsibilities be --

        MR. ZAYAS:  Objection.  Sorry.

BY MR. YOUNG:

Q   What other responsibilities would the plaza boss in Rio Bravo have to maintain command and control of the plaza?

A    Like in Progreso, if you notice Rio Bravo is over here, and Progreso is over here right by the river.  In other words, it's -- well, Progreso is like another little city, but smaller. And Progreso is a place where there's a lot of business.

In the first place, there are a lot of pharmacies.  A lot of people here from the United States go over there and buy a lot of medications that they can't get here because here they need a prescription, and over there they don't.  And there's a lot of people that buy a lot of pills, thousands and thousands of medications from the pharmacy in dollars.

And, for instance, there are people that go and pay 100,000 or $200,000 for medication.  Since I was the boss of the plaza, and why are you charging or paying $100,000 and then I'm paying and paying and I'm the boss of the plaza?  And all the pharmacies are there all around.  There are about 100 of them. They're all charged a quota per month.  It goes from $3,000 on up.

Q    And is that part of the profits that goes to the plaza boss in the Gulf Cartel?

A    Yes.

Q    Would you do anything with regards to the local police officers in Rio Bravo like you did in San Fernando?

A    Yes.

Q    What would you do?

A    I did the same thing when I got to San Fernando.  I got to

Rio Bravo, yeah, I put the commander of the state police, the boss, the head of the local police, the ones from AFI, PFE, all of them, TV, newspapers, I would make arrangements with them so they wouldn't mess with me.  So I'd have everything controlled, the whole town.  And then I talked to the mayor of the town not to bother me and mess with me, and I wouldn't mess with him.

Q   All right.  Let me ask you, with regards to the river, how is marihuana typically smuggled into the United States by the Gulf Cartel in the -- in Rio Bravo?

A   Through the river.

Q   How is cocaine typically smuggled into the United States by the Gulf Cartel in Rio Bravo?

A   Marihuana is crossed more often through the river.  And coke or cocaine is crossed through the bridges.

Q   Can you describe the process of how -- is that -- strike that.  Sorry.

    Is what you're describing in Rio Bravo, is that process of marihuana through the river and cocaine through the bridges normally consistent with the other plazas on that map?

A   Yes.

Q   Okay.  Describe to the jury how the Gulf Cartel, you specifically and other members of the Gulf Cartel in general, would attempt to cross cocaine at the ports of entry.

A   Cocaine, since it's worth more than marihuana, you have -- and you have to take better care of it.  But since it occupies a

less volume than marihuana, and then the cars are bought and then a hiding place, a clavo, as they call it, is established or put in it.  A clavo is a hiding place to hide the drugs.  And then the -- that goes on above or through the bridge.

Q   Have you -- has the Gulf Cartel employed efforts to bribe individuals at the bridge on both sides of the river to allow cocaine to pass into the United States?

A   Yes.

Q   And how does that work?  When you set up an operation to transport cocaine at the bridge in the United States, how does that work?

A   Most of the time the people there at the bridge, they're corrupt, the Customs, ICE and Border Patrol.  So you contract one.  And then through that person, when that person is working the bridge at his place -- an example.

Let's say this is the bridge from Progreso.  I made arrangements with a person from the Border Patrol.  And he tells me, "Hey, Junior, I'm going to work" -- say it's Friday.  He says, "I'm going to work Sunday."  So on Sunday you can send the cars with the drugs.

They're also checking them, so we put a guard here.  We put a guard over, but on this side, so that person can be watching.  So then the person is at the revision point in one or two.  So the drugs and the car are over on that side.  And here's the guy at the inspection point, and here's the guard over here.  And

the guard is looking at the person over at the inspection point. Say he's at inspection point No. 1 -- three, three.  And then the guard calls the person who's driving that car, says, "Come on, come on.  Look for the inspection point No. 3," because there's where that person, that corrupt person is.

Q   Let me stop you there.  In that operation that you're talking about, are there times that you have been successful in crossing cocaine through the ports of entry?

A   Yes.

Q   And are there other times where the cocaine is captured and discovered at the ports of entry?

A   Yes.

Q   Okay.  Is it part of each of the plaza boss activities and responsibilities along the border to attempt to corrupt law enforcement on both sides of the river?

A   Yes.

Q   All right.  Now, with regards to Rio Bravo while you were there, the crossers you talked about -- and I'm talking about the crossers for marihuana along the river.  Could anybody be a crosser, or would they have to do something to become a crosser; in other words, a payment or something like that?

A   That's their job, and they have their own group of people. They have from 40 to 50 to 60, up to 100 people, the people who are crossing, the crossers.  So they can watch the river both from this side and this side, so when they're going to work with

the marihuana and cross it over, so they can be checking it out from both sides.

Like, for instance, on Military Highway over on Donna and Progreso, Immigration goes through there a lot, so they put their people to watch Immigration to see where they're going and where they're coming from.

Q   My question, however, was with regards to the head of the crossers.  Could someone operate in Rio Bravo as the head of the crossers and not pay a piso or not answer to you?

A   No.

Q   Okay.  And so as a plaza boss or any plaza boss of Rio Bravo, would the crossers have to answer to that person, meaning the plaza boss?

A   Yes.

Q   How would you know if there was a -- someone crossing marihuana without you knowing?  What would --

A   I had a person both in charge of the cocaine and one in charge of the marihuana, and then they get permission from six to eight to ten crossers, and they have to let the person in charge there -- for instance, it's noon.  They say, "Hey, tonight I'm going to work."  And then the person who's in charge of that has to let me know.

And there's a crosser, and they call him Rojo.  And he was the one who was crossed the most in Rio Bravo.  And he would just let me know, "Hey, Rojo is going to go through."  Excuse

me.  "He's going to cross a ton, half a ton."  He would just let me know.

Q   Okay.  Now, how long were you the plaza boss at Rio Bravo approximately?

A   How long was I there?

Q   Yes.

A   From 2009 until 2011.

Q   Okay.  Let me ask another question about the crossers, the ones in charge.  What would prevent them from cheating on you in terms of crossing loads you didn't know about or changing the amounts of the loads?

A   They needed to let me know everything; because if they didn't, I wouldn't let them cross.  And everything that they were working, they wanted to cross, they needed to let the guy in charge know, and then he would let me know.

Q   Did you ever receive -- while you were plaza boss in Rio Bravo, did you ever hear any communications with the defendant while you were in Rio Bravo regarding drugs?

A   Yes.

Q   Okay.  Tell the jury about that.

A   Since I was the plaza boss in Rio Bravo, sometimes the one from Reynosa would call me.  "Hey," he says, "I'm going to cross some drugs, but it's going to be in your territory."  That's the way it was.

     And Guerra would also call me like that.  He was in charge

of Valle Hermoso.  And he'd say, "Hey, Junior, I'm going to cross some marihuana, but it's going to be in your territory."

"Okay."

Rincon would also call me and say -- call me, "I'm going to be crossing some marihuana from your territory."  I'd say, "Go ahead."  All that I wanted was for them to let me know, that was it, since everybody knew or was let know -- was told.

Q    Did you ever speak with crossers specifically about them crossing -- your crossers, in other words, crossing marihuana for other lieutenants in the Gulf Cartel while you were in Rio Bravo?

A    Yes.

Q    Okay.  Tell the jury specifically, did any of these pertain to the defendant?

A    Yes.

Q    Okay.  Tell the jury specifically about that.

A    For instance, like a while back I was telling you about this guy who was one of the crossers, and they called him El Rojo. He was one of the ones who crossed a lot of drugs.  And since it was rare or very infrequent that they would ever confiscate or get the drugs that he was crossing, so a lot of people would look for him so that he would cross the drugs over to this side.

Since, for instance, somebody like Juan Rincon would call him, El Flaco, Metro 3, Mario Pelon.  "Hey, cross this drug for me over there to the other side."  They would tell him, and he

would let my person in charge know, and then my person in charge would let me know.

Q   And was this allowed in your plaza, in other words, to allow Rojo to move marihuana into the United States on behalf of the defendant and other people?

A   Yes.

Q   All right.  With regards to your plaza boss activities in Rio Bravo, what were your monthly expenses?  And I want to talk in general terms.  How much would your salaries cost approximately for all of the people working for you on a given month in Rio Bravo?

A   Like a million dollars.

Q   Was that your total expenses approximately?

A   Yes.

Q   And would that involve -- what types of things would $1 million in one month apply to?

A   On the payroll for the guys, rent houses, buy cars, pay for the plaza, the news people.

Q   Sorry.  Now, within a given month if you spent $1 million on all of these expenses as a plaza boss in 2009 to 2011, what would be your total profit approximately?

A   When I got there from the year 2009 to 2010, since the fight between us had not started yet against -- or excuse me.  When the fight against the Zetas had not started yet, we had more money left over.  But when we started to fight against the

Zetas, everything went up, the cost of the weapons, the cost --
the expenses.  A lot more money was spent than a million
dollars.

Q   Well, let me ask you this.  Were you losing money or were
you still making money after the breakup with the Zetas?

A   Breaking even.  Just to get ahead.

Q   And with regards to the amounts of drugs that would pass
through your plaza -- and let me focus on the harvest seasons.
For instance, what are the harvest seasons for marihuana in
Mexico?

A   There's two harvests per year, the one with irrigation and
the one with just rain, natural rain.  The first one is from
February to March, and the other one is from July to August.

Q   And how many tons -- excuse me, how much marihuana would go
through your plaza during that time approximately in the growing
seasons through Rio Bravo?

A   Many, many tons would go through.

Q   All right.  I want to go to some specific interactions you
may or may not have had with the defendant while you were the
plaza boss in Rio Bravo.  Would you ever see the defendant while
you were the plaza boss in Rio Bravo?

A   Yes.

Q   How would you see him?

A   In that zone there of Rio Bravo, Costilla would hide out
there.  And since there, Costilla's lieutenants, they would go

see Costilla and have meetings with him.  And I would see them at times, or sometimes I would realize that they were there because they would let me know on the radio.

Q   And would you say hello to them?

A   Yes.

Q   How would you do this?  Describe just for example a meeting with --

A   When Costilla was there still, there was a restaurant where they would go and have breakfast, lunch, and sometimes I would go by there and I'd see them, and then I'd say hi to them.

Q   Would you talk to both of them?

A   Yes.

Q   Would you eat with them?

A   Sometimes.

Q   Would you talk about the cartel?

A   Yes.

Q   What sort of things would you discuss at the table with the defendant and Costilla?

A   Well, we would talk about the plaza, because Costilla would be asking me, "Well, how are things going in the plaza?  How is it going?"  Because how was it going over there, because I had a group of people that were fighting with the Zetas over there, and we would be talking about that.

Q   Would the defendant be present when you had these conversations?

A    Yes.

Q    And would there be other people from time to time that were plaza bosses or members of the cartel present when you would speak with Costilla and the defendant in Rio Bravo?

A    The one who was always with them was Mario Pelon.

Q    What type of vehicles did Costilla and the defendant travel in in Rio Bravo while you were in charge of Rio Bravo?

A    They had trucks that were -- had armor, armored trucks.

Q    And did Costilla own any property in your plaza, meaning in and around the Rio Bravo area?

A    Yes.

Q    And how often in the -- from -- during the time that you were the plaza boss in Rio Bravo would you see Costilla and the defendant in the -- in Rio Bravo?

A    I'd see them very often, because what all this zone is, what the Control Plaza and the Plaza De Rio Bravo, all in this zone and area Costilla would hide out.  They would -- they would always see Costilla, and that's why I would see them very often.

Q    All right.  During various times while you were the head of the Rio Bravo Plaza, when you wanted to get in touch with Costilla, how would you do that if you didn't see him personally?

A    Costilla never would talk on the phone.  One of them had to be called first so they could let Costilla know.

Q    Okay.  And who would you get in touch with then to say, "I

want to talk to Costilla"?

A   I didn't talk on the phone either.  And I would tell my second in command, "Hey, get in touch with them.  Tell him I want to talk to Costilla," and that's how the communication went.

Q   Would you ever talk to Mario Pelon?

A   Yes.

Q   What would you tell him with regards to trying to get in touch with Costilla?

A   I would tell him I wanted to talk to Costilla.  And he'd say, "Well, tell me first, and I'll tell him."  And that's the way it went.

Q   Did you have any conversations with the defendant in an effort to get in touch with Costilla?

        MR. ZAYAS:  Objection, Your Honor.

        THE COURT:  Your objection?

        MR. ZAYAS:  I'm not objecting.  His earphones.

        THE INTERPRETER:  Yes.

        THE COURT:  Your objection again, or was it your request for a change?

        MR. ZAYAS:  A change.

        THE COURT:  All right.  Thank you.

BY MR. YOUNG:

Q   Would you ever talk to the defendant in an effort to get in touch with Costilla?

A    Yes.

Q    Okay.  And why was that?

A    One time over here in Rio Bravo, there were -- we got the helicopters there both from the marines and the army.  And I moved over here to Control Ramirez.  And there's a gasoline station over here by the railroad tracks.  And I got here to the gasoline station, and they were all there.  And I talked to him, Mario Pelon -- with Mario Pelon and with several other people that were working for Costilla.  I told them I wanted to talk to Costilla, and they told me they were going to let him know.

Q    And are you familiar with a Blackberry phone?

A    Yes.

Q    How was a Blackberry utilized by members of the Gulf Cartel while you were a member of it?

A    As I said before, Costilla and all those that were like plaza bosses, we never talked hardly on the phone.  All that was done -- everything was done through the Blackberry with text. That was the communication.

Q    Did you use a Blackberry as well?

A    Yes.

Q    I want to take you now to -- do you remember an incident involving the defendant's brother in Matamoros?

A    Yes.

Q    Okay.  And what happened there?

A    Once when I was in Matamoros and I had just gotten there to

Matamoros, his brother was drunk.  And he went to a little store, a little retail store, a drugstore.

MR. ZAYAS:  Your Honor, objection.  Relevance.

THE COURT:  What is the relevance?

MR. YOUNG:  To explain additional contact with Rincon in terms of resolving the tiendita is a drug selling place, so it's relevant to the conspiracy.  It's an issue that happened within his control.

MR. ZAYAS:  The testimony has been that the --

THE INTERPRETER:  I'm sorry, Your Honor.  I'm having trouble hearing.

THE COURT:  Mr. Zayas, if you'll come to the microphone so that your voice is amplified.

THE INTERPRETER:  Thank you.

MR. ZAYAS:  The testimony was that the tienditas are for drug selling points in Mexico only and for the locals, and so I don't see the relevance, Your Honor.  And there was no 404(b) notice given to me.

THE COURT:  Overruled.

BY MR. YOUNG:

Q   Was there a problem with the defendant's brother in Matamoros after you went there?

A   Yes.

Q   Let me stop you for a second.  When did you go to Matamoros prior to this incident?

A   I went there in March 2011.

Q   Okay.  And is that the time that you took over the control of the Matamoros Plaza?

A   Yes.

Q   Okay.  Did you resolve this incident with the defendant's brother?

A   No.

Q   Okay.  Well, did you talk to anyone about the incident?

A   Juan Rincon, with Juan.

Q   What was the discussion about what happened in your area based on the brother?

A   The thing is his brother was drunk.  He went to a little store or place where they sell drugs retail, and he took some little baggies of drugs from the people who were selling drugs there, and he left.

Q   Let me stop you there.  After the incident, did you speak with the defendant and resolve the matter after everything was done?

A   Yes.

Q   Okay.  And how did you explain yourself to -- how did you represent yourself to the defendant?  As the plaza boss, or just someone who was in Matamoros?

A   Well, with that that happened and the people that run that little drug selling store, they let the person know that was in charge of that area that a drug -- such-and-such had done that,

and that person was his brother.

And so my guys went and stopped him and got him off the truck. And they got him into one of their trucks, and then he called. That was his brother. So I gave orders that he be set free. But he went and he was mad. And once we had the little drug selling stores, he had -- he beat them up. And then I got mad and I called him, and I said, "What are you doing?" I said, "I already let your brother go."

"No," he said, "they beat him up, and that's why I'm mad." I said, "Yeah, I know. You need to understand that he was the one to blame."

And we came to an agreement, and he was -- we kept on talking. And I said for him not to do that again because if he did it again, the punishment was going to be even greater. And since I'm the plaza boss, if I don't defend my people, who's going to defend them?

Q   After that meeting, did you have any other face-to-face meetings with the defendant until you were captured?

A   Yes, I did see him prior to that.

Q   Okay. Tell us about that.

A   As I said before, that little store, El Caribe -- I hardly drink. And that day I got there, and I asked for a michelada. And so I went to one side of the little mini super. It's like dark there. And I stood there talking to Siji, the owner. They were just there talking, and the little -- all of a sudden a

little car arrived there.  I don't know what kind of car it was. And there were like three people in it.  And just one got off, and it was Juan Rincon.  And he got parked there, right in front of the little mini super, and he walked in and went inside the little mini super.  And I was watching him from the shade over in the darkness.

Q   Did you talk to him?

A   Yes.

Q   Did you introduce yourself?

A   And then when he got out of the mini super, I called him over and I said hey and I whistled at him.  And he turned towards me, recognized me, then he came over to talk to me, and we remained there talking.  It was like 1:00 in the morning, 12:00, midnight, and we were there talking some two hours.

Q   Okay.  And what -- were you eating, drinking, just standing there?  What was going on?

A   We were just talking back and forth, how were we and how were things going.

Q   Was this a friendly conversation or an argument?

A   Yes.

Q   Yes, meaning friendly or arguing?

A   No, no argument.  We were talking on good terms.

Q   Did the defendant tell you about his activities currently at that time with the cartel or where he was going?

A   Yes.

Q    What did he tell you?

A    And he told me that Costilla was almost getting ready to send him over to Victoria to fight the Zetas.  And he had already been over there and returned, but he was going to return again over there.  And then he was just waiting for Costilla's orders so that he could go over there to Victoria.

Q    Was that --

A    Ciudad Victoria.

Q    Was that the last time you had seen the defendant until in court today or yesterday?

A    Yes.

Q    Okay.  What happened to you in May of last year, 2011?

A    I got to Matamoros in March, and the government was really after me.  They were chasing me, and they wanted to catch me whatever the cost.  And I couldn't find any place to hide out or to hide myself.

And then, for instance, I would go one place, and the soldiers would get there and the marines.  So I got all my people together and left everything in place in Matamoros, the whole town.  And the first of -- the beginning days of March -- May, I came over here to this side.

Q    And did you remain in the United States until your capture on October 20th, 2011, by federal law enforcement?

A    Yes.

Q    Okay.  I want to ask a few questions about drug ledgers.

Within the Gulf Cartel, what is marihuana referred to as?

A   The marihuana, they call it national.  Yes.

Q   And what type of weight do you weigh marihuana in?

THE INTERPRETER:  I'm sorry.

BY MR. YOUNG:

Q   What type of weight do you weigh marihuana?  How do you refer to the weight of marihuana versus cocaine?

A   Marihuana is weighed by kilos.  And then when they're going to take it over, cross it over to this side, it becomes pounds.

Q   And what about cocaine?  What is it referred to in terms of weight?

A   Kilos.

Q   Okay.  You have talked about several different types of accountants that you had.  One for piso --

A   Yes.

Q   -- one for marihuana, one for cocaine and other types. Would you yourself keep ledgers to try to keep track of various things?

A   Yes.

Q   Okay.  What would -- how would the amount of money spent on the people who work for you, and I'm talking about arms and the equipment for the people under you, how would that play a role, if any, in ledgers?

A   Let's say there's an accountant in charge of marihuana, and then there's an accountant there getting ready to charge

payment, and then there's an accountant in charge of the payroll to pay the guys, another one for cocaine.  And then they have to write everything down, everything down in a book.

And then above all of those accountants, there's another accountant, the main guy who's in charge of all the accounts.  The one in charge of all the marihuana has to pass all the information and -- to him.  And if I want to know how much money is there or how much has been spent on expenses, the main accountant, the ones in charge of all the accountants, I call him.  And I say -- I call him.  I say come over to such-and-such a place, and I want to talk to you.  Bring me the book.  And then there I'm looking at the -- checking the book.

Q   Okay.  So as one of your duties as a plaza boss, would you have occasion to either write down ledgers or review ledgers written by other people to try to take account of the business of the Gulf Cartel?

A   Yes.

MR. YOUNG:  May I have one moment, Your Honor?

THE COURT:  All right.  Let me give the jury a break.  Members of the jury, this time you'll be in recess for 20 minutes.  During this recess, you're still under my admonishment you must not form or express any opinion about the facts of this case.  Thank you.

*(Jury leaves courtroom)*

THE COURT:  All right.  Thank you.  Please be seated.

Mr. Young, how much longer do you think this direct is going to take?

MR. YOUNG:  Not long at all.

THE COURT:  All right.  Thank you.

*(Recess taken from 2:47 to 3:14.)*

*(Jury enters courtroom)*

THE COURT:  Thank you.  Please be seated.

Please bring in the witness.

You may continue.

MR. YOUNG:  Thank you, Your Honor.

THE COURT:  Actually he needs to get the headphones on.

BY MR. YOUNG:

Q   Mr. Cardenas, just before the recess, I was asking you questions about the use of ledgers for the Gulf Cartel.  Do you recall those questions?

A   Yes.

Q   And do you recall the questions relating to what was the code language for marihuana used by the Gulf Cartel?

A   Yes.

Q   And the different weights on how you would weigh marihuana versus cocaine?

A   Yes.

Q   And have you had occasion in the past to look at ledgers that were created by others; in other words, your accountants or other people working for you?

A    Yes.

Q    Have you had occasion in the past to also create your own writings, in other words, as a way to remember or account for certain things within the Gulf Cartel?

A    Yes.

MR. YOUNG:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. YOUNG:

Q    Mr. Cardenas, I'm going to show you what has been marked for identification purpose only as United States Exhibit 44.  I'm not going to ask you to talk about the contents of it.  What I'm going to ask you, based on that, does that look like it would be similar to -- what does it look similar to without talking about its contents?

MR. ZAYAS:  Objection, Your Honor.  He wants him to comment on some writing or piece of evidence that's not been admitted into evidence.

THE COURT:  He has to identify it.  Objection is overruled.  He may not speak about the contents, but if the question is regarding something general, I'll allow it.

BY MR. YOUNG:

Q    Without reading from it, looking at it, though, what type of a document with regard to the Gulf Cartel does this look like it would be?

MR. ZAYAS:  I'll object again, Judge.  He's testifying

to the type of writings it is, and it's a document that has not been admitted into evidence.

THE COURT:  Mr. Young, let me ask you.  At some point in time is there going to be someone who will testify as to what the contents are?

MR. YOUNG:  That's going to be the effort made by the United States, yes.  We're simply asking him to identify what it could be, and we're going to make an offer later, subject to the court, as to whether it's admissible.  But we're asking him to lay a predicate to identify at least the nature of the document.

THE COURT:  May I see it, please?  May I see it, please?  The objection is sustained.

MR. YOUNG:  May I approach again, Your Honor?

THE COURT:  Yes.

BY MR. YOUNG:

Q   I'm going to show you what has been marked for identification purposes as United States Exhibit 26B and ask if you can recognize this.

A   Yes.

Q   Okay.  And, in fact, did you help create this document?

A   Yes.

Q   Okay.  And are you familiar again with the plaza boundaries of Rio Bravo?

A   Yes.

Q   And does this particular map accurately reflect the plaza

boundaries along the river of Rio Bravo and its relationship to the rest of the locations on the map of the United States?

A   Yes.

        MR. YOUNG:  Your Honor, United States now offers into evidence United States Exhibit 26B, an item that has been previously tendered to the defense.

        MR. ZAYAS:  No objection.

        THE COURT:  Admitted.

BY MR. YOUNG:

Q   What is 26B, Mr. Cardenas?

A   That's the Plaza Rio Bravo.

Q   And did you help create the additional -- the boundaries of this?

A   Yes.

Q   Okay.  At any point while you were the head of the Plaza Rio Bravo, at any point prior to your capture by federal officials in the United States in October of 2011, who was in control of the Rio Bravo Plaza, the Zetas or the Gulf Cartel?

A   The Gulf Cartel.

        MR. YOUNG:  Thank you.  Nothing further, Your Honor.

    *(End of requested excerpt.)*

                              *  *  *

     (End of requested transcript)

-oOo-

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date:  October 31, 2012


/s/_____
Signature of Court Reporter
Barbara Barnard