UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  1:12-CR-00005-1 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Brownsville, Texas |
| | ) | |
| JUAN ROBERTO RINCON-RINCON, | ) | Tuesday, September 25, 2012 |
| | ) | ( 8:33 a.m. to 10:14 a.m.) |
| Defendant. | ) | (10:45 a.m. to  1:51 p.m.) |

TESTIMONY OF RAPHAEL CARDENAS-VELA DURING JURY TRIAL

BEFORE THE HONORABLE HILDA G. TAGLE,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**                See page 2

| | |
|---|---|
| Interpreters: | Beatriz Wright / Sandra Cortez |
| | Karen Pena |
| Clerk: | Stella Cavazos |
| Court Recorders: | Dori L. Noriega / Dahlila Ahumada |
| Deputy U.S. Marshal: | David Gavito |
| Transcribed by: | Exceptional Reporting Services, Inc. |
| | P.O. Box 18668 |
| | Corpus Christi, TX 78480-8668 |
| | 361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES:</u>

For Plaintiff:            ANGEL CASTRO, ESQ.
                          JODY YOUNG, ESQ.
                          Assistant United States Attorney
                          600 E. Harrison, Suite 201
                          Brownsville, Texas 78520

For Defendant:            RICHARD E. ZAYAS, ESQ.
                          3100 E. 14th Street
                          Brownsville, Texas 78521

U.S. Probation:           Gregoria Manrriquez

EXCEPTIONAL REPORTING SERVICES, INC

3

INDEX

| PLAINTIFF'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RAPHAEL CARDENAS-VELA | | 4/22/48 | 71/83 | 89 |

**Brownsville, Texas; Tuesday, September 25, 2012; 8:33 a.m.**

(Partial transcript; testimony of Raphael Cardenas)

(Interpreter Utilized for Translation)

(Jurors Present)

THE COURT:  All right.  Then would you please bring in the witness?

(Pause)

Good morning, sir.  Have a seat in the witness chair.

And I'll just inform the interpreter that that chair is there in case you would like to use it.

THE INTERPRETER:  Thank you, ma'am.

THE COURT:  All right.  Mr. Zayas.

MR. ZAYAS:  Thank you, your Honor.

**RAPHAEL CARDENAS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

**CROSS EXAMINATION**

**(TESTIMONY TRANSLATED THROUGH INTERPRETER)**

BY MR. ZAYAS:

Q   Good morning, Mr. Cardenas.

A   Good morning.

Q   Mr. Cardenas, do you understand English?  Do you understand it?

A   No, no, no, hardly.

Q   When you were in Oklahoma did you have to learn the language?

A   Not exactly.  But I did understand it a little bit.

Cardenas - Cross / By Mr. Zayas                                5

Q    Let me go through some of your testimony, sir.  I'm going to go through some of your testimony that you gave and ask you some questions to clarify some of the points that you talked about.

A    Okay.

Q    Now, during the weekend or yesterday did you get an opportunity to meet with the Government?

A    Yes.

Q    And they prepared you for today's testimony?

A    Yes.

Q    Okay.  And prior to today and prior to the beginning of this case starting you got a chance to meet with the Government, also, correct?

A    Today?

Q    No, prior to this whole trial starting.

A    Okay, yes.

Q    Okay.  And sometimes you met with the Government to give them information, correct?

A    Yes.

Q    And sometimes you met with the Government to prepare for actual trial.  Would that be correct?

A    Yes.

Q    Okay.  Before the trial started how many times did you meet with the Government just to prepare for trial itself?

A    It was several times.

Cardenas - Cross / By Mr. Zayas                              6

Q    Okay.  And when I say "when you met with the Government,"
you met with the prosecutor, Mr. Jody Young?

A    Yes.

Q    And you also met with Mr. Angel Castro?

A    Yes.

Q    Okay.  Now, I'm not talking about when you were preparing
for trial; I'm talking about there's times when you sat down
with the Government -- and not necessarily with them, but you
sat down with some agents and gave them information, correct?

A    Yes.

Q    Our agent's given us some documents stating some dates
that you gave some information, and I want to check if this is
correct.

A    Yes.

Q    Okay.  On October 17th was your first statement to agents.
Would that be correct?

A    No.

Q    Okay.  Was your first -- we have a statement of
October 17th.  Maybe I'm wrong, but were you arrested some time
close to that date?

A    Close to that date, to that date in 2011.

Q    Okay.  What date were you actually arrested?  Do you
remember the actual date?

A    Yes.

Q    And what date was that?

A    It was October 17th.  Around 5:00 or 6:00 in the afternoon.

Q    Okay.  Do you remember first sitting down with the Government and giving them information on October 21st, 2011?

A    No.

Q    Okay.  Do you remember the first date that you sat down with the Government and gave them information?

A    Yes.

Q    What was the first date that you remember?

A    The day after I was detained on October 20th of 2011.

Q    Okay.  Could you be wrong?  Is it possible that you're wrong on the date?

A    No.

Q    What day of the week did October 19th, 2011 fall that you got arrested?

A    A Thursday.

Q    Okay.  Because I've got a report here saying on Friday, October 21st, they sat down and talked to you.

THE COURT:  All right.  Counsel, you don't cross examine the witness on a statement or a report that he did not generate or adopt.

MR. ZAYAS:  Okay.

THE COURT:  So the last question is stricken.  But I'll take judicial notice of the date.  What is the date, Mr. --

MR. ZAYAS:  October 21st.

THE COURT:  The Court takes judicial notice that October 21st, 2011 was a Friday.

MR. ZAYAS:  Okay.

BY MR. ZAYAS:

Q    October 21st, 2011 was a Friday.  And you just testified that you got arrested on October 19th, and it was a Thursday.

A    Yes, it was a Thursday in the afternoon.

Q    Is it possible that you got arrested on October 20th and you would just be mistaken with the date, because October 20th it falls on a Thursday?

A    Possibly, yes.

Q    Okay.  And I'm not trying to trick you, Mr. Cardenas.  I'm just trying to get the facts straight.

A    Okay.  Okay.

Q    So then it is correct that you did meet, just to get it straight, on Friday, October 21st, with agents?

A    I was arrested on Thursday afternoon, and the following day I met with the attorneys, U.S. Attorneys.

Q    Do you remember at that meeting Special Agent Lorenzo Ponce was present?

A    Yes.

Q    Ramona Bower (phonetic)?

A    There were several --

Q    You just tell me the ones you remember.

Cardenas - Cross / By Mr. Zayas                    9

THE COURT:  Excuse me.

MR. ZAYAS:  I'm sorry.

THE COURT:  You may understand the question, but the record has to be clear.

MR. ZAYAS:  I'm sorry, your Honor.

THE COURT:  So don't start a question until an answer has been given to you.

MR. ZAYAS:  Okay.

THE WITNESS:  There were several agents but I don't remember their names.

BY MR. ZAYAS:

Q    Okay.  Do you remember if Agent Luis Flores was present?

A    It seems like.  I don't remember if it was that day or afterwards.  Since there were several agents, I do not recall. There were a lot of them.

Q    And it's fine, Mr. Cardenas.  I'm not trying to trick you. I'm just asking you if you remember specifically that date. That's all.

A    Yes, I'm telling you the truth as to the ones that were there, but I do not recall all their names.

Q    Okay.  Do you remember if Agent Sergio Velasquez was present?

A    That one it seems so.

Q    Do you remember --

A    It seems so.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                    10

Q    Do you remember if group supervisor Daniel Ramirez was present?

A    Yes, he was there.

Q    Okay.  Do you remember if ICE Criminal Intel Research Specialist Jesus Garcia was present?

A    It's just that I don't know their name.  As I said a while ago, there were a lot of them, there were a lot of them.

Q    And just to make this go easier or faster, if you don't remember, I understand.  Say "I don't remember his name" and that will be fine.  I'm just asking you if you remember.

A    Okay.

Q    All right.  Do you remember if Agent Brian Ferguson (phonetic) was there?

A    There were several from the FBI there.

Q    Do you remember if DEA Task Force Officer Jesse Hernandez was there?

A    Yes.

Q    Okay.

A    Him, also.

Q    So then that was the first interview you gave, and I think we've established that was October 21st, 2011, which was a Friday, correct?

A    Okay.

Q    Okay.  And then three days later, which would have been Saturday, Sunday, Monday, October 24th, 2011, do you remember

Cardenas - Cross / By Mr. Zayas                    11

giving another interview?

A    Yes.

Q    We've established right now there's been two interviews you've given so far, correct, that you remember of?

A    Yes.

Q    And in both of those interviews you were giving information to the Government, correct?

A    Yes.

Q    All right.  Now, some time passed and my notes tell me -- or let me ask you.

     Do you remember giving another interview somewhere in the neighborhood of a month later?

A    There were several.

Q    Do you remember if you gave an interview on November 21st, 2011, about a month later?

A    Yes, there were several.  But I do not recall exactly when they were.

Q    Okay.

A    I do not remember exactly.

Q    Okay.  And again, I'm not trying to trick you.  I'm just trying to get, more or less -- after your October 24th interview do you remember having one about a month later?

A    Yes.

Q    Okay.  And after you gave that one, do you remember having another one like about a week later like on November 29th,

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                                    12

2011?

A   As I said before, there were several that I do not remember the date.

Q   Do you remember giving one on December 1st, 2011?

A   I repeat again, I do not recall.

Q   Okay.  And so we can make this quicker, if I ask you a date and you don't remember the specific date, say "I don't remember."  And that will be easier, okay?

A   Okay.  Okay.

Q   Do you remember having one on December 8th, 2011?

A   Okay.

Q   You've got to remember you have to say you don't remember.

A   Okay.  I don't remember.

Q   Do you remember having one on December 13th, 2011?

A   I do not remember.

Q   Do you remember having one on December 20th, 2011?

A   I do not remember.

Q   Do you remember having one on January 3rd, 2012, this year?

A   I do not remember.

Q   Just to help your memory on that one, it would have been a little bit after New Year's.  Do you remember talking to them?

A   It's like I'm saying, there were several from the moment I was detained it was --

Q   Okay.

Cardenas - Cross / By Mr. Zayas                13

A    -- continuous every week.  They would go see me --

**(Witness and interpreter's voices overlapping)**

Q    Okay.  So then --

A    January, February, several months.

Q    Okay.  So then it's fair to say they met with you quite a few times and you gave quite a bit of information, correct?

A    Yes.

Q    Now, they told you in those interviews that the testimony you gave had to be truthful, correct?

A    Yes.

Q    They did not want you to lie in any way, correct?

A    Yes.

Q    And the reason for you helping them out was you wanted them to help you out with your ultimate sentence for your crime, correct?

A    Yes.

Q    And what you're hoping is, is that this Court is lenient when it comes to your sentencing, correct?

A    I did not understand your question very well.

     **THE COURT:**  Excuse me, Mr. Zayas.  Your sentence leaves the impression by when you say "this Court" that it is myself who would be involved in the sentencing.

     **MR. ZAYAS:**  Okay, your Honor.

//

//

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                    14

**BY MR. ZAYAS:**

Q    What you're hoping is when your sentencing comes up that the judge will be lenient on your sentencing, correct?

A    I have a hope that they will help me.

Q    And that's why you're here.

A    No.  Ever since they caught me I cooperated with the Government.  And the times that they came to see me I still did not -- as to Rincon.  I was giving them information about a lot of things that I knew about, not only specifically about him.

        **THE COURT:**  Okay.  I believe he didn't say "not only specifically."  It was -- the word "only" I don't think was part of the answer.

        **THE INTERPRETER:**  Yes, your Honor.  The Interpreter stands corrected.

Q    You did have an interview though, correct, where they asked you specifically about Rincon?

A    Yes.

Q    And you did have an interview also where they asked you specifically about Wicho?

A    Yes.

Q    Okay.  Now, when you testified the other day you testified that you worked at -- as a factory worker at Fisher Price, correct?

A    Yes.

Q    And after you were working for Fisher Price somewhere

**EXCEPTIONAL REPORTING SERVICES, INC**

Cardenas - Cross / By Mr. Zayas                     15

between the age of 15 or 16, you went and you worked for the
state police or some police force, correct?

A    For the federal.  The federal police, yes.

Q    Okay.  Do you remember telling the agents that on
October 20 -- I'm sorry.  Do you remember telling the agents on
a statement given on October 21st that you started moving drugs
for Osiel Cardenas on or about the age of 15 years old?

A    No.

Q    You don't remember giving that statement?

A    No.  I said that I started working at the age of 15, that
I started working at a factory.

Q    Okay.  So if we brought in some agents that testified that
that's what you said, would they be wrong or would you be
wrong?

A    Perhaps they are mistaken.

Q    Okay.  I wanted to clarify something.  You came up with a
story something about you went to a house and there were some
people kneeling down, correct?

A    Yes.

Q    And I wanted to clarify.  One of the people kneeling down
in that house was Mr. Rincon?

A    Yes.

Q    All right.  Now, I want to go back to when you started in
San Fernando.

A    Yes.

Cardenas - Cross / By Mr. Zayas                    16

Q    At the time did San Fernando have a boss?

A    No.

Q    Nobody controlled that area at all?

A    No.

Q    What year was that, more or less?

A    It was in 2001.

Q    Okay.  And when you went to go control it, I think you said that you had to do several things in order to control the area, correct?  You had to go pay off the transit.

A    Yes.

Q    Okay.  How did you go about it?  What was the first thing you did when you got there?  Who did you talk to?  What?

A    When I arrived there at San Fernando, my Uncle Osiel told me that when I arrived at San Fernando that I was as head of the group, as an administrating commander.  Noe Hinojosa, who was a friend of his, that I should speak to him.

        THE COURT:  Excuse me.  I'm sorry, the translation given is --

        THE INTERPRETER:  Yes.  That Noe Hinojosa was the head commander.

        THE COURT:  Thank you.  All right, go ahead.

        THE INTERPRETER:  The administrative commander.

        THE WITNESS:  And that I should speak to him, that he was his friend and that he was going to help me.

//

**BY MR. ZAYAS:**

Q    Okay.  So if I'm not mistaken, you testified that you had to form your own army, correct?

A    Yes.

Q    That you had to pay off transits.

A    Yes.

Q    That you had to pay off the newspaper people.

A    Yes.

Q    That you had to pay off the television people.

A    Yes.

Q    That you had to pay off the mayor.

A    The mayor, no, I did not have to pay him.  I had to pay the campaign so that he could become president.

Q    Okay.  You had to pay off the highway federal police.

A    Yes.

Q    You had to pay off the state police.

A    Yes.

Q    You had to pay off the preventative police.

A    Yes.

Q    That you had to pay off the people in control of the alcohol.

A    Ye.

Q    That you had to pay off the Navy.

A    Yes.  To those that worked there were some members that sometimes worked -- that worked with me and others that did

Cardenas - Cross / By Mr. Zayas                    18

not.

Q    Okay.  That you had to pay off the Mexican Army.

A    Yes.

Q    That you would have to pay off dancers.

A    Those that worked with me that would give me information,
the ones that would obtain all the information they got, those
are the ones that were paid.  Not all of them.

Q    Okay.  You had to pay off some people that worked at the
telephone company.

A    Yes.

Q    Okay.  Those are a lot of people, would you agree with me,
that you had to meet with and make arrangements to pay off,
correct?

A    Yes.

Q    How long did it take you to get in there and to make
arrangements to pay off all these people that we just talked
about?

A    When I arrived I did it step by step.  I would speak to
one.  Then I spoke with, for example, with the head of police.
Once I had made arrangement with the police I would speak to
the ministerial one.  And like that it took time.

Q    About six months?

A    Less.

Q    About four months?

A    No, a week, ten days.  Let's say ten days, more or less.

Cardenas - Cross / By Mr. Zayas                    19

Maybe ten days or less.

Q    Were these people being paid off prior to you getting there?

A    No.

Q    How did you know who, like in the newspaper you had to talk to, who in the highway patrol you had to talk to?  How did you know who to go to?

A    Because I already knew.  I could see how my Uncle Osiel would manage all the different plazas, the one in Matamoros. So I saw how he would do it, how he would make arrangements, who he had to pay to have the plaza organized.  In order to have your plaza well, all organized, you have to have paid all the police agencies.

Q    Okay.  And so it took you about 60 days to get your army together?  I think you testified earlier.

A    No.  When did I say 60 days?

Q    No, no, no.

A    I didn't say 60 days.  I said ten days or less.

Q    I'm referring to when you testified when Mr. Young was asking you, how long would it take for you to train your men, to get them equipped, to get them recruited and to put your army together.  I think you testified between 60 and 90 days.

A    Between one to three months.

Q    Okay.

A    That's what I said on Friday or Thursday.  I don't

Cardenas - Cross / By Mr. Zayas                    20

remember what day.

Q    So to get it right, it took you about a month to 90 days to get your army together.

A    Yes.

Q    Now, during this time where did you get the funds to fund that?

A    When I arrived there I arrived there with $10,000.  And I started giving it to them a little bit at a time, and I told them that as I would receive the money I would be paying it out.

Q    Now, the purpose to have your own army is to have an army that's loyal to you, correct?

A    Yes.

Q    That's very important in the business that you are in to have an army that is loyal to you.

A    Of course.  Yes, yes.

Q    Did each one of them know who you were personally?

A    Yes.

Q    Okay.  Let me get a couple of facts straight, because I was a little bit confused when you were testifying.

        You were saying that some people would go through moving drugs through your territory, they had to pay you a piso.

A    Yes.

Q    And a piso was a charge for the right to go through your

Cardenas - Cross / By Mr. Zayas                    21

territory; is that correct?

A    A piso, let me explain it.  Perhaps when I explained it that day you did not understand me.  A piso is -- the person who is going to move drugs in my territory or in my -- or through my plaza, that's the piso.  They pay me for the entrance for -- the entrance for moving through my territory plaza.  And the pasadores are separate.  The pasadores are the ones who bring the drugs over here.  That's all they do.

Q    I understand.  But what I'm trying to say is when you were in San Fernando, for a person going through your territory with drugs had to pay you money for the right to go through your territory.

A    If he arrived to where I was in San Fernando, he had to pay me the piso.  If he arrived in Reynosa, Rio Bravo or Matamoros, they did not pay me.  Because they would pay over there in Matamoros, Rio Bravo or Reynosa.

            **THE COURT:**  Mr. Zayas, I have to recess momentarily.

            **MR. ZAYAS:**  Okay.

            **THE MARSHAL:**  All rise.

        **(Recess taken from 9:05 a.m. to 9:18 a.m. / Parties present / Jurors not present)**

            **THE COURT:**  Thank you.  Please be seated.  All right.

            Mr. Zayas, I have spoken to Judge Yanez (phonetic) and I explained to her what the situation was with this trial. She had not gotten to the courthouse yet, but she was going to

Cardenas - Cross / By Mr. Zayas                    22

be talking to the lawyers.  I just suggested there's a possibility that if you would be needed today that 4:30 would be, you know, more efficient for us.  So she was going to get back -- or someone from her -- from that chambers will be calling so that we can then get an idea of what they came up with.

             **MR. ZAYAS:**  Okay.

             **THE COURT:**  So she is aware of the time constraints.

             All right.  Please bring in the jury and the Defendant and the witness.

         **(Pause / Jurors enter courtroom at 9:19 a.m.)**

             Thank you.  Please be seated.  Mr. Zayas, please bring in the witness, and you may continue with your cross examination thereafter.

             **MR. ZAYAS:**  Thank you, your Honor.

         **(Pause)**

             **THE COURT:**  Mr. Zayas.

             **MR. ZAYAS:**  Thank you, your Honor.

                 **CROSS EXAMINATION (CONTINUED)**

**BY MR. ZAYAS:**

Q    Now, when you were in San Fernando -- and we're talking about piso -- you would charge somebody that was taking drugs through your territory, you would charge them for going through your territory.  And that was what was called a piso, right?

A    No.  The one who would come to me, the person said, "Hey,

Cardenas - Cross / By Mr. Zayas                    23

Junior, I want to come in with you."  Those are the ones who would pay me the entrance, the piso, to me.  Sometimes they would go through but they would arrive at Matamoros, Reynosa, and that's where they would -- and over here is where they paid.

The one who was in charge of the plaza at Matamoros, Reynosa, Rio Bravo, would say, "Hey, you know what, Junior?" Oscar, for example, Oscar is going to go through.  He's going to arrive over here to me at my place.  So they would just let me know that they were going to go through and arrive in Reynosa.  And those would not pay me.

Q    Did it ever work the other way where you would tell the people in Matamoros, Reynosa, Rio Bravo, Miguel Aleman, wherever it was, that they had paid you a piso and to not charge those people a piso?

A    Yes.  When they would arrive to my place, yes.

Q    I'm a little bit confused on the term when you say, "cuando yagavo (phonetic) and comigo (phonetic)," when they came to me.

A    An example, like I just said, let's say you, you know what, you call me and you say, "Hey, Junior, I want to arrive to where you are and I want to pay you the piso, but I want to move my drug through Reynosa."

So then I tell you, "Okay, come on."  You come to me. Then I call the one in Reynosa, "Hey, you know what?"  For

Cardenas - Cross / By Mr. Zayas                    24

example, you are going to pay me the piso and so you can go through Reynosa so that they will not charge you there.  Okay.  Did you understand me?

Q    So it would be like your client.

A    Yes.

Q    And then the people from Reynosa, Rio Bravo, Control (phonetic), Matamoros, they had their own clients.

A    Yes.

Q    The area where Vallehermoso is, is not on the border, correct?

A    Yes.

Q    And so they also would charge pisos?

A    Yes.

Q    So then a person could call you from Vallehermoso, a person that controlled the Vallehermoso area and say, "I have a client.  Don't charge a piso because he's going to go through my territory."  Was that the way it would work?

A    Yes, yes.

Q    And he would also have to call somebody along the river that was in Matamoros or Rio Bravo or Control or Reynosa and tell them, "Don't charge this client for piso because he's my client."

A    Yes.

Q    So everybody that was going through the whole territories only had to pay one piso.

Cardenas - Cross / By Mr. Zayas                        25

A    Yes, wherever you arrived.  The plaza you arrived you had to pay there.

Q    So if somebody paid a piso and went through going north, you personally wouldn't follow the drugs.  Would that be fair to say?

A    Yes.

Q    Okay.  So you would assume that it's going north and going into the United States but you personally would not be able to know that because you personally wouldn't follow those drugs. Would that be a fair statement?

A    No -- yes, I would know because I had someone that I was in charge of.  Well, el pasador -- well, let's go back a moment.  The example that I gave you before, el pasador, whenever you arrived to my place, you paid me the piso.

This is an example. You pay the piso to me in San Fernando when I was in San Fernando.  You told me you wanted to cross over to Reynosa, right?  I've already spoken to the person in Reynosa and told them that as to that merchandise you have already paid me.  So that person in charge of Reynosa already knows that drug is going to arrive there in Reynosa. Now, you are going to hire el pasador so that he will cross it over to this side.

Q    Hold on one second.

A    Okay.

Q    I'm going with your example.  When you say me, the person

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                    26

passing the merchandise, would have to contract his own

pasador, his own passer --

A     Yes.

Q     Correct?

A     Yes.

Q     You did not take care of crossing personally.

A     No.  I had someone I was in charge of.

          **THE COURT:**  Excuse me.  I think the witness seems to suggest by his answer that he had someone who was in charge. If you can clarify that, because the translation as given is that I had someone I was in charge of.  So clarify.

          **MR. ZAYAS:**  Okay.

          **THE COURT:**  Who the object was.

**BY MR. ZAYAS:**

Q     Let's go back on to our example.  I'm the one that wants to go through your territory and I want to go through Reynosa, correct?

A     Okay, okay.

Q     When you say you have somebody encargado, what do you mean by that?

A     Well, like I am the one in charge of the plaza.  I cannot do everything all by myself.  That's why we had someone in charge of each department.  And there's one who is in charge, who's in charge of all the pasadores, the crossers.  And then so one pasador will speak to that person in charge.  You know

Cardenas - Cross / By Mr. Zayas                27

what?  This person so-and-so --

Q    Mr. A --

THE COURT:  Allow him to complete that answer.

MR. ZAYAS:  Sorry.

THE WITNESS:  For example, Guerra arrived.  Guerra arrived and he wants to cross over one ton of marijuana into the United States.  The pasador tells the person in charge.  The person in charge passes his work to you, his people.  And before he crosses over the drug at the river, at the river --

THE COURT:  Bed.

THE WITNESS:  -- river bed, the person in charge sends his team, his people, to pay --

THE INTERPRETER:  Sorry, interpreter's correction.

THE WITNESS:  To weigh it, to see that it is a ton. Because what happens if they add 200 kilos to it?  So the person -- the team of the person who is charge has to be there watching, weigh it, and see that the drug is being crossed over to this side, and be checking out that everything came out the same or it came out badly.  So they let the person in charge know, and the person in charge lets me know.

MR. ZAYAS:  Okay.

THE WITNESS:  That's how it works.

BY MR. ZAYAS:

Q    I understand.  But in all that that you just talked about right now, you have to rely on other people giving you

Cardenas - Cross / By Mr. Zayas                              28

information, correct?

**(Witness answers in Spanish)**

        I understand.

A    They are commanders, as I said to you a little while ago, that are in charge of different departments.

Q    Well, what I'm saying is you would have to rely on the information they give you.

A    They are -- they have to let me know about everything --

Q    So would the --

A    -- they have to let me know about everything.

Q    Would the answer be, yes, you would have to rely on their information?

A    Yes.

Q    And the reason is, is because you physically would not leave San Fernando to follow the drug all the way onto the river and onto the United States side, right?  You personally would not go do that?

A    No.

Q    Did you ever personally go to the river and see drugs being crossed?

A    Sometimes I would arrive there by surprise.

Q    Well, would it be fair to say you almost never did?

A    Yes.

Q    Would you also agree that some drugs were used in tenditas?

Cardenas - Cross / By Mr. Zayas                    29

A    In part, yes.  The other, the majority would come to the United States.

Q    So Mexico has its own consumption of drugs.  Would that be a fair statement to say?

A    Yes.

Q    Now, when you were a new plaza boss of San Fernando, did you have at that place in San Fernando, did you have bulletproof vehicles?

A    The beginning, no.

Q    Okay.  Or bulletproof trucks or cars?  I guess those are all vehicles.  Scratch the question.

     How long did it take you before you were able to buy your own bulletproof -- did you end up buy -- excuse me, let me start again.

     Did you end up buying bulletproof vehicles in San Fernando?

A    In San Fernando, yes.

Q    How long after 2001 would you say it went before you ended up buying those things?

A    Well, the thing is I don't remember because they would give them to me, they would -- it started out by that they would give it to  -- give them to me, the panel (phonetic), my Uncle Tony.  Costilla would also send me them as gifts.

Q    If you were a plaza boss or a new plaza boss in an area, you got transferred to an area, I think you testified earlier

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                     30

that plaza bosses would have to take care of sending some type

of money to the family of deceased soldiers.

          THE COURT:  Is there a question?

          THE WITNESS:  Yes.

BY MR. ZAYAS:

Q    Right?

A    Yes.

Q    I'm sorry.  Is that correct?

A    Yes.

Q    Okay.  When you would do -- when you would go in to a new

plaza and some soldiers had already been -- the families had

been paid because it was -- excuse me.

          Was the payment continued?  How long after the

soldier's death would the payments have to continue to the

family?

A    The same as it was being paid, the payroll.  By week, each

week, they were going to be paid the same only --

Q    If you went --

A    -- that it would be half.

          THE COURT:  Excuse me, Mr. Zayas.  Allow the

translation to be complete before you begin another question.

          MR. ZAYAS:  I'm sorry.

          THE COURT:  Excuse me.  And the translator doesn't

have to translate what I tell the attorneys, only the question

and answer, please.  Thank you.

Cardenas - Cross / By Mr. Zayas                    31

THE INTERPRETER:  Yes, your Honor.

BY MR. ZAYAS:

Q    When you would go into a new plaza and somebody had died prior to you arriving there, would it be the new plaza boss's responsibility to continue paying that family?

A    No.

Q    Or was that a debt that was owed by the old plaza boss?

A    Each one pays their people.  I'm going to pay only for my people.  If I die, if I'm arrested, how am I going to be able to pay them?  I'm not going to pay them.

Q    I think you testified that you left San Fernando somewhere in the neighborhood of 2009.  Would that be a fair statement?

A    Yes.

Q    So you were in San Fernando straight from 2001 all the way to 2009, which is eight years, correct?

A    Yes.

Q    And then you went in to Rio Bravo; is that correct?

A    Yes.

Q    Okay.  When you went into Rio Bravo, did you take the soldiers that you had from San Fernando into Rio Bravo?

A    Yes.

Q    And the soldiers that were in Rio Bravo, what happened to them?

A    Well, Mario Pelon was in charge there before I was, and he took his soldiers, his people.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                      32

Q    Okay.  So he took his people and you came in with your people; is that correct?

A    Yes.

Q    And with that I think you testified that you had some accountants in San Fernando, you had some accountants for the cocaine, some accountants for the marijuana, some accountants for the pisos and some accountants for the tenditas; is that correct?

A    Yes.

Q    Did you also take these accountants with you to Rio Bravo when you went to Rio Bravo?

A    Yes.

Q    Now, you also mentioned that there was a castigo, I guess a punishment is the term that I think you used, or people that would go through your piso [sic] without paying.

A    Yes.

Q    And I'm sorry, I said to "go through your piso."  I meant go through your territory without paying.

A    Yes.

Q    Were there times people did get through your territory without paying the piso?

A    Sometimes.

Q    Were there times that they actually got away with it that you did not find out about it?

A    Yes.

Cardenas - Cross / By Mr. Zayas                           33

**(Pause)**

Q    Okay.  So your testimony that when you left San Fernando, you went to Rio Bravo and Mario Pelon was there.

A    Yes.

Q    Right?  And you took your soldiers, Mario took his.  You came in with your -- you came in with your accountant, and I guess Mario took his accountants with him?

A    Yes.

Q    Okay.  Now, so then after that in March of 2011, you decided to go and take over Matamoros plaza; is that correct?

A    Yes.

Q    And is it correct that you told the agents that you went to go do that March -- at the end of March, like March 29th, 2011?

A    It was in March.  I don't remember the day.

Q    Do you remember if it was in late March?

A    I don't remember.  I don't remember.  I don't remember if it was the beginning or the middle or the end.  I just remember it was in March.

Q    Okay.  And you do remember that when you went to Matamoros the person that was the plaza boss of Matamoros was Wicho, correct?

A    Yes.

Q    And you gave Wicho 24 hours to get out.

A    Yes.

Q    And you did this with the help of Metro Tres.

A    Yes.

Q    And is it fair to say that you said you left Matamoros and came into the United States in May, early May of 2011?

A    Yes.

Q    So somewhere like a month and a little bit later or two months later -- anywhere from two months to a month-and-a-half later you were in Matamoros, physically?

A    I arrived --

Q    That's two months later.

A    -- in March at Matamoros and in May I came over here.

Q    So that was two months later, correct?

A    Yes.

Q    Okay.  And during this time period did you use -- you did not use telephones to communicate, correct?

A    No.

Q    Okay.  The only way of communication that you had was through e-mail, correct?

A    Yes.

Q    And all the information you got about what was going on on this side -- I'm sorry, not this side, the other side -- that was going on on the Mexican side of the river was from information you got from others.  Would that be a fair statement?

A    When I was on this side?

Q    Correct.

A    The people would send me messages.

Q    Right.  But you would not use the telephone, correct?

A    I would have someone call for me.  I would be telling him what to say and I would be listening in.

Q    Who was the person that you had doing that?

A    El Chino.

Q    El Chino is the same person that you used to send e-mails through, correct?

A    Yes.

Q    But then again I'll tell you, you never came back or you never went back to Mexico after you came in May of 2011.

A    No.

Q    And so all the information that you had about what was going on on the Mexican side was information you received from other people; that is correct?

A    From the person that I have in charge there in Matamoros. I would talk to him, to Metro Tres.

Q    But from those people you had to get the information of what was going on on the Mexican side of the border, correct?

A    Yes, yes.

Q    You physically did not go and see what was going on in Matamoros from May to today, correct?

         **MR. YOUNG:**  Asked and answered, your Honor.

         **THE WITNESS:**  No.

**THE COURT:** Excuse me just a second. Mr. Zayas, I'm going to sustain the objection; but unless you can tell me what the reason is for asking this question again, if that's a predicate for something else.

**MR. ZAYAS:** I'll move on, Judge.

**THE COURT:** All right. Thank you.

**BY MR. ZAYAS:**

Q You cannot personally testify, personally testify, when and what date Mr. Rincon went to Rio Bravo; because you personally weren't in Rio Bravo on that day, correct?

A Correct.

Q And you personally cannot testify what Mr. Rincon was doing in September or October of 2011 because you personally were not there, correct?

A Correct.

Q And it would be a fair statement to say that all the information you gave the agents about what was going on after you left in May was information you had received from others.

A Yes.

**(Pause)**

Q Now, you also said that each plaza boss would control as many people as they had money for, correct?

A Yes.

Q Now, I also remember you mentioning that at one time Control -- and when we're talking about Control, we're talking

Cardenas - Cross / By Mr. Zayas                    37

about Control Ramirez, which is one of the territories.

A     Uh-huh.

Q     On the Mexican side, correct?

A     Yes.

Q     Okay.  And I think you testified when you testified

earlier that Control Ramirez at one time belonged to the

territory of Matamoros.

A     Yes.

Q     And I just wanted to clarify.  When did that change

happen, that Control Ramirez broke off from the territory of

Matamoros?

A     When the thing with my Uncle Osiel happened when he was

arrested.  Costilla was -- became then the boss of the Gulf

Cartel.  And he's the one who made Control and Ramirez a plaza.

          **MR. ZAYAS:**  Okay, Judge, I believe there was some

large exhibits that...

          **THE COURT:**  Why don't you confer with Mr. Castro

about the number of the exhibit or the exhibit that you're

referring to.  Is that it?

          **MR. ZAYAS:**  This is it.

          **THE COURT:**  Okay.  Can you move the boards to where

the jury can see it, please, as well as the witness?

          **(Pause)**

//

//

Cardenas - Cross / By Mr. Zayas                    38

**BY MR. ZAYAS:**

Q    I'm referring to Government's Exhibit 27A.  And I think your testimony is that all this area that's in blue and in pink belonged to the Matamoros area at one time?

A    Yes.

Q    Okay.  Were Reynosa and Rio Bravo ever together at one time, also?

A    No.

Q    Were any other territories between -- well, let me strike that.

During the time that Matamoros had Control did it come all the way to this west side of the map, this, (indicating), line; or was the Rio Bravo plaza bigger...

A    Yes.  All this up until this line here, (indicating), all of this was Matamoros.

Q    And how did you all establish that?  Did you have actual maps that you all could draw out and say, "You've guys go to this area and you guys go to this area?"  How did that happen?

A    When Costilla created the Control plaza, he said that Matamoros was going to be all of this up to Los Indios.  From Los Indios to Rio Rico was going to be the Control plaza.  And he said that all this where the road is, all this -- all it appears here, all of this is going to be the Control plaza.

Q    How did the line get distinguished between Rio Bravo and in Control?

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                39

A    That's the Road 24.  This, (indicating), is the highway, and this, (indicating), is 24.  That's the one from the highway down over here, (indicating), it divides Rio Bravo and Control.

Q    Okay.  And how did Rio Bravo get split from Reynosa?  What was the distinguishing like?

A    They've never been -- they've never been together.  Rio Bravo and Reynosa have never been together.

Q    I know.  I'm asking how -- what was the line that would distinguish the division between them?

A    Okay.  When I arrived in Rio Bravo I was told that the dividing line was river, a river called Las Anzalduas.  When you get off the highway and you take this road here, (indicating), there is a river called Las Anzalduas.  And then from here, (indicating), to there, (indicating), is Reynosa; and from here, (indicating) -- and from there to this, (indicating), line is Rio Bravo.

     But then the river turns over here, (indicating), through the town.  This, (indicating) is a gap.  It's called Brecha Cinco, Gap Five.  So that's the divider on Brecha Cinco. From here, (indicating), to there, (indicating), is Reynosa. From here, (indicating), to there, (indicating), is Rio Bravo.

Q    Okay.  And when you say "Brecha," you mean dirt road?

A    Yes.

Q    Okay.  And the dirt road runs this, (indicating), distance, correct?

Cardenas - Cross / By Mr. Zayas                          40

A     You have here five, six, eight, ten.  This is the Road 24, and this one is five.  So that's how the dirt roads run, like this, (indicating), and like this, (indicating).

Q     Do most of these roads run ejidos -- through an ejidos?

A     There are several ejidos.  There's a ejido here, (indicating).  There's several ejidos.

Q     So all these roads that you're referring to run through the ejidos?  That's my question.

A     Yes.

Q     How far of a distance in kilometers is it from here, (indicating), to there, (indicating)?

A     What would they be?

Q     About 40 kilometers?

A     No, less.  Some 20, 30.

Q     Okay.  And that's from here, (indicating), to here, (indicating), or all the way to this bridge?

A     From here, (indicating), to here, (indicating).

Q     Okay.  And if we had to look on a map and find the exact distance, the two distinguishing markers would be this bridge that's here, (indicating)?  What bridge is that on the east side?

A     The bridge is here, (indicating).  This is the Progreso Bridge.  And here, (indicating), there's a little town called Rio Rico.

Q     What's on the American side?

**EXCEPTIONAL REPORTING SERVICES, INC**

**(Witness answers in Spanish)**

No, on the --

A    Here's, (indicating), Progreso; Progreso, Texas.

THE COURT:  Excuse me, Mr. Zayas.  Just wait until the translation is completed.

THE WITNESS:  (Speaks in Spanish)

THE COURT:  Excuse me, sir.  Stop.  Go ahead.

BY MR. ZAYAS:

Q    Again, I'm looking for what's on the American side of Rio Rico.

A    No, no.  Well, I'm not familiar with this side.

Q    Okay.  Is there a bridge at Rio Rico?

A    No.  In Progreso.

Q    I see a main road that's been drawn out between Rio Rico and the bridge at Progreso.  Is there any bridge in between Rio Rico and the Progreso bridge?

A    No.

Q    Okay.  Do you know what the rationale of this little part being cut out and not being given all to Control that goes east of Progreso Bridge?

A    When I arrived at Rio Bravo, when Mario Pelon handed the plaza to me, they explained to you the entire territory that is part of the plaza.

Q    Who is that person that described it to you?

A    Mario Pelon.

Cardenas - Cross / By Mr. Zayas                    42

Q    Okay.  Now, on the west side is there a bridge right here, (indicating), that divides between Reynosa and Rio Bravo?

A    No, there's no bridge here.  There's one further ahead, what is the one at Pharr; but that belongs to Reynosa.

Q    Can you point to the ladies and gentlemen of the jury exactly where that bridge is in Pharr?

A    Here, (indicating), a little bit further ahead from this division where Las Anzalduas is.  I don't know exactly where.

Q    Okay.  Is there a town right at the northwest division between Rio Bravo and Reynosa?

A    There's a town.

Q    That's the question.

A    No, there's no town.  There's a ejido.

       THE INTERPRETER:  The interpreter thinks ejido means like a town.

       MR. ZAYAS:  I believe a ejido is a rural coop.

       THE COURT:  Excuse me, Mr. Zayas.  You can't testify. You can ask the witness, "would you agree with me that."

       MR. ZAYAS:  Okay.

BY MR. ZAYAS:

Q    Would an ejido be -- because we're having a hard time making an actual translation of the term "ejido."  Is an ejido like a small community that's a coop of farmers?

A    No, it's like a -- well, yes, like an ejido like a -- 10, 15 little houses; that's all.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                    43

Q    Do they own the property or does the government own the property?

A    Well, that I do not know about that.

Q    Okay.  Just to make it clear, at the northwest corner of the Rio Bravo plaza and the northeast corner of the Reynosa plaza what distinctive factor is there that distinguishes the division?

A    It's a little canal.  It's a little canal.  And if you notice, there's another canal here, (indicating).  It's called -- I don't remember what it's called.  It's another canal.  And it runs this, (indicating), way horizontally.  And then there's another little one here, (indicating), that is for...

Q    Irrigation?

A    Irrigation.  And that's what divides it.

Q    Okay.  Now, between the Progreso Bridge and the division line of this irrigation ditch that you just talked about, is there another bridge?

A    Yes.

Q    And where is that bridge?  Can you point it out to the ladies and gentlemen of the jury?

A    It's the Donna Bridge.  It's here, (indicating).

Q    Okay.  On this, (indicating), side of Donna is what?  I'm sorry.  On the Mexican side of Donna is what?

A    There is another community.

Cardenas - Cross / By Mr. Zayas                    44

Q    Okay.  And on the other side of the Donna Bridge is it the town of Donna that's actually there?

A    Well, no, I am not familiar.

Q    Okay.

     **(Pause)**

          When you left Rio Bravo in March of 2011, who took over in Rio Bravo at that time?

A    When I left to go to Matamoros, Mario Pelon was left in charge -- or took charge.

Q    Is it fair to say that you, Mario Pelon and Metro Tres at that time was in Reynosa?  Correct?

A    Yes.

Q    Is it fair to say that you, Mario Pelon and Metro Tres were thinking of throwing Costilla out and taking over the cartel?

A    No.

Q    Did you, along with Metro Tres, ever get together and talk about kicking Costilla out?

A    We did get together but not as to getting him out, no.

Q    I'm sorry, the term that you used was what?

A    We were a bit angry with him, because he was not supporting us.  But we never talked about kicking him out.  He was only supporting Rincon, Wicho, Guerra (phonetic).  He would not support Metro Tres and me.

Q    When you left in May of 2011, was Mario Pelon still plaza

**EXCEPTIONAL REPORTING SERVICES, INC**

Cardenas - Cross / By Mr. Zayas                45

boss of Rio Bravo?

A    When I went to Matamoros he left to be Rio Bravo boss.

Q    Okay, maybe I'm -- and I'm not trying to trick you.  I'm just trying to get the facts straight.  I thought you told -- okay?  I thought you told me that Metro -- I'm sorry -- that Mario Pelon went to Rio Bravo in March when you went to Matamoros.

A    Yes.

Q    Okay.  So he did not go in May when you came to the United States.  In March when you went to Matamoros is when he went to Rio Bravo; is that correct?

A    Yes.

Q    Okay.  And the question was, when you left from Matamoros to Brownsville, was Mario Pelon still in charge of Rio Bravo?

A    Yes.

Q    When you testified the other day, you were giving the whole structure of the cartel.

**(Pause)**

        **THE COURT:**  All right.  Members of the jury, let me give you a 20-minute break.  During this recess you are still under my admonishment that you must not form or express any opinion about the facts of this case and cannot do so until it has been submitted to you for your deliberation.  Thank you.

        **THE MARSHAL:**  Please rise for the jury.

        **(Jurors exit courtroom at 10:12 a.m.)**

46

THE COURT:   Thank you.   Please be seated.   All right. Did you all get to -- we're in recess.   You can take the Defendant back in.

Did you all figure out what the logistic problem is or what's going on here?

MR. CASTRO:   Mr. Zayas wanted an 8 1/2 by 11 of these exhibits.   I told him these are the ones that were introduced. We do have 8 1/2 by 11's but they -- those weren't introduced. But they are the duplicates.   I just didn't want to say that the other ones were introduced when the ones that are introduced are actually poster boards that are enlarged --

MR. ZAYAS:   The reason, Judge, I wanted to show them to the jury -- and I think it would be easier to show them on this versus taking this size up there wouldn't be very --

THE COURT:   Okay.   Well, just to get things off of dead center, if you have that -- whatever chart you're referring to, 8 1/2 by 11, to project on the Elmo, but at the same time have it on display; if you can ask the witness something to the effect of:   I'm asking you to look at Exhibit, whatever number that is, that I'm displaying a copy of to the jury on the Elmo.

MR. ZAYAS:   Okay.

THE COURT:   For easier viewing.   That will explain that what you're showing him is not the exhibit but just a duplicate for purposes of viewing as to what the exhibit is

47

that is on display that you're inquiring about.  And actually it might be easier for him to compare that and look at the Elmo, because sometimes the faces may not be as visible or identifiable on a small screen versus what's on the larger poster.

MR. ZAYAS:  Thank you.

THE COURT:  All right.  Thank you very much.  We're in recess.

THE MARSHAL:  All rise.

**(Recess taken from 10:14 a.m. to 10:45 a.m. / Parties present; jurors present)**

THE COURT:  Thank you.  Please be seated.

Counsel, you may continue.  Do you have the issue of the exhibits sorted out?

MR. ZAYAS:  Yes, your Honor.

THE COURT:  All right.  Thank you.

MR. ZAYAS:  Thank you.

THE COURT:  Please bring in the witness.

**(Pause; voices and whispers off the record)**

Thank you, Karen.

THE INTERPRETER:  Thank you.

THE COURT:  You may proceed.

MR. ZAYAS:  Thank you, your Honor.

THE WITNESS:  Thank you.

//

Cardenas - Cross / By Mr. Zayas                        48

**CROSS EXAMINATION (CONTINUED)**

**BY MR. ZAYAS:**

Q    I think you testified when Mr. Young was asking you questions -- and I want you to clarify this if I'm wrong -- that Beto Fave controlled Matamoros --

**THE INTERPRETER:**  One moment, please.

**THE COURT:**  Excuse me just a second.

**(Pause)**

**THE WITNESS:**  Yes.

**MR. ZAYAS:**  Is that better?

**THE WITNESS:**  Yes.

**MR. ZAYAS:**  -- that Beto Fave controlled Matamoros between March and October of 2010.

**THE WITNESS:**  Beto Fave, when I was moved over to Rio Bravo, Matamoros had -- El Guaco was in Matamoros.  They changed him over to San Fernando, and Beto Fave was the boss in Matamoros in 2009.

**BY MR. ZAYAS:**

Q    Okay.  That happened -- do you remember what month in 2009, more or less?

A    It was around August; August of 2009.

Q    So, then, just to get our timeline correct, you left San Fernando in around August of 2009 and went straight to Rio Bravo.  Is that correct?

A    Yes.

Cardenas - Cross / By Mr. Zayas                         49

Q    Okay.  And at the time that you went to Rio Bravo, Beto Fave went to Matamoros?

A    Yes, at the same time.  I went on over to Rio Bravo and he went over to Matamoros.

Q    Okay.  And Beto Fave stayed in Matamoros from August of 2009 up until when?

A    Until 2010 when -- it was around October.

Q    October, 2010?

A    It was around October.

        THE COURT:  Excuse me.  Mr. Zayas, allow the interpreter to finish the translation before you begin another question.

        MR. ZAYAS:  I apologize, your Honor.

        THE COURT:  I know you understand the answer, but the record has to be clear.

        MR. ZAYAS:  I understand.

BY MR. ZAYAS:

Q    Okay.  And, then, when Beto Fave passed away in 2010, Tony Tormenta took over Matamoros?

A    Half of it.  Half -- half Tony Tormenta and half Eduardo Costilla.  And each one put one.

Q    The reason I'm asking you about that is because -- let me ask it a different way.  When you gave all those statements to the agents, in each one of those statements I couldn't find where you told the agents that.  Did you ever tell them that?

Cardenas - Cross / By Mr. Zayas                    50

THE COURT:  Excuse me just a second.

THE INTERPRETER:  One moment.

THE COURT:  Mr. Zayas, you cannot testify about what you did or you did not find.  That's basically a testimonial regarding reports that have not been adopted by this witness --

MR. ZAYAS:  Okay.  I'll --

THE COURT:  -- or written by this witness.

MR. ZAYAS:  I'll restate the question, your Honor.

BY MR. ZAYAS:

Q    Well, you testified as to all the different statements you gave the agents, correct?

A    Yes.

Q    Okay.

MR. YOUNG:  Your Honor, for the record, these are not statements; these are meetings.  In other words, he did not provide a written (indiscernible), just to be clear.

THE COURT:  You can bring that out on redirect.

Q    Okay.  We talked -- excuse me.  Again, I'll ask the question.  We went through a series of dates that you gave statements to the agents, correct?

A    Yes.

Q    And you don't remember the specific dates because there were so many of them.

A    Yes.

Q    Okay.  If I brought in the agents and they testify that

you never said what you just said right now, would that be

wrong, or did you tell the agents that?

A    I gave them a lot of information.

Q    Do you remember if you actually told them what you just

testified to right now?

A    I (indiscernible) a lot of things, a lot of things, a lot

of information.  It wasn't just about Juan Rincon.  It was

about a lot of people.

Q    If I brought in the agents and their testimony is

different from yours, would you say that you were wrong or they

were wrong in the recollection of what you said?

A    Perhaps they're wrong, but I'm not.

Q    Now, after Tony Tormenta was killed -- he was killed on

what date?

A    It was in 2010, in November; the first days in the

beginning of the month of November, 2010.

Q    That's when he was killed.

A    Yes.

Q    And after he was killed, who was put in charge of

Matamoros?

A    Flaco, Wicho and Rincon remained.

Q    Do you remember telling the agents on a statement that you

gave October 21st that Wicho was the person that was left in

charge of Matamoros?

A    That he was in charge when?

Cardenas - Cross / By Mr. Zayas                          52

Q     When -- after Tony Tormenta got killed.

A     Yes.  Wicho, Flaco, and Rincon.

Q     Okay.  But do you remember telling the agents only about Wicho, not about Flaco and not about Mr. Rincon?

A     I told them about the three of them.

Q     Do you remember telling them on your statement given on November 24th that Wicho was in charge of Matamoros and Gama was there as his accountant?

        MR. YOUNG:  I'm going to object, your Honor, to the reference of a statement he gave; it's not his statement.  He can ask the question as to what he talked about on a particular day, but reference (indiscernible) testimony (indiscernible) your Honor.

        THE COURT:  You can clarify it on redirect.

        But, Mr. Zayas, I caution you, from -- in the way you are addressing the witness, that it appears that you are reading from something that makes -- that might suggest to the jury that you're trying to use a report or document that he has not written or adopted in an effort to improperly impeach him. So, you can ask the question, but don't make it obvious or make it appear as if you are reading from a document which is not in evidence.

        MR. ZAYAS:  Okay, your Honor.  That will be fine.

//

//

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                                    53

BY MR. ZAYAS:

Q    Do you remember on October -- on November 21st, 2011, telling the agents that Wicho was in charge of Matamoros after Tony Tormenta's death and Gama was his accountant?  Do you remember saying that?

A    No.

Q    Are you saying that it did not happen, or you just don't remember if you said that?

A    I told them that Wicho, Flaco, and Juan Rincon were the plaza bosses in Matamoros.

Q    Did you just testify today that Wicho was in charge of Matamoros when you gave him 24 hours to leave Matamoros because you were going to take over Matamoros?

A    Yes.

Q    Okay.  So, that happened in March of 2011, correct?

A    Yes.

Q    So, between November 2010 and March 2011 --

A    Yes.

Q    -- did the structure change that Wicho became the only person that was in charge of Matamoros?

A    No, it was the three of them.

    (Pause)

Q    Is it true -- let me scratch the -- let me scratch that question.  Just -- I'm trying to get the timeline correct.  I think you just testified that Beto Fave got killed somewhere in

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                    54

October of 2010.

A     Yes.

Q     And that in November of 2010 Tony Tormenta was killed.

A     Yes.

Q     You're testifying that Tony Tormenta was in Matamoros for a month prior to being killed?

A     Well, I don't know if he was exactly in Matamoros.  I don't know where he was.

Q     Okay.  And during that time you were in Rio Bravo, correct?

A     Yes.

Q     Did you tell the agents that you wanted to get rid of Costilla because you felt he had something to do with your uncle, Tony Tormenta's, death?

A     No, I didn't tell them that I wanted to (indiscernible) him.  I said that it was because he was to blame and it was his fault that they killed him.

Q     But were you upset with Costilla because you felt that he had something to do with your Tony -- your uncle, Tony Tormenta's, death?

A     That he had something to do with it, yes.

Q     I'm sorry; I'm going to object to nonresponsive.  The question is, is:  Were you upset because you felt Costilla had something to do with your uncle, Tony Tormenta's, death?

A     Well, perhaps, yes.

Cardenas - Cross / By Mr. Zayas                               55

Q    Did you tell the agents that "equis dieciocho," X-18, R-1, Wicho, and Galivan (phonetic) had formed an alliance that was going to take over Matamoros?

A    That -- that -- I didn't -- I'm not understanding let's say.

Q    Did you tell the agents that X-18, R-1, Wicho, and Galivan were going to get together and take over Matamoros and Reynosa?

A    Yes.

     **(Pause)**

Q    Did you also tell the agents that you knew of some money that Beto Fave had left in a house inside the walls with a girlfriend of his and it was your intent to find it and steal that money?

A    Yes.

     **(Pause)**

Q    Have you told the agents that you have never sent drugs into the United States?

A    Yes.

Q    Did you tell the agents that you have sold all of your drugs in the country of Mexico?

A    Yes.

Q    Did you tell the agents that you wanted to work out a deal like your uncle, Tony -- I mean your uncle, Osiel, and have all your family sent to the United States?

A    Yes.

Cardenas - Cross / By Mr. Zayas                    56

(Pause)

Q    Did you tell the agents that it was Wicho who was stealing the armored vehicles, the eight armored vehicles that you talked about?

A    Who told me?

Q    No.  Did you tell the agents that it was Wicho that was stealing from these armored vehicles?

A    Yes.

Q    Did you tell the agents that when you were in Rio Bravo there was an area that Lazcano was -- had control over?

A    Yes.

Q    And can you tell the ladies and gentlemen of the jury who Lazcano is?

A    He was -- Lazcano was the second in command of the Zeta Uno, who -- One -- who was -- and then Lazcano remained as the head and boss of the Zetas.

Q    Okay.  Now, with regards to this map that has been identified as 27A, there has been some talk about Valle Hermoso.  Where exactly is Valle Hermoso on this (indiscernible)?

A    Valle Hermoso is around here, more or less; right here down below.

Q    And has there been a big fight, constant battle for the Valle Hermoso area between the Zetas and the Gulf Cartel?

A    Yes.

Cardenas - Cross / By Mr. Zayas                    57

Q    Does this fight just exist here, or does it also go into these areas north (indiscernible)?

A    When the fight started with them, we fought with them, and then we got them right out, right away, of Valle Hermoso.  And then we won the -- we won the plaza of Valle Hermoso.

Q    What year did --

A    (indiscernible) the Mexican drug cartel.

Q    What year did that happen?

A    When the war started between us, right away; 2010.

Q    And how long -- before that, who controlled the Valle Hermoso area?

A    Paco Banda (phonetic).

Q    (indiscernible) before the (indiscernible), before the war started with Valle Hermoso and when the Zetas (indiscernible) Valle Hermoso, were you all working together?

A    Yes.

Q    And how long did that war with the Zetas go from 2010?

A    The war started just the beginning of ten, and between Tony and I we got the Zetas out of Valle Hermoso.

Q    And have they been out ever since?

A    It now belongs to the drug cartels.

          THE COURT:  To the --

          MR. ZAYAS:  Is there --

          THE INTERPRETER:  To the cartel.

          THE COURT:  Yes.  Thank you.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                    58

**BY MR. ZAYAS:**

Q     Is there still fighting that goes on in Valle Hermoso?

A     Yes.

**(Pause)**

Q     Did you tell the agents that --that November was the harvest for drugs, of marijuana?

A     In July and August is when they start cutting the marijuana, where they -- where they planted it.

Q     You did not mention to the agents anything about the month of November?

A     Oh, yes.  In September, October, November, that's when marijuana arrives here at the border.  In December, not anymore, because the people on this side don't want to work then.

Q     When you came to the United States, you were living in -- on the island?

A     Yes.

Q     In a ranch in the Rio Hondo area?

A     I wasn't living there.  That belongs to my wife.

Q     Okay.  And then you had a house in Brownsville also?  Did you live in there?

A     No.

Q     You basically just lived on the island?

A     Yes.

Q     After you got picked up by the American authorities, Chuy

**EXCEPTIONAL REPORTING SERVICES, INC**

Cardenas - Cross / By Mr. Zayas                         59

Cabezon (phonetic) became your successor?

A    Yes.

Q    Is he still in charge of the plaza Matamoros?

A    It seems like they arrested him.

**(Pause)**

Q    Did you tell the federal agents that you were willing to help them find Costilla?

A    Yes.  Ever since the moment that I was arrested I cooperated.

Q    Did you also tell the authorities that you felt that Costilla was setting you up with the Mexican officials?  The Mexican authorities, should I say.

A    Yes.

Q    And because of that was the reason that you fled to the United States, because the Mexican authorities were putting too much heat on you?

A    Yes.

Q    Did you tell authorities that you and Metro Cuatro were not supporting Costilla anymore?

A    Yes.

Q    Did you tell authorities that you and Metro Cuatro had a plan to overthrow Costilla?

A    We didn't have any plan.

Q    Did you --

A    We were planning to (indiscernible) investigate what had

Cardenas - Cross / By Mr. Zayas                    60

happened to Metro Tres.

Q    Did you tell the authorities that you were planning with Metro Cuatro to take over the Gulf Cartel?

A    We weren't planning that.

Q    When you were cooperating with the Mexican -- with the U.S. authorities after you had been captured, did they allow you to call Chuy Cabezon?

A    Yes.

Q    Were you still giving orders when they allowed you to do this?

A    No.

Q    Did you also agree to go into Wicho's cell and talk to the neighbors to find out what Wicho was talking about?

A    I didn't -- what do you mean?  I didn't understand the interpreter.

Q    I'll ask again.

A    Okay.

Q    It was a bad question.  I'm sorry.

        Okay.  When you were cooperating with the Government, did they take Wicho out of his cell block and put you in there --

A    No.

Q    -- so that you could get information as to what Wicho was talking to his cellmates about?

A    I never saw Wicho there.

Cardenas - Cross / By Mr. Zayas                    61

Q    I understand.  Maybe I didn't ask you correctly, and I'll -- I apologize.  I'll ask it again.

Did they take Wicho out of his cell block -- and you didn't see him; I'm not saying you saw him -- but they put you in his cell block so that you could talk to his neighbors?

THE COURT:  Excuse me just a second.  Excuse me. Stop.  You have to stop.

Mr. Zayas, first of all, your question is premised on -- unless he says that he knows as to what might have happened in his absence, when you say, "Did they take him out of the cell," that assumes that he would know whether he did -- he was --

MR. ZAYAS:  Okay.

THE COURT:  -- the other person was or was not.

MR. ZAYAS:  I'll ask it a different way, your Honor.

THE COURT:  And also the -- another part of your question being "so that you could do this," you have to establish what he was told or what the understanding was or any action that he was part of.

BY MR. ZAYAS:

Q    I think you've testified already that you've been cooperating with the Government, correct?

A    Yes.

Q    In part of that cooperation did they put you into a cell block that you understood to be where Wicho was staying at one

EXCEPTIONAL REPORTING SERVICES, INC

time?

A    I didn't know that he was there.  I never saw him.  I don't know.  There's 20 cells.  And after a while, when time went by, talking to other people that were in the jail there as well, they told me that Wicho had been there, that he had been there.  I never saw him there.  I -- I didn't know he was there.

Q    Was it the same cell block that -- cell that you were in, the way you understood it?

A    (indiscernible)  There are 20 of them there.  Yes.

Q    Did the Government ask you to give them information of what Wicho had told his cellmates or people within his cell area?

A    No.  No.

Q    Did you testify that when Pelon went to Reynosa after the death of Metro Tres that Metro Tres's people did not allow him to take control of the Reynosa plaza?

A    Yes.

Q    Did you tell agents in the interviews that you had that -- that you had only spoken to Wicho approximately three times total?

A    Yes.

Q    When a person becomes a plaza boss, they have the authority to do in that plaza what they want to do, right?

A    Yes.

Cardenas - Cross / By Mr. Zayas                          63

Q    They can run their business the way they want to run their business, correct?

A    Each one runs their plaza the way they want to.

Q    Have you, yourself --

        **(Pause)**

            In going through what I have as Exhibit 24, it is the exact duplicate of 24A, but it's reduced into size so we can use it here on the ELMO.  The term "lieutenant" that's there; did you ever use that term when talking to the agents, or was that something that the agents came up with in describing these people?

A    That's what we -- the name we gave them.

Q    When you say "we gave them," who's "we"?

A    The agents, the Government's people, and -- and myself.

Q    But it wasn't a term that you came up with.  Is that fair to say?

A    It was a specific name that was given to these people that worked underneath Costilla.  Since they're not the plaza bosses, instead of putting a title like "workers," instead of that, we gave them the title of lieutenants or -- instead of giving them another name, that's why that name was given them.

Q    But "workers" would have been an okay name to give them?

A    (indiscernible) as well.

Q    This gentleman right here; can you see him?  Maybe I can give you the bigger version of that.  That's on 24A.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Cross / By Mr. Zayas                 64

A     Where the red spot is?

Q     No; I'm sorry.

          THE COURT:  Why don't you give him a row and number, something -- the names are not visible on the monitor.

          MR. ZAYAS:  I think I can give him a bigger version of that and he could be -- be able to read from that, your Honor.

          THE COURT:  All right.  Thank you.

          MR. ZAYAS:  If I may approach the witness, your Honor?

          THE COURT:  Yes.

          MR. ZAYAS:  Thank you.

BY MR. ZAYAS:

Q     I have what's been marked in my hand as Exhibit 24A.  The gentleman I'm referring to is the third down, left one.  Can you read his name?

A     Galo Gaspar Perez (phonetic).  That's what it says.  Is that the one you're referring to?

Q     That's the one I'm talking about.  Is he -- is he an attorney in Mexico?

A     Yes.

Q     Does he live here in the United States?

A     I don't know.

Q     Do you know where this gentleman right here on the bottom third right is?

Cardenas - Cross / By Mr. Zayas                                   65

A    Lizardi (phonetic).

Q    Right.  Do you know where he is today?

A    No.  No.

        **(Pause)**

            **MR. ZAYAS:**  I'm looking for Exhibit 24G, Judge.

        **(Pause)**

**BY MR. ZAYAS:**

Q    Down at the bottom of this Exhibit 24G, Government's
Exhibit 24G, the gentleman here, can you read us his name?

A    Armando Arizmendi-Hernandez (phonetic).

Q    Do you know where he is?

A    They're saying that they arrested him along with Wicho and
Rincon.

Q    Do you know if they let him go back into the Republic of
Mexico?

            **MR. YOUNG:**  Relevance, your Honor.

            **THE COURT:**  What is the relevance?

            **MR. ZAYAS:**  Well, they're claiming that this is a
plaza boss, and I want to know if he knows if he was let go or
not.

            **THE COURT:**  The relevance of whether he was let go or
not?

            **MR. ZAYAS:**  Right.

            **THE COURT:**  The relevance of what --

            **MR. ZAYAS:**  Oh.  Why he was let go or not?

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT:  The relevance of that information, if the witness were to know.

MR. ZAYAS:  Because I want to know if he knows why they would let a plaza boss go back into the Republic of Mexico if they had him here in the United States.

MR. YOUNG:  That would call for speculation and legal conclusion.  There are certain proceedings that this individual has gone through as well.

THE COURT:  Okay.  Don't testify.

Mr. Zayas, I'm going to allow you to ask the question, but your questions have to be based on good faith belief that the witness can answer the question.

MR. ZAYAS:  Okay.

THE COURT:  If he would be privy to know the rationale of someone other than himself as to why something happened, then you could ask him that.

BY MR. ZAYAS:

Q    You testified that Mr. Arizmendi-Hernandez was, I guess, a co-plaza boss with -- with Wicho.  Is that correct?

A    In control?

Q    Control.

A    In 2011?

Q    Right.

A    Yes.

Q    And you also testified that you knew he had been picked up

with Mr. Rincon, Mr. (indiscernible) Zuniga-Hernandez?

A    I saw it on the news.

Q    And, so, the question is:  Has it been relayed to you by the Government the reason -- let me scratch that.  Do you know if he has been let go?  First of all, let's just ask you that.

            MR. YOUNG:  Relevance, your Honor.

            THE COURT:  I'm going to allow it.  Go ahead.

            MR. ZAYAS:  If you know.  If you don't know, that's fine.

            THE WITNESS:  I don't know anything about that.

BY MR. ZAYAS:

Q    Okay.  That's fine.

A    No, sir.

Q    If you don't know, then I'm not going to ask you about it.

A    I don't know, sir.

Q    Okay?

A    Uh-huh.

Q    Now, you know that if you're going to get -- let me strike that.  You know the way sentencing works in the United States for your crime that you have pled guilty to, correct?

A    My attorney explained it.  My attorney has explained it to me.

Q    Okay.  And I don't want to talk to you about what you and your attorneys talked about.  I want to talk to you about your understanding of the law, okay?

Cardenas - Cross / By Mr. Zayas                    68

A     Yes.

Q     You understand that the way it works is the first thing you do is plead guilty, and which you have already done.

A     Yes.

Q     Okay.  And after you plead guilty, then a presentence report is done on all your background, correct?

A     Yes.

Q     And when the presentence report is done, there is this thing called the Federal Sentencing Guideline book.  Have you seen that book?

A     As to the number, the (indiscernible), yes.

Q     Yes, that one.

A     Yes.

Q     Okay.  And there's different points that you get for different things related to the offense that you've pled guilty to.

A     Yes.

Q     Okay.  And on this guideline book you know that you're looking at life, correct?

A     Yes.

Q     And, so, when you're here testifying, you're here trying to testify to get something less than life sentence, correct?

A     I have hopes that they'll lower (indiscernible).  I'm not the one deciding that.  The one who will decide it is the judge, but I'm hoping.

Q    Have you also joked around that you're hoping that you get 10 years?

A    Yes.

Q    And the reason that you cannot go lower than 10 years is because under the statute that you pled guilty to there is a 10-year minimum.  And you understand that.

A    Yes.

Q    And, so, you have an interest in coming here and testifying, correct?

A    Yes.

Q    But you also have to be truthful, correct?

A    Yes.

Q    With the agents.

A    Yes.

Q    Do you know who Mario Cardenas is?

         **THE INTERPRETER:**  I'm sorry; I couldn't hear you.

**BY MR. ZAYAS:**

Q    Do you know who Mario Cardenas is?

A    Yes.

Q    He's your uncle also, right?

A    Yes.

Q    Do you remember at your statement that you took on October 24th, 2011 -- do you remember telling the agents that your uncle, Mario Cardenas, was a legitimate businessman?

A    Yes.

Cardenas - Cross / By Mr. Zayas                    70

Q    And it turns out he is not a legitimate businessman; is that correct?

A    Yes.

Q    So, then, you outright lied to the agents.  Would that be a fair assessment?

A    Yes.

Q    So, when it's convenient for you, you're willing to lie, correct?

MR. YOUNG:  Argumentative, your Honor.

THE COURT:  Don't argue with the witness.  You don't have to answer the question.

**BY MR. ZAYAS:**

Q    It turns out that your uncle, Mario, was pretty much involved in the movement of drugs.  Is that correct?

A    He's involved in the drugs, but he is not a plaza boss or the leader of a cartel.  But he is involved in the drug business.  I said that before, because (indiscernible) family, I lied to the agents, that he had a trailer business.  Since I am now under oath I can't (indiscernible).  Because of this, I'm -- I'm telling the truth.  He's involved in drugs, but he doesn't belong within the cartel and the structuring.

Q    You also know that it is a crime to give false statements to a federal law officer, correct?

A    Yes.

Q    So, even when you're not under oath.  You understand that,

Cardenas - Redirect / By Mr. Young                    71

correct?

A     Yes.

Q     And they explained to you that there is a statute that could find you guilty for giving false statements to a --

A     Yes.

Q     Is that also part of your agreement in coming and testifying today that they will not prosecute you for telling them a lie about your uncle, Carlos Cardenas?

A     Mario Cardenas?

Q     I'm sorry; Mario.  I'm sorry.  Mario Cardenas.

A     Well, since he's my family and a family member, I didn't want to get anybody involved, but since they kept on asking me, yes, I said he was involved in the drug business.

Q     Did you tell them after he was caught?

A     Yes.

          MR. ZAYAS:  I'll pass the witness, your Honor.

          THE COURT:  Mr. Young?

          MR. YOUNG:  Thank you, your Honor.

                    REDIRECT EXAMINATION

BY MR. YOUNG:

Q     Mr. Cardenas, I am going to ask you a series of statements, and I'm going to ask you if you agree with those statements.  In other words -- in other words, whether those statements are accurate or not.  Do you understand?

A     Okay.

Cardenas - Redirect / By Mr. Young                    72

Q    If someone would say that the defendant was close friends with Jorge Eduardo Costilla, a/k/a "Coss," the leader of the Gulf Cartel, would that be an accurate statement?

MR. ZAYAS:  Objection, your Honor, leading statement.

THE COURT:  Overruled.

THE WITNESS:  Yes.

**BY MR. YOUNG:**

Q    If someone said that the defendant was a close confidante of Jorge Eduardo Costilla, a/k/a "Coss," the leader of the Gulf Cartel, would that be an accurate statement?

MR. ZAYAS:  Objection, your Honor.  Leading, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes.

**BY MR. YOUNG:**

Q    And if someone said that Jorge Eduardo Costilla, a/k/a "Coss," the leader of the Gulf Cartel, told the defendant to take control of the Rio Bravo plaza in September of 2011, would that or would that not be an accurate statement?

MR. ZAYAS:  (indiscernible)

THE WITNESS:  Yes, sir.

THE COURT:  Excuse me just a second, sir.  There is an objection.

Mr. Zayas?

MR. ZAYAS:  That calls for a hearsay statement and

**EXCEPTIONAL REPORTING SERVICES, INC**

Cardenas - Redirect / By Mr. Young                                73

knowledge that is not in his purview, and it's against the

confrontation clause of the U.S. Constitution.

          **THE COURT:**  Sustained.

BY MR. YOUNG:

Q    On October 21st, 2011, on the night of your arrest -- I'm

sorry; October 20th and into the morning of October 21st, 2011,

was this defendant arrested yet or not?

A    No.

Q    Was this defendant in custody in the United States, as far

as you knew?

A    No.

Q    And that night, before he was arrested, who did you tell

the agents was the plaza boss of Rio Bravo?

A    I told them that he was the boss of Rio Bravo.

Q    And on that night, before the defendant was arrested, what

did you give as his nickname?

A    Equis Cinco or El Primo.

Q    And that night, before the defendant was arrested, did you

tell the agents who was aligned with Costilla and who was

aligned with you?

A    Yes.

Q    And who did you say was aligned with Jorge Eduardo

Costilla?

A    Wicho was, Juan Rincon, Guerra, Mario Pelon.

Q    And on that night, before the defendant was arrested, what

Cardenas - Redirect / By Mr. Young                                74

did you tell the agents would happen when elements aligned with Costilla would find out that you were arrested in the United States?

A    That they were going to go into Matamoros and to find and get my people out of there.

Q    And what did you tell the agents would be the response of this future action by the people under your control?

A    Well, I said that, that once they found out I was arrested, they were going to fight for the Matamoros plaza, that they were going to go into Matamoros.

Q    But what would your -- people under your control do in response?

        **MR. ZAYAS:**  Objection, your Honor.  Calls for speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  They were going to defend themselves. They were going to defend the Matamoros plaza.

**BY MR. YOUNG:**

Q    I'm going to ask you another series of questions based on your experience as the plaza boss for two years approximately in Rio Bravo.  And I want you to focus just on your duties in Rio Bravo.  And at the end of each question I'm going to ask you:  Is this an accurate statement, more or less, or not? Okay?

A    Okay.

Cardenas - Redirect / By Mr. Young                    75

Q    If someone else had told agents that they were paying the
Ministerial Preventiva (phonetic), the police Preventiva,
approximately $20,000 a week for corruption in Rio Bravo, does
that sound accurate to you?

A    Yes.

Q    If someone said that they have --

THE INTERPRETER:  Excuse me.  "La policia preventiva"
can mean municipal police, it can mean traffic police --

MR. YOUNG:  Yeah.

BY MR. YOUNG:

Q    If someone said that they had a payroll and expenses in
Rio Bravo as plaza boss of approximately $95,000 a week, would
that be more or less accurate?

A    Yes.

Q    If someone said that they had groups of people working 24-
hour shifts to help watch over the plaza on behalf of that
person, does that sound accurate or not accurate?

A    Yes.

Q    If a person said that they have several smugglers in Rio
Bravo that smuggle for that person and also smuggle on behalf
of others to import into the United States large amounts of
narcotics, would that be an accurate statement or not?

A    Yes.

Q    If someone said that these smugglers would charge a price
of approximately $40 a kilo and then, in turn, pay the plaza

Cardenas - Redirect / By Mr. Young                    76

boss about $10 a kilo for the crossing and the importation into the United States of these narcotics, does that sound like that would be an accurate statement?

A     Yes.

Q     If that person said that:  In my plaza, Rio Bravo, that my smugglers smuggle for me approximately 500 kilos a week, on average, would that sound like an accurate statement?

A     Well, yes, sometimes, and sometimes no.

Q     Let me take you back to September and October of last year.  Would September and October be what you would consider a high volume time to cross narcotics into the United States because of growing seasons or a low volume time?

A     Yes.

Q     "Yes" meaning high volume or low volume?

A     Oh, it's -- it's the time -- that time of the year.  I don't know if you recall when I told you that it was two times of the year; the one involving irrigation and the one having to do with rain.  January, February, March, that's when they -- they -- (indiscernible), and then April and May is when it comes to the border.  And the other time of the year is in July and August, again, when they plant.  And September, October, November is when they get to the border and then they cross it over here.  That's the time of the year for marijuana, season for marijuana.

Q     Do you know an individual by the name of "El Rojo"?

Cardenas - Redirect / By Mr. Young                    77

A     Yes.

Q     And tell the jury who El Rojo was with regards to your duties as plaza boss in Rio Bravo.

A     The "Rojo" is a crosser whose job is to cross drugs across to the United States.  He works in the Rio Bravo plaza.  He has about a hundred people working for him, and their job is to cross the drugs over to this side.

Q     Okay.  While you were plaza boss for the two years in 2009 up until approximately March of 2011, did you have any conversations with El Rojo regarding any sort of activities that he did with the defendant specifically?

          MR. ZAYAS:  Objection, your Honor.  Calls for hearsay.

          THE COURT:  The question is --

          THE WITNESS:  Yes.

          THE COURT:  Excuse me.  The question calls for whether he had conversations.  Overruled.

BY MR. YOUNG:

Q     What did El Rojo tell you from time to time with regards to some of his crossing of drugs, specifically marijuana, with regards to the defendant?

          MR. ZAYAS:  Objection, your Honor.  It calls for hearsay and it's against the confrontation clause.

          THE COURT:  Overruled.

          THE WITNESS:  Sometimes he would call me or the one

Cardenas - Redirect / By Mr. Young                          78

in charge would call me.  You all recall that I did tell you that I had somebody put in charge of the people crossing. Sometimes they would either report to me or report to him.  The drugs were going to be crossed over onto this side.  Sometimes it was Guerra, sometimes it belonged to Rincon, sometimes it belonged to Mario Pelon, and sometimes it belonged to other people who were paying a quota to use that territory.  And then he would let me know, either through the person I had in charge or me personally, and then I would call him and --

Q     What amounts of marijuana would Rojo tell you that he was crossing specifically for this defendant?

A     It varies, but --

        MR. ZAYAS:  Objection, your Honor.  Calls for hearsay and it's against the confrontation clause (indiscernible).

        THE COURT:  All right.  The evidence being that this is allegedly a co-conspirator?

        MR. YOUNG:  Yes, your Honor.

        THE COURT:  Objection is overruled.

        THE WITNESS:  Could you repeat the question to me again?

BY MR. YOUNG:

Q     When Rojo would tell you what is going on in your plaza with regards to crossing marijuana, what specifically did he tell you with regards to amounts that he was crossing for this defendant?

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Redirect / By Mr. Young                    79

**MR. ZAYAS:**  Same objection.

**THE COURT:**  Overruled.

**THE WITNESS:**  He would have advised me as to the amounts of money that they had given -- they had put him in charge of; 300, 500, even up to a ton.  It would vary.  It would vary.

**BY MR. YOUNG:**

Q    When you say 300 or 500, are you referring to kilos or pounds?

A    Kilos.

Q    And would, over the time that you were in charge of Rio Bravo, would Rojo cross in total more than a thousand kilos of marijuana?

A    Yes.

Q    Was it close or substantially more?

A    Sometimes he would cross a ton, a ton and a half.  He also crossed minor one as well.

Q    When you were told by Rojo that he was crossing, again, hundreds of kilos at a time for this defendant, would you charge a separate piso, or no?

A    Well, I would charge him.  Since he's a crosser, he would charge him.  You recall that I did tell you that I would charge him 10 percent and the crosser would charge the owner of the (indiscernible).  He would charge him $50 (indiscernible), and then the crosser has to, in turn, give me 10 percent of every

kilo that's crossed over.

Q    Is that one way you could account for the amounts that this defendant crossed through Rojo?

A    Yes.

Q    Now, with regards to taking over Rio Bravo in 2009, there were some questions about how long it took you to get started in San Fernando.  When you go to Rio Bravo, do you have to start completely from scratch, or are things already in place so that you can transfer into power quickly or slowly?

A    Since I already had experience, I already had my people in charge, my (indiscernible) -- all of my accountants, my -- and I would get to Rio Bravo, I would change everything, and then I would put all my people in very quickly.  Yeah, the quicker you do it the better, because then you can take control of the plaza.

Q    Did you have to wait for 90 days for your academy to go through?

A    No.  No, in 90 days the Zetas would have come in.

Q    What about other people that you put on all these charts that took over plazas?  Were they able to come in, based on your experience, quickly, or did they have to wait for 30, 60, or 90 days?

A    No.  No.  Quickly, quickly.  That's the day when we would come in they needed to come in and get control of the department or the area that they were in charge of.

Cardenas - Redirect / By Mr. Young                    81

Q    And, then, based on your experience, having taken over plazas yourself, when somebody is placed in charge of a plaza, does he go there by himself and start knocking on doors, or does he come in with his own personnel?

A    He starts there with his people to grab control (indiscernible) as fast as it can be done.

MR. YOUNG:  May I approach, your Honor?

THE COURT:  Yes.

BY MR. YOUNG:

Q    Mr. Cardenas, I'm going to ask you to look at the screen here.  Mr. Zayas asked you questions about the term "lieutenants."  Specifically, we're looking at a copy of 24A, and I'm asking you to direct your attention to where it says "Costilla's lieutenants."

A    Yes.

Q    Now, you also said that the term "workers" could be used.

A    Yes.

Q    Now, how would you classify these individuals in terms of their -- their status in the cartel?

A    In reality, the truth is, as far as the cartel goes, however they're called, they're called "hit men."  They do everything.

Q    And would you consider these people -- how trusted are they to -- and I want to direct your attention to Costilla. Would these be considered the most trustworthy or mid-level

Cardenas - Redirect / By Mr. Young                    82

people or low level?

A     They're people that are very trustworthy as far as Costilla goes.

Q     And do each of these individuals have their own personnel that report directly to them as they do to Costilla, or do they operate as an army of one?

A     They have their groups, their structure of people as well, their team of people that work for them as well.

            THE COURT:  Mr. Young, I'm going to recess the jury. Their lunch is here.

            Members of the jury, at this time you will be in recess until 1:30.  during this recess you're still under my admonishment that you must not form or express any opinion about the facts of this case.

            Thank you.  If you'll just go ahead and take the defendant -- I mean the witness, rather.

      **(Pause; witness stepped down)**

            **THE COURT:**  All right.  Members of the jury, we'll see you at 1:30.  Thank you.

            **COURTROOM ATTENDANT:**  Please rise for the jury.

      **(The jury exited the courtroom at 11:59 a.m.)**

            **THE COURT:**  You may take the defendant.

      **(Pause)**

            **THE COURT:**  All right.  You may be seated.

            Mr. Zayas, the hearing is concluded in state court,

Cardenas - Redirect / By Mr. Young                    83

so you won't be needed, apparently --

MR. ZAYAS:  Okay.

THE COURT:  -- according to the attorney who issued the subpoena.

MR. ZAYAS:  Okay.

THE COURT:  Thank you.

MR. ZAYAS:  Thank you, Judge.

COURTROOM ATTENDANT:  All rise.

(Recess was taken from 11:59 a.m. until 1:36 p.m.)

(Jurors present)

COURTROOM ATTENDANT:  All rise.

THE COURT:  Good afternoon.  Please be seated.

Bring in the witness, please.

(Pause)

THE COURT:  You may continue.

MR. YOUNG:  Thank you, your Honor.

THE COURT:  I'll have the headphones to be provided.

(Pause)

THE WITNESS:  Yes.

REDIRECT EXAMINATION (CONTINUED)

BY MR. YOUNG:

Q    Mr. Cardenas, what is an "ezteca" (phonetic)?

A    It's a patrol car where there are three or four people.

Q    When you say a "patrol car," are we talking about an actual police officer car or something different?

EXCEPTIONAL REPORTING SERVICES, INC

A    A Suburban or an armed pickup truck.  It doesn't even have to be armor.  A vehicle where there are three or four people (indiscernible).

Q    But are those individuals actual official police officers, or are they someone who work for someone else?

A    They are hit men who work for a plaza boss.

Q    And would lieutenants, or those people that we've talked about that are closely aligned with one of the higher leaders of the Gulf Cartel, would they or would they not also have eztecas?

A    Yes.

Q    Who is "El Mudo"?

A    He's one of Costilla's cousins.

Q    Do you recall his name?

A    Fernando Sanchez.

Q    Now, based on your experience in the Gulf Cartel, is it easier or harder to have connections with the Gulf Cartel if you are related to or are good friends with members that are in the cartel?

A    It's easier.

Q    Is it easier or harder to rise up in the ranks of the Gulf Cartel if you begin as either a relative or good friends with someone in the Gulf Cartel?

A    It's easier.

Q    Now, I believe Mr. Zayas asked you some questions about

Lazcano and some sort of influence in Rio Bravo.  Do you recall those questions?

A    Yes.

Q    Now, I want you to focus from 2009 until the time of your arrest.

A    Okay.

Q    When the Zetas broke from the Gulf Cartel, who was in control of Rio Bravo?

A    On the Gulf Cartel side it was me.  And on the second side it was a woman, and they called her -- I don't recall what the name was, the name they gave her, but it was a woman.  And she worked for Lazcano.

Q    But when the break happened, who won control of the Gulf -- who won control of Rio Bravo?  Excuse me.

A    We did.

Q    "You" meaning who?  Which cartel?

A    Gulf Cartel.

Q    Now, with regard to some questions that Mr. Zayas asked you about the importation of drugs into the United States, did you as a plaza boss receive a profit from anyone who imported narcotics into the United States that you knew of?

A    Yes.

Q    And did the Gulf Cartel, in general, receive a profit from any narcotics that was imported into the United States?

A    Yes.

Q    With regards to the landing strips that you testified about, what is your opinion, based on your experience and knowledge, of these 500 kilo of cocaine loads that landed on your landing strips?  Were these -- were these 500 kilos at a time meant for distribution at tienditas, or were they meant to go elsewhere?

THE INTERPRETER:  In houses that sell drugs.

THE WITNESS:  It was for houses where they would sell drugs, and the majority of it though would be for sending to the United States.

**BY MR. YOUNG:**

Q    Okay.  And based on your testimony, from approximately 2003 until you -- in San Fernando, until you left in 2009, what is your opinion and belief, based on your experience, about the specific loads you recall that the defendant helped in San Fernando, the 500-kilo loads?  Where was -- where were those drugs going?

MR. ZAYAS:  Objection, your Honor.  It's causing him to speculate and it's on his belief, not his actual knowledge.

THE COURT:  Overruled.

THE WITNESS:  All of that drug was coming over here to the border and then it was to be crossed into the United States.

//

//

Cardenas - Redirect / By Mr. Young                        87

BY MR. YOUNG:

Q    Now, Mr. Zayas asked you a few questions about plaza bosses, and I believe you answered that they are in control of their plaza and, so, they do what they want.  Do you -- do you remember those questions?

A    Yes.

Q    But let me ask you this.  What would happen to a plaza boss if they charged the piso --

THE INTERPRETER:  Quota.

MR. YOUNG:  -- for someone else's narcotics that a piso had already been paid for?

THE INTERPRETER:  Quota had already been paid for.

MR. YOUNG:  Would there be a problem?

THE WITNESS:  Yes.

BY MR. YOUNG:

Q    Now, you've testified about several people who were either killed or arrested that were plaza bosses.  Do you recall some of that testimony?

A    Yes.

Q    Were there other individuals who were removed from plazas because of problems that they may have encountered?

A    Yes.

Q    So, ultimately, a plaza boss, do they answer only to themselves, or do they answer to other people?

A    They have to obey the boss, the cartel's boss.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Redirect / By Mr. Young                    88

Q    During your years within the Gulf Cartel, who did you have to answer to?

A    The time frame that I was there, when I was there, they -- before they arrested Osiel, I have would have to answer to Osiel.  And then after Osiel got caught, then I had to give an accounting to, an answer to, Costilla.

        MR. YOUNG:  Just one second, please, your Honor.

        THE COURT:  Yes.

        (Pause)

BY MR. YOUNG:

Q    Mr. Cardenas, I want to make, hopefully, clear some questions involving a piso --

        THE INTERPRETER:  Quota.

        MR. YOUNG:  -- versus what a smuggler at the river would charge.  And I believe there were some questions asked about, for instance, "Rojo."  Does a crosser charge a piso or is that just a charge for importing the drugs into the United States?

        THE WITNESS:  He just charges whatever the drugs -- the drugs that are being crossed.  He -- the owners of those drugs, he charges them.

Q    And does the plaza boss receive some cut of that payment to the crosser?

A    Yes.

Q    Do you recall approximately how much that might be per

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Recross / By Mr. Zayas                    89

kilo?

A    Ten percent.

Q    When you were arrested in the United States, did you have -- were you -- did you have more than a quantity in excess of a thousand kilos of marijuana on you?

A    No.

Q    Can you lift a thousand kilos of anything?

A    No.

Q    Were you caught with a quantity in excess of five kilograms of cocaine when you were arrested?

A    No.

Q    With regards to importation, again, questions being asked recently by Mr. Zayas, let me ask you about a "polla".  Were pollas intended --

THE INTERPRETER:  A pot.

MR. YOUNG:  Were pollas intended only for drugs that stayed in Mexico, or were pollas also intended to go elsewhere?

THE WITNESS:  Almost everything was included in the pot when you come over to the United States.

MR. YOUNG:  Thank you.  Nothing further, your Honor.

THE COURT:  Mr. Zayas?

RECROSS EXAMINATION

BY MR. ZAYAS:

Q    When you were caught in Port Isabel -- is that where you were caught?  I'm sorry.

Cardenas - Recross / By Mr. Zayas                                    90

A      Yes.

Q      You were with how many -- you were with two different gentlemen?

A      Yes.

Q      And what were their names?

A      Okay.  Well, I was with Daniel, Javier, and then one that we called "Jico" because he's from Jicotanca (phonetic), but we don't know his name, so that's what we call him.

Q      These guys, were they from the United States, or were they from Mexico?

A      One is a resident alien, Daniel; the other two have a visa.

Q      And when you say they have a visa, they have the (indiscernible) visa that allows them to come across?

A      Yes.  When you come over for -- to buy something or to come as a tourist.

Q      Would you refer to these gentlemen as your lieutenants?

A      No.

Q      They just hung around with you?

A      Yes; they were my friends.

Q      And you were a plaza boss, correct?

A      Who?

Q      You were a plaza boss in Matamoros at the time they were hanging around with you?

A      Yes.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Recross / By Mr. Zayas                91

Q     Would they do errands for you?

A     They wouldn't.

Q     They knew who you were?

A     Yes.

Q     They knew what you did for a living?

A     Yes.

Q     Did they drive you around?

A     That day they arrived for me and I got in -- got in with them.

Q     And you hadn't been hanging around with them before that?

          THE INTERPRETER:  I'm sorry?

BY MR. ZAYAS:

Q     Had you been hanging around with them before that?

          MR. YOUNG:  Objection, your Honor.  I believe it's outside the scope of my redirect.

          THE COURT:  Mr. Zayas, I was waiting for you to at some -- eventually touch upon a subject that was brought out on redirect, so --

          MR. ZAYAS:  It has to go with the classification as "lieutenant," your Honor, and I'm -- just to finish up on that.

          THE COURT:  All right.  Then, overruled.  You may proceed.

          MR. ZAYAS:  Thank you, your Honor.

          THE WITNESS:  I can't hear.

          THE INTERPRETER:  One moment, your Honor, please.

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Recross / By Mr. Zayas                    92

(Pause)

THE WITNESS:  Yes.

BY MR. ZAYAS:

Q    Can you hear now?  I'm sorry.

A    Yes.

Q    Did they ever pass messages along to you to people that you knew in Matamoros?

A    No.

Q    On the day that they caught you, were you only hanging around with them on that day, or had you been hanging around with them prior to that?

MR. YOUNG:  Outside the scope, your Honor, of redirect.

MR. ZAYAS:  Again, I'm just going to see what kind of relationship they had.

THE COURT:  All right.  You told me --

MR. ZAYAS:  In regard --

THE COURT:  -- that it was regarding the positions?

MR. ZAYAS:  Lieutenant.  Right.

THE COURT:  I'll allow it.

THE WITNESS:  They're my friends, and when they would come over here I would see them at times, because they're my friends.

//

//

EXCEPTIONAL REPORTING SERVICES, INC

Cardenas - Recross / By Mr. Zayas                93

**BY MR. ZAYAS:**

Q    When you were caught, did they try to hide your identity?

        **MR. YOUNG:**  Objection, your Honor.  Again, I believe this is outside the scope.  We've well established the "lieutenant" issue, I believe.

        **THE COURT:**  All right.  Mr. Zayas, I'm asking you; is --

        **MR. ZAYAS:**  That's going to be my last question.

        **THE COURT:**  All right.  Go ahead, then.

**BY MR. ZAYAS:**

Q    Did they try to hide your identity when you were captured?

A    I wasn't -- well, I wasn't there.  I don't know.

        **MR. ZAYAS:**  Okay.  I'll pass the witness.

        **THE COURT:**  Mr. Young?

        **MR. YOUNG:**  Nothing further, your Honor.

        **THE COURT:**  All right.  Sir, you may step down.

    **(The witness stepped down)**

    **(Testimony and transcription of Rafael Cardenas-Vela concluded at 1:51 p.m.; proceeding continued)**

94

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>February 27, 2013</u>

             Signed                                          Dated


                    *TONI HUDSON, TRANSCRIBER*