UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  1:12-CR-0005-1 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Brownsville, Texas |
| | ) | |
| JUAN ROBERTO RINCON-RINCON, | ) | Wednesday, September 26, 2012 |
| | ) | ( 8:34 a.m. to  9:37 a.m.) |
| Defendant. | ) | (10:00 a.m. to 10:41 a.m.) |

TESTIMONY OF ALEJANDRO JIMENEZ-MENDOZA DURING JURY TRIAL

BEFORE THE HONORABLE HILDA G. TAGLE,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES FOR:</u>

Plaintiff:                    ANGEL CASTRO, ESQ.
                              Assistant United States Attorney
                              600 E. Harrison, Suite 201
                              Brownsville, Texas 78520

                              - And -

                              JODY L. YOUNG, ESQ.
                              Assistant United States Attorney
                              P. O. Box 61129
                              Houston, Texas 77208

Defendant:                    RICHARD E. ZAYAS, ESQ.
                              Attorney at Law
                              3100 E. Fourteenth Street
                              Brownsville, Texas 78521

Transcribed by:               Exceptional Reporting Services, Inc.
                              P.O. Box 18668
                              Corpus Christi, TX 78480-8668
                              361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ALEJANDRO JIMENEZ-MENDOZA | 3 | 58 | 83/88 | 87 |

EXCEPTIONAL REPORTING SERVICES, INC

Jimenez-Mendoza - Direct / By Mr. Young          3

**Brownsville, Texas; Wednesday, September 26, 2012; 8:34 a.m.**

**(Partial transcript; testimony of Alejandro Jimenez-Mendoza)**

THE COURT:  Call your next witness.

MR. YOUNG:  Alejandro Jimenez, your Honor.

THE COURT:  Good morning, sir.  Have a seat in the witness chair and you'll have an interpreter.

Do you need an interpreter?

THE WITNESS:  No.

THE COURT:  You don't, okay.  Then please speak into the microphone so that your voice is amplified.  Thank you.

Mr. Young, you may proceed.

MR. YOUNG:  Thank you, your Honor.

ALEJANDRO JIMENEZ-MENDOZA, GOVERNMENT'S WITNESS

DIRECT EXAMINATION

BY MR. YOUNG:

Q    Mr. Jimenez, for the record could you please state your full name?

A    Alejandro Jimenez-Mendoza.

Q    And what is your current occu --

A    Excuse me?

Q    How old are you?

A    I am 45 years old.

Q    And where were you born?

A    In Brownsville, Texas.

Q    I'd like to ask you about your family.

EXCEPTIONAL REPORTING SERVICES, INC

Jimenez-Mendoza - Direct / By Mr. Young          4

Who are your parents?

A    My mom is Guadalupe Mendoza-Zuniga and my father is Manuel Jimenez-Diaz.

Q    And what did -- what did your father do for a living?

A    Well, he was a custom agent.

Q    And what about your mom?

A    She was a reception, phone, you know.

Q    Do you -- how -- do you speak Spanish?

A    Yes.

Q    Do you also speak English?

A    Yes.

Q    Do you prefer trying to speak in English before the jury?

A    Yes.

Q    Okay.  I will ask you that if there are things that I say or Mr. Zayas says that you do not understand please ask us to repeat the question.

A    Yes.

Q    I will also ask you if -- if you feel more comfortable going to Spanish you're allowed to.  We have an interpreter here.

A    Okay.

Q    All right.  Where did your parents live?

A    My mom lived in Matamoras and my father in Monterrey.

Q    And where did you grow up?

A    In Matamoras.

Jimenez-Mendoza - Direct / By Mr. Young          5

Q    Okay.  Why were you born in the United States, if you know?

A    Because my mom and my father at that time they were living together and that time he got money and that's why I was born in Brownsville.

Q    So you a United States citizen?

A    Yes.

Q    How many brothers -- do you have any brothers and sisters?

A    Yes, I got three brothers and I got three sisters.

Q    And how many are -- are any of them United States citizens?

A    Yes, two of them.

Q    Tell the jury about your educational background.

A    Okay.  I studied in Matamoras, elementary and middle high, and I got my GED in prison.

Q    Have you been to prison before?

A    Yes.

Q    Tell the jury how many times you've been to prison.

A    Two times.

Q    When was the first time you went to prison?

A    Nineteen ninety-seven.

Q    And what were you charged with and what did you plead guilty to?

A    Okay, trafficking of marijuana.

Q    And where were you caught?

Jimenez-Mendoza - Direct / By Mr. Young                6

A     In Kentucky.

Q     And was this federal or state?

A     Federal.

Q     Did you attempt -- did you attempt to cooperate?

A     Yes.

Q     Okay.  And tell the jury what your sentence was.

A     It was 37 months.

Q     And where did you serve your prison time?

A     In Three Rivers Camp.

Q     And where is Three Rivers?

A     Close to San Antonio.

Q     Did you get arrested and convicted again?

A     Yes, in 2004.

Q     Two thousand four.  Tell the jury what you were arrested for and what did you plead guilty to.

A     Okay.  They arrest me with 2,750 pounds of marijuana.

Q     Were you transporting it?

A     Yes.

Q     Where was this at?

A     From Freeport to Houston.

Q     And were these state charges or federal charges?

A     State.

Q     And did you plead guilty?

A     Yes.

Q     Did you attempt to cooperate?

Jimenez-Mendoza - Direct / By Mr. Young          7

A    Yes.

Q    And what sentence did you receive?

A    Five years.

Q    Five years in state?

A    In state.

Q    And how much time did you -- tell the jury how much time you ultimately served in state prison.

A    Two years and four months.

Q    And which time did you get your GED?

A    When I was in federal.

Q    And are you currently in custody?

A    Right now?

Q    Yes.

A    Yes.

Q    Okay.  And have you pled guilty to a third drug offense?

A    Yes.

Q    What -- what drug offense have you pled to recently?

A    For crystal meth and cocaine and marijuana.

Q    Were you arrested on January 5th of 2011 and these items, these drugs were found in your house?

A    Yes.

Q    And were you then indicted federally last year and arrested on the federal charges?

A    Yes.

Q    For the same offense?

Jimenez-Mendoza - Direct / By Mr. Young          8

A    Yes.

Q    And did you plead guilty several months ago to your participation in a conspiracy involving these narcotics and involving more than that?

A    Yes.

Q    And is -- do we have -- is there a plea agreement in your case?

A    Yes.

Q    Okay.  And does the plea agreement involve a dismissal of the remaining counts within your indictment?

A    Yes.

Q    Okay.  What is the range of punishment for what you pled to, meaning the conspiracy to possess more than 5 kilos of cocaine, less -- more than 500 grams of meth, and more than 100 kilos of marijuana?  What kind of range of punishment are you looking at?

A    Twenty-five to life.

Q    Are you -- is it more accurate to say ten years to life?

A    Yes.

Q    Okay.  I mean twenty-five could be it but you know you have to serve at least ten years --

A    Uh-huh.

Q    -- do you recall that?

A    (No audible response)

Q    Yes?

Jimenez-Mendoza - Direct / By Mr. Young          9

THE COURT:  You have to answer yes or no.

A    Yes.

Q    And you could serve up to life in prison?

A    Yes.

Q    And are you aware that your prior felony convictions can impact the sentence as well?

A    Yes.

THE COURT:  You have to speak loud enough to where your voice is amplified.

THE WITNESS:  Yes.

THE COURT:  Thank you.

Q    In this particular conspiracy you pled to -- guilty to dates back to 2009?  Do you recall that?

A    Yes.

Q    Now part of the plea agreement is in exchange for your plea of guilty do you recall that the United States will recommend that you receive full acceptance of responsibility?

A    Yes.

THE COURT:  You have to speak louder.

A    Yes.

THE COURT:  Thank you.

Q    And do you recall that the plea agreement also includes the -- that the United States would recommend the low end of whatever guideline range probation would recommend to the -- to the judge?

A     Yes.

Q     Do you recall that in pleading guilty to the Count of ten years to life that we would recommend dismissing the remaining counts against you?

A     Yes.

          **THE COURT:**  Sir, you --

A     Yes.

          **THE COURT:**  Thank you.

Q     And do you recall that based on your cooperation that if -- that the United States reserves the right to recommend a sentencing reduction recommendation to the judge?

A     Yes.

Q     What do you hope to get out of your cooperation?

A     I hope that they give me 15 years or less.

Q     Or something less than you might get if you did not cooperate?

A     Yes.

Q     Okay.  Who makes the final decision on your sentence?

A     The judge.

Q     And have you had a discussion with me where I have told you that if I make a recommendation to my superiors they can either accept it or reject it?

A     Yes.

Q     And if a recommendation is authorized that -- what can the judge do with that recommendation?

A     She can approve it or she can refuse.

Q     Okay.  Can the judge also give you more time off than our recommendation?

A     Yes.

Q     Can the judge give less time off than the recommendation?

A     Yes.

Q     And what could happen to any sort of cooperation if you do not tell the truth?

A     It can be punishment for that.

Q     And punishment in what way?

A     Given more time.

Q     And if you did not tell the truth what would happen to any possible recommendation for a reduction in your sentence?

A     As though it wouldn't come true.

Q     And are you aware of criminal possibilities if you were to lie under oath?

A     Yes.

Q     Do you know the term perjury?

A     Yes.

Q     Do you -- what is perjury?  Tell the jury what perjury is.

A     When you lie.

Q     Okay.  And are you aware that there -- that there could be criminal -- a criminal charge against you --

A     Yes.

Q     -- if you were to lie in court?

A     Yes.

Q     Okay.  When did you -- who did you get involved with and started getting in trouble with drugs?

A     Okay.  It was in 1996 with my brother-in-law, Fernando Sanchez.

Q     And tell the jury what nickname do you know your brother-in-law.

A     El Mudo (phonetic).

Q     El Mudo.  And what significance does your brother-in-law El Mudo or Fernando Sanchez have with regards to individuals in the Gulf Cartel?

A     He's the cousin of Jorge Eduardo Costilla.

Q     And do you know Jorge Eduardo Costilla?

A     Yes.

Q     Have you had occasion in the past to meet him personally?

A     Yes.

Q     And I want you to focus your attention on the years between 2002 up until your arrest last year.

Who -- based on your workings in narcotics, who was Jorge Eduardo Costilla?

A     The boss of the cartel.

Q     Okay.  So with Fernando Sanchez what did you start doing back in, you know, in '96 and going from there with Fernando?

A     Yes.  We start to sell some ounces of cocaine.

Q     Okay.  And then ultimately what happens in 1997 to you?

A     Okay.  I was driving a semi truck.  I was delivering marijuana to -- to the north.

Q     Where at?

A     To Kentucky and Houston.

Q     Now was this Fernando's marijuana or someone else?

A     No, somebody else.

Q     Okay.  So did you work exclusively for Fernando Sanchez or did you work for him and others?

A     I worked for him and for others.

Q     Who did you work with primarily in your -- in your narcotics trafficking?

A     The first time?

Q     Well, just in the '90's in other words and through the 2000's.

A     In the '90's with Fernando and other guys.

Q     Okay.  When you got caught in Kentucky when did you leave prison?  In other words, how -- what year, more or less, did you get out of prison after this first offense?

A     Okay.  They arrest me in '97 and I got out in 2000.

Q     And then when you get out in 2000 where do you go?

A     I live for a few months in Brownsville and I go live to Matamoras.

Q     And let me ask you, I forgot to ask you this. Have you -- are you married and have you been married before?

A     Yes, I've been married -- well, one legally and I was

living with a -- with a woman.

Q    Okay.  When were you first married?

A    In '93.

Q    And who were you married to then?

A    (Indiscernible) Torres.

Q    And how long were you married with her?

A    I marry for -- with her like eight years.

Q    And do you have any children through her?

A    Yes.

Q    How many children?

A    I got one daughter.

Q    And what is her name?

A    Paloma (phonetic) Alejandro-Jimenez.

Q    And have you been married since then?

A    Yes, I got married one more time.

Q    Okay.  Who was that?

A    Well, I lived with her, with one woman, and I married another one.

Q    Okay.  And who was that?

A    The first one, the one earlier, with Nadia Lorena Medina (phonetic).

Q    And who is Nadia Medina?

A    Okay.  I got a daughter with her and right now she is the couple of Mario Cardenas.

Q    She's the what?

A    The couple.

Q    The couple?  Are they married?

A    The wife.

Q    I'm sorry?

A    The wife of Mario Cardenas.

Q    And do you know Mario Cardenas?

A    Yes.

Q    And how do you know Mario Cardenas?

A    Because I grow in the same neighborhood as him.

Q    Did you know Osiel Cardenas?

A    Yes.

Q    Okay.  Was there occasion in the past that you talked about drugs with Mario Cardenas?

A    Yes.

Q    What do you know him to do in general as a profession, if you will?

A    Well, he's a drug dealer.

Q    And are you currently married?

A    Yes.

Q    And who are you married to?

A    Maita Patricia Castro (phonetic).

Q    All right.  Let me take you now to 2001.  You've been out of prison for approximately a year.

        Do you come in contact and see and meet an individual by the name of Juan Roberto Rincon-Rincon?

Jimenez-Mendoza - Direct / By Mr. Young          16

A     Yes.

Q     And is the individual that I'm referring to as Juan Roberto Rincon-Rincon, is he in the courtroom today?

A     Yes.

Q     Okay.  Could you please point to him and describe an article of clothing he is wearing?

A     It's a gray shirt.

        **MR. YOUNG:**  Your Honor, will the record reflect that the witness has identified the defendant Juan Roberto Rincon-Rincon.

        **THE COURT:**  The record will so reflect.

Q     Did you have any nicknames or do you know -- do you know the defendant by any nicknames as well?

A     Well, I know they call X-5.

Q     Okay.  Was there any other nicknames that El Mudo or your brother-in-law Fernando Sanchez would use as well?

A     To him?

Q     Yes.

A     Juanito.

Q     All right.  Tell us about this first meeting where you met the defendant.

        Where did you meet him at?

A     Okay.  It was a funeral in Matamoras in the parking lot. They killed Juan Pablo Gonzalez-Sanchez, La Torta (phonetic).

Q     The nickname was what again?

A    La Torta.

Q    Okay.  And tell us about which -- do you know which funeral home?  Do you recall that, which funeral home it was?

A    It was (indiscernible) Lozano.

Q    Where's that at in Matamoras?

A    Matamoras, (indiscernible) Juarto Camino Manso in Matamoras.

Q    Well, tell the jury how this meeting -- what happened at this meeting.

A    It was -- it was a lot of guys outside in the parking lot.

Q    Like who?

A    Like Jorge Costilla, Osiel Cardenas, Antonio De La Garza (phonetic), Visarde (phonetic), and some more guys.

Q    Individuals that you --

A    Including Mr. Rincon.

Q    I'm sorry?

A    Including Mr. Rincon.

Q    And these are individuals that you recognized?

A    Yes.

Q    Okay.  Then how is it that you met Rincon, the defendant?

A    By my brother-in-law.

Q    Okay.  And what -- tell the jury how that happened.

A    It was something fast like you know, I hired him.  This is Juan, you know, like something fast.

Q    Okay.  And was there an occasion shortly thereafter that

Jimenez-Mendoza - Direct / By Mr. Young          18

you met the defendant again?

A     Yes, well, I saw him.

Q     Okay.

A     One more time two days later.

Q     And tell the jury about that.

A     It was in front of my brother-in-law's house and I was waiting for him and they come in three trucks, white trucks, silver ones, with guys inside and it was Jorge Costilla and more guys including Mr. Rincon.

Q     And including who?

A     Mr. Rincon.

Q     Could you please -- could you please --

        THE COURT:  Would you please move the microphone closer to the witness?  It can get -- sir, if you get too close it will be difficult to hear but hopefully we'll -- you'll get to the right length or distance from the microphone.  Thank you.

        THE WITNESS:  Okay.

        THE COURT:  Thank you.

        THE WITNESS:  Okay.

Q     Now during the time that I'm going to ask you about your interactions with the defendant did you engage in any drug negotiations yourself personally with the defendant?

A     No.

Q     Who would engage in those types of conversations?

A    My brother-in-law.

Q    And how would you know that?

A    Because I was the helper of my brother-in-law.  He's telling me everything.

Q    And were there at least a few occasions where you were present during conversations?

A    One time and the other one I was with them but I was at another table.

Q    All right.  Then let's go to 2002 after meeting the defendant.

Do you -- what is -- do you get involved again with working through the Gulf Cartel?

A    Yes.  I got involved one more time working with Victor Manuel Vasquez-Morales (phonetic) and Meme Cabazon (phonetic).

Q    His nickname is what?

A    Meme Cabazon.

Q    Okay.  Tell the jury how you became involved after -- in 2002 and going into 2003 with Meme Cabazon.

A    Well, I was working with him.  I was like helping him deliver money to Veracruz, delivering clothes and wine, and things that he needed.

Q    Okay.  Do you recall going to a party for Tio Lolo around this time?

A    Yes, it was in the middle of 2002.

Q    And who is -- who was or is Tio Lolo?

A    Tio Lolo is the uncle of Jorge Costilla.

Q    Tell the jury about this party.

A    It was in a big warehouse.  It was a big cookout.  There was a lot of guys over there.

Q    And who do you see there?

A    I see Gaby Montez (phonetic), Osiel Cardenas.  I see Jorge Costilla, Meme Cabazon, (indiscernible), Juan Carlos De La Cruz.  I see a bunch of guys from Matamoras.

Q    Who else do you see there?

A    Mr. Rincon.

Q    At that time did you say hello to him --

A    No.

Q    -- if you recall?

A    No.

Q    But you did -- but you saw him?

A    Yes, I saw him.

Q    All right.  Now I want to take you to April of 2003 with regards to your work with Meme Cabazon in the Gulf Cartel.

Is there an event that happens then in approximately April of 2003 to both you and Meme Cabazon?

A    Okay.  We are arrested in Boca del Rio, Veracruz.

Q    And you were arrested for what?

A    Well, they looking for him because he was one of the heads of the cartel.

Q    And so what happens to you?

Jimenez-Mendoza - Direct / By Mr. Young          21

A    They release me five days later because they got no charges on me.

Q    And then what do you do?

A    I come back to Matamoras and I start to work with Fernando Sanchez one more time.

Q    Working doing what, washing cars, or what are you doing?

A    Selling drugs.

Q    And what happens to you in approximately September of 2003 with regards to selling drugs in Matamoras for Fernando Sanchez?

A    Okay.  I was picked up by the people of Gaby Montez.

Q    The people of Gaby Montez.

        Who was Gaby Montez at the time?

A    At that time he was a plaza boss in Matamoras.

Q    And do you recall the day that you were picked up?

A    I remember exactly it was the 9th of September.

Q    What night was it?

A    Nine September -- September nine.

Q    In 2003?

A    Two thousand three.

Q    Why were you picked up by Gaby Montez's people?

A    Because I sold a quarter of a kilo to a guy and he set me up.

Q    And were you selling other amounts of cocaine?

A    Yes.

Jimenez-Mendoza - Direct / By Mr. Young          22

Q    Okay.  But why were you picked up?

A    Because I don't report the fee to them, the piso.

Q    Okay.  Were you paying the piso or no?

A    No, we don't pay the piso because I was working for the cousin of Costilla.

Q    Is -- were -- is it your experience and your knowledge through those individuals in the Gulf Cartel that if you are related to someone who is high up does that help or hurt you in trying to get authority to deal drugs or to be in the organization?

A    Yea, that help you.

Q    Would you be able to do some of the bad things that you did just by your name alone or did -- was it helpful that you knew someone?

A    I need to give you the name of my brother-in-law.

Q    All right.  When you were picked up by Gaby Montez's people what happens?

A    They released me because my brother-in-law talked to him.

Q    And how did that happen?  Tell the jury how you were -- where did they take you if you recall and how were you held?

A    Okay.  They picked me up at 3:00 in the morning and they take me to a house and my sister called Castillo's mom and Castillo's mom called Costilla and Costilla called Gaby Montez and next when -- when I was in prison with Gaby Montez, Gaby Montez asked me if I had the telephone number of Fernando

Sanchez.  I said, "Yes, look for Fer (phonetic)."  He called him and they are talking on the phone and they released me.

Q    I want to stop you there.  When you say "Look for Fer," what are you talking about?

A    The nickname Fer.  I have a nickname Fer.

Q    But where?

A    Matamoras.

Q    You have the nickname of Fer but on what?

A    In my phone.

Q    Okay.  So what do you do with the cell phone or what did you tell him to do with the cell phone?

A    I call Fernando, call Fer.

Q    While you were being held how were you being held?

A    How?  They tie me up and they put a bandana on my eyes.

Q    All right.  And for how long were you being detained?

A    I was picked up at 3:00 in the morning and they released me at 11:00, 12:00 in the morning.

Q    The next day?

A    The next day.

Q    All right.  Let's go to October of 2003 then after this incident.

         Did you work with Fernando in efforts to get appropriate authority to do something within the Gulf Cartel?

A    Okay.  Yes, I was working with Fernando but I meet a guy 'cause I call Fer -- Gerardo Ochoa from Veracruz.  We tried to

Jimenez-Mendoza - Direct / By Mr. Young        24

make a line from Guajata (phonetic) to Veracruz, Veracruz, Houston, and I asked to -- Fernando to have a meeting with Costilla.  That way I can ask for permission to -- to make the line.

Q    When you say "a line," what are we talking about?  Are we talking about a railroad or what are we talking about?

A    Try to import marijuana to United States.

Q    All right.  And when you say from -- ultimately from Veracruz to Houston how would -- what mode of transportation were you talking about?

A    We using a small boat and an extreme boat.

Q    And when you say you wanted to talk to Jorge Costilla in October of 2003, who was the head of the Gulf Cartel?

A    Him, Jorge Costilla.

Q    Did you ultimately have that meeting?

A    Excuse me?

Q    With Costilla.

A    Yes.

Q    Okay.  Where was -- tell the jury where that meeting took place.

A    It was in a carwash and Costilla received me.  I talked to him and I explained what I wanted and he say okay.  He gave me the okay to move forward.

Q    Do you recall meeting also at a mechanic shop?

A    Yes.

Jimenez-Mendoza - Direct / By Mr. Young          25

Q    Was that -- this meeting about this line or was that a different line?

A    That's -- well, we call carwash or mechanic shop.

Q    Was it -- are they -- are they the same type of business?

A    The same, the same.

Q    Who owned this carwash/mechanic shop?

A    Okay, my brother-in-law.

Q    Your brother -- I'm sorry.  When you say "your brother-in-law" do you have more than one brother-in-law?

A    No, Fernando Sanchez.

Q    Well, I'll ask you if you can refer to the name.

A    Okay.  Fernando Sanchez.

Q    All right.  So who owned this place, this business again?

A    Fernando Sanchez.

Q    Okay.  And -- all right.  Take us to this scene when you're meeting -- when you're -- who arranged the meeting with Costilla?

A    Fernando.

Q    Where is -- where is the location of this carwash/mechanic store?

A    (Indiscernible)

Q    In what city?

A    Matamoras.

Q    All right.  When you're -- when you're there is this in the day, the early morning, the evening?

Jimenez-Mendoza - Direct / By Mr. Young          26

A    No, it was in the night.

Q    Okay.  And what's going on at the carwash?

A    Well, there was Costilla there and there was more guys and --

Q    Did you recognize anybody else?

A    Yes.

Q    Who else?

A    Mr. Rincon.

Q    Okay.  And did you recognize anybody else there?

A    My brother-in-law and there was some guys there working with -- with Costilla.

Q    Do you recall any of those individuals?

A    Excuse me?

Q    Do you recall any of those individuals also working for Costilla?

A    Yes.

Q    Who were they?

A    Well, that day was my brother-in-law, Jorge Costilla. There was Juan Rincon, different folks.

Q    People like that?

A    Uh-huh.

Q    Now at this point, the times that you've testified to, who was Rincon always with?

A    He was a helper, just a helper.

Q    At the time?

A     At the time.

Q     The helper of who?

A     To Jorge Costilla.

Q     All right.  Now what's -- what's going on at the carwash? In other words, do you have this meeting and ask him for this new line to take drugs into the United States with everybody? Was it a formal meeting or how do you approach --

A     No, it just -- well, because my brother-in-law that's his cousin.  He got the permission to go close to Costilla.  He's saying why we want to talk.  We want to decide.  What this cost.  What I wanted and then he say "Okay," and we went to the front of the car.

Q     All right.  The front of whose car?

A     My car.

Q     And what kind of car did you have?

A     It was a Tahoe, a red Tahoe.

Q     Where was Costilla sitting when you had this discussion?

A     In the hood.

Q     On the hood?

A     Yes.

Q     Where was the defendant during this time?

A     On the side, the other side of the truck.

Q     Now was he part of the conversation?

A     No.

Q     Okay.  And what did Costilla -- were you present when

Jimenez-Mendoza - Direct / By Mr. Young          28

Fernando made this pitch for the new line?

A     No, he go first to talk to him to explain what we wanted and then he called me and I explained with details what I wanted.

Q     Could you back at that time yourself gone to Costilla and asked for this authorization or did you need to go through somebody?

A     No, I need to go through him.

Q     And where was Gerardo Ochoa at this time?  Was he at the carwash?

A     No.  He was in Veracruz.

Q     What did Costilla end up doing at -- later that night at the carwash?

A     He got so drunk.

Q     What happened?

A     He took my truck.

Q     He took your truck?

A     Yes.

Q     Okay.  I mean did he steal it or what did he --

A     No, no, he just took it to and they give it back the next day.

Q     You got -- you got your truck back?

A     Yes.

Q     Did he -- did he sleep in the truck?

A     Yea, he sleep in the truck because he got so drunk.

Jimenez-Mendoza - Direct / By Mr. Young          29

Q    Okay.  So but when you say "he took it" do you mean that he drove it off somewhere or he just slept in it?

A    No, he asleep inside but somebody else drive the truck.

Q    After this authorization what happens?

A    Well, we start to work and I make the first -- the first load.

Q    And this is in approximately October of 2003?

A    October of 2003.

Q    Okay.  And how much was this first load more or less?

A    It was 1,800 pounds.

Q    Okay.  And did you successfully use boats?

A    Yes.

Q    Okay.  And was that load a successful load?

A    Yes.

Q    Okay.  And what happens -- what was the negotiations for?  Did you have to pay anything to the Gulf Cartel for the permission to start taking these loads into the United States and up to the Houston area?

A    Okay.  I -- he told me to pay $50 a kilo.

Q    Fifty dollars?

A    For the piso.

Q    Okay.  So, $50 a kilo, okay.

A    Uh-huh.

Q    And when -- and let me ask you this.  When Costilla had this meeting with you at the carwash and with Fernando, you

testified that Rincon was close by.  Even though he didn't participate in the conversation could you tell whether he was -- could he listen to it?  Could he hear it or was he off talking to other people?

A    No, he wasn't in --

THE COURT:  Excuse me, just a second, Mr. --

MR. ZAYAS:  Objection, your Honor, calls for speculation.

THE COURT:  He can testify if he knows.

Q    What was the defendant doing while you were having -- while this conversation was going on with Costilla about permission?

A    He was in the back of the truck.  He was on the side.

Q    Okay.  All right.

A    He don't listen what we talking about.

Q    Okay.  He was not?

A    Uh-huh, no.

Q    Okay.  Who do you pay the piso for this first load that was successful?

A    Okay.  The first load I pay to Sergio.  He was the loader or the helper of Costilla.

Q    And do you know what Sergio's full name is or nickname?

A    Well, just he's a brother-in-law of Fernando but I don't his second name or nickname.

Q    Let's go to a second load.

Was there a second load in November of 2003?

A    Yea, it was a second load too.

Q    Okay.  And this was successful.  Approximately how many pounds of marijuana or kilos of marijuana was this if you recall?

A    It was almost 2,700, something like that.

Q    Kilos of marijuana?

A    Yes.

Q    And was this successfully imported into the United States?

A    Yes.

Q    Okay.  And was there a piso that needed to be paid for that?

A    Yes.

Q    Okay.  Tell the jury what piso -- how did you pay that piso.

A    I paid the piso directly to Jorge Costilla in the hand in a Louis Vuitton bag.

Q    What type of bag?

A    Louis Vuitton bag.

Q    Okay.  Tell the jury what's the location, what's going on, how do you do this.

Do you see him in the street and hand him a bag or how does this happen?

A    No.  They have a party, a cookout, and they told me where they are and then I go there and say "This is for the" -- you

know.

Q    When you say "they," who are you talking about?  How did you know to go to the party?

A    How?  By my brother-in-law, Fernando Sanchez.

Q    Fernando tells you?

A    Yes.

Q    Is Fernando with you when you go to the party?

A    Yes.

Q    Okay.  And do you just walk up to Costilla and say "Here," or how does that happen?

A    No, we need to have permission for -- to go to him.

Q    Okay.  And so did you get permission to go to him?

A    Yes.

Q    Okay.  When you go in what do you see?

A    Well, it was Mr. Costilla and I give the bag to him and said "This is for the piso."  He give the bag to Juan Rincon and say "Count this," and they go to another table.  They count and they say "Clear, everything is all right," and we stayed a little bit over there and then we left.

Q    Now let's go back to the -- at this party where was it more or less?  Was it in a house, an office, a warehouse?  I mean do you recall approximately where it was?

A    It was in a carwash of (indiscernible) Espana (phonetic).

Q    Is it the same carwash that you had the previous meeting or a different one?

Jimenez-Mendoza - Direct / By Mr. Young          33

A      No, excuse me, the first -- the first one, it was in Fernando's mechanic shop.  The second one, it was at 18 and Espana and that's the carwash.

Q      Okay.  So let me be very clear about this.  Where was the location of the first meeting you had with your brother-in-law to talk to Costilla about opening up a line with you and Gerardo Ochoa?  Was that a carwash or was it at a mechanic shop?

A      Well, my brother-in-law had a mechanic shop with a carwash to where it's together, you know.

Q      So then when you have this meeting to pay the piso for the second imported load into the United States that is at a different carwash?

A      Yes.

Q      All right.  When you go inside at this party do you hand the bag in front of everybody after you receive permission to meet him or are they in a separate office or how does that work?

A      No, it was outside and I give him the bag.  You know, he told Mr. Rincon to "Count this."

Q      And how close was the defendant to Costilla when you handed the bag?  Was he like 50 feet away, 100 feet away, right next to him?

A      Well, he was like 6 feet away and he say "Look, count this."

Q    And what does Rincon say?  Does he say "No, I'm not going to do that" or does he say anything or just takes the bag?

A    Yea, he took the bag and then him and another guy they moved to another table.  They count it and say everything's all right.

Q    Can they see -- can you see them while they're counting or do they go to like a separate room?

A    They go to another table, you know.

Q    Within your sight?

A    Yea, like a few feet separated from us.

Q    How long does it take for them to count?

A    Well, I remember it was all -- it take like, maybe like 15 minutes.

Q    And so this was a -- how much -- was this United States currency or was it pesos?

A    Yea, U.S. dollars.

Q    Do you recall approximately how much that piso would have been for you've said about I think 2,700 kilos?  Do you recall approximately how much the piso would have been?

A    Okay.  At that time, we -- I give him like 78,000.

Q    Seventy or eighty thousand?

A    Seventy-eight thousand.

Q    Seventy-eight thousand?

A    Uh-huh, approximately.

Q    Approximately.  Was there a third dope load that was

Jimenez-Mendoza - Direct / By Mr. Young          35

successfully imported into the United States as part of your activities with Gerardo Ochoa?

A     Yes.

Q     And when did that occur approximately?

A     Approximately in December.

Q     Of 2003?

A     Two thousand three.

Q     Okay.  And what happens there?

A     It was successful and I went to pay the piso but I can't go to pay it because I was sick that day and my brother-in-law called Costilla and that's when Mr. Rincon he picked up the money.

Q     And how do you know this?

A     Because I was outside waiting with my brother-in-law when he go -- he drive to the house and he give him the bag.

Q     Let's back up.  What month was this?

A     December.

Q     Of 2003?

A     Two thousand three.

Q     And how are you feeling?

A     I was sick.

Q     Okay.  And how is that Costilla knows to send someone to pick up the money, the piso for this load?

A     Because they invite me to a posada and I refused it because I was sick and then they send Mr. Rincon to pick up the

money.

Q    But how is they sent -- who -- how did that happen?

A    How?

Q    Yes.  Who makes the phone calls to arrange this?

A    My brother-in-law make the phone -- the phone call.

Q    And who does he call?

A    He call Costilla.

Q    And who shows up to collect the piso?

A    Well, they send Mr. Rincon.

Q    Okay.  And how does the money get to the defendant?

A    I give it to my brother-in-law.  Mr. Fernando Sanchez give it to -- to him.

Q    And where are you sitting?  Are you inside the house or are you outside the house?

A    I was inside first but I'm coming out with him and I see when he hand him the bag.

Q    And what does Fernando do with the bag?

A    He give it to Mr. Rincon in the window on the truck.

Q    Okay.  And is the truck in what, a driveway, or on the side of the street?  I mean tell us --

A    Right in front of the house in the street.

Q    Now you're watching this?

A    Yes.

Q    Okay.  How do you know that it's the defendant?

A    Because my brother-in-law told me that it's Mr. Rincon.

Jimenez-Mendoza - Direct / By Mr. Young          37

Q     Okay.

A     And I saw it.

Q     And you saw it?

A     Uh-huh.

Q     Okay.  And was the defendant by himself or was he with other people?

A     No, no, by himself.

Q     Were there any other cars with him at the time?

A     No.

Q     Okay.  Now based on these two experiences and I'm talking about the party at the carwash where you handed the piso to Costilla and that the defendant counted and now this second one, has your opinion changed about the relative level of the defendant based on what you're seeing with regard to the Gulf Cartel?

A     I am thinking that he was --

        MR. ZAYAS:  Objection, your Honor.  The opinion of Mr. Rincon's position is --

        THE COURT:  Excuse me.  You'll have to speak up at the microphone or either speak louder when you urge your objection or come to the microphone.

        MR. ZAYAS:  The opinion is irrelevant as to his feeling of the position of Mr. Rincon.

        THE COURT:  Mr. -- I'm sorry, Mr. Young, how do you respond to the objection that is basically by speculation?

Jimenez-Mendoza - Direct / By Mr. Young          38

**MR. YOUNG:**  Well, it's based -- I'm asking him specifically as to his observations.  He talked about his impression of the defendant when he first met him in 2001 at the funeral and how he thought he was a helper.  Now he's having more involved meetings with him, higher responsibilities.

So I'm saying based on your observations are you seeing any sort of progress or change in his activities?

**THE COURT:**  He can testify about what he observed as far as actions or comments or things that somebody else did or said but he cannot express an opinion.

**MR. YOUNG:**  Thank you.

Q     After --

**THE COURT:**  Or -- I'm sorry, let me clarify that.  He cannot express anything that would be attributable -- an opinion attributable to anyone else.  He can form his own opinion about what he observed.

**MR. YOUNG:**  Thank you, your Honor, and I'll reserve that question for right now, your Honor.  I'll withdraw it for right now.

Q     Okay.  Let's go to February of 2004.

What's going on in your life at that point?

A     Okay.  At that time I run out of money and I have a -- this conversation with Sergio, another helper of Costilla, and I told him that I'm running out of money and I need to work.  I

need to do something and he told -- he talked to Costilla and they called me back and they send me to Houston to pick up some money.

Q    When you say "they called you back," who called you back?

A    Well, okay, Mr. Costilla called me and said he'll call me.

Q    And what -- all right.  And specifically what did Costilla tell you to do?

        **MR. ZAYAS:**  Objection, your Honor, hearsay and it's in violation of the (indiscernible).

        **THE COURT:**  Overruled.

Q    What did Jorge Costilla tell you to do?

A    Go to Houston to pick up some money.

Q    What type -- I mean did you know what the money was from?

A    Yes.

Q    What was it from?

A    From drugs.

Q    Did you go to Houston?

A    Yes.

Q    Okay.  Tell the jury how did you do this money pick up.

A    Okay.  I went to Houston and I called a friend and he let me use his truck.  It was a Range Rover, like a Range Rover. And I go pick up the money and next I called the driver.  I give him the money and I take the Greyhound and I meet it one time in Brownsville.  I called my brother to pick me up here in Brownsville and I crossed the bridge and I give the money to

Jimenez-Mendoza - Direct / By Mr. Young          40

Fernando Sanchez.

Q     Which brother did you call to help you?

A     Roberto Jimenez.

Q     When you take the money back to -- I'm sorry, where -- how did you travel back?  Did you actually transport the money back yourself or did someone else?

A     No, somebody else.

Q     Okay.  And how did you get back from Houston?

A     How?  Well, they give me a black suitcase, luggage, a black one like this big.

Q     And how did you -- you didn't travel back in the suitcase. How did you travel back from Houston?

A     Well, it was -- everything was sealed in a plastic bag and I give it to the driver and I don't know how he -- he put it in merchandise or -- I don't know he --

Q     Did you see the money in Houston?

A     Yes.

Q     What did you do once you received the money?

A     I went to my friend's house and I cleaned every package with soap and I put it back into the suitcase.

Q     And did -- did you count the money?

A     No because it was a lot and I supposed to don't count the money.

Q     And based on your experience with giving money to the cartel, did you -- how much do you think this money was?

Jimenez-Mendoza - Direct / By Mr. Young          41

A     Well, I think --

          MR. ZAYAS:  Objection, your Honor, calls for speculation.

          THE COURT:  Mr. Young, the question being what, how much you think?  You need to -- what is your response?

          MR. YOUNG:  He can testify to the weight of the -- the numbers of packages.

          THE COURT:  Well, he can testify about that.

          MR. YOUNG:  Okay.  And then the weight of it and he can form an --  he can form an opinion as to the weight of the -- because he's handed bags of money, you know, before and he's going to testify as to whether this was light or heavy and based on that.

          THE COURT:  He can testify about that but as far as the sum then it would speculation.

Q    How many bags -- were they vacuum sealed bags or how were -- what were they like?

A    Yea, it was vacuum sealed and with saran wrap and it was 28 packages.

Q    Twenty-eight packages?

A    Uh-huh.

Q    And 28 packages with 1 bill in each one of them or were there --

A    No, it wasn't.  I think it was like 20,000 in each or more.

Jimenez-Mendoza - Direct / By Mr. Young          42

Q    Okay.  And when you put the money into the bag how did the bag feel?  Was this a light bag or a heavy bag?

A    I mean heavy.

Q    Okay.  And I want you to use your -- when you handed what you believed was approximately $78,000 of the piso to Costilla during the party at the carwash, I want you to use what you remember as that weight and tell me if this bag was heavier or lighter.

A    That bag was like four times heavier than the --

Q    It was heavier?

A    Yes.

Q    All right.  How do you get back to Brownsville though if the individual -- your friend takes the money in the Range Rover I think it was, how do you get back to Brownsville?

A    Well, I -- he gave me the same luggage and I put it on the hood of my truck because it was a Cheyenne, a '98, and it was a V-6.  They got a lot of empty room in the hood and I put it there and I cross it to the bridge.

Q    How did you get back from Houston to Brownsville?  Did you go with your friend or did you go some other way?

A    I come in on Greyhound on the bus.

Q    All right.  When you get back to Matamoras with the money where do you take it?

A    I take it to my brother-in-law's house, Fernando.

Q    Okay.  And why did you take it there?

Jimenez-Mendoza - Direct / By Mr. Young          43

A     Because he gonna call Costilla to go to pick up.

Q     And after the call is made to Costilla what happens?

A     They send me to Rincon to pick up the money.

Q     Okay.  And were you present during this delivery of the money?

A     Yes.

Q     Okay.  What do you see?  Tell the jury where -- where this was and what do you see.

A     It was in front of the house, right in the door to the garage.

Q     Which house?

A     Fernando Sanchez.

Q     Okay.

A     You know Mr. Rincon drive right in the front.  He turned down the window and my brother-in-law give him the luggage and --

Q     And where were you?  Were you inside the house or outside close to the car or far from the car?

A     I was inside of the house but I can see the truck.

Q     Okay.  And after the -- the payment or the delivery is made what happens?

A     Mr. Fernando -- well, my brother-in-law told me that it was Mr. Rincon that -- who was that pick up the money.

Q     And who did he tell you it was?

A     Mr. Rincon.

Jimenez-Mendoza - Direct / By Mr. Young          44

Q    Could you see the delivery though or not?

A    Yes.

Q    Could you see him hand it to --

A    Yes.  I see that he give it to somebody in the window.

Q    Well when you say "somebody," who are we talking about?

A    Mr. Rincon.

Q    Okay.  And what happens a couple of days later?

A    Okay.  I talked to my brother-in-law.  I say "Hey, they want to pay me or not, you know?" because I do the job and they send me $5,000.

Q    When you say "they," who sent you $5,000?

A    Well, Mr. Costilla send me the money but Mr. Rincon was the one to go to give me the money.

Q    Okay.  Tell the jury how do you get -- how much money do you get?

A    Five thousand dollars.

Q    Okay.  Tell the jury how it is that you get this money.

A    Okay.  My brother-in-law go to his truck.  I was next to him.  Mr. Rincon was right in the front of the house, rolls down the window, and give the money to my brother-in-law in the hand, and he gave it to me.

Q    Now as opposed to being at the porch or inside the house, where again are you when this money is handed from the defendant to your brother-in-law Fernando Sanchez?

A    Well, like two feet separated from Fernando Sanchez.

Jimenez-Mendoza - Direct / By Mr. Young          45

Q    Do you say "Hello" or anything?

A    Yes.

Q    Okay.  And does the defendant respond?

A    Yes, he say "Hi," that's it.

Q    Any long conversation or just --

A    No, not with me but with my brother-in-law.

Q    Did you walk away -- sorry.

          THE COURT:  Repeat your answer, please.

          THE WITNESS:  Not with me, with my brother-in-law.

Q    And were you present during that conversation or did you walk away?

A    I moved to the side but I hear a little bit.

Q    So were you part of that conversation?

A    No, not complete.

Q    Was it common when Fernando was talking to other individuals about the cartel that you would -- were there times where you wouldn't be part of the conversation?

A    Sometimes and sometimes not.  Sometimes he's talking with high members or sometimes with family members or, you know, but sometimes "Hey, can you move to the side?"

Q    Let me -- and I may have asked this, I apologize.  But how much money were you given for that load, the money load?

A    The luggage?  Approximately it was more than 700,000.

Q    No, I'm not asking that.  How much were paid for bringing the -- what was your part?

Jimenez-Mendoza - Direct / By Mr. Young          46

A    They paid me 5,000.

          THE COURT:  Excuse me, just a second.  Wait until the question is complete before you begin an answer.

          THE WITNESS:  Okay.

Q    How much were you paid for this job?

A    Five thousand dollars.

Q    Now I want to take you to May 3rd of 2004.

          Do you recall that day?

A    Yes.

Q    And what happened that day?

A    They arrest me between Freeport and Houston.

Q    All right.  And is this the state charges that you were arrested for?

A    Yes.

Q    And how much time did you spend in prison approximately?

A    They give me five years but I spent two years and four months.

Q    When do you get out?  What year do you get out?

A    I get out in 2006, August.

Q    And where do you go?

A    I live in Houston.

Q    And what do you do in Houston?

A    I work in a restaurant.

Q    Which restaurant?

A    Pappas Barbeque.

Jimenez-Mendoza - Direct / By Mr. Young          47

Q    How long did you work at Pappas Barbeque in Houston?

A    One year complete.

Q    And where do you go from there?

A    I move back to Brownsville.

Q    And what year are we talking about now?

A    In 2007.

Q    And what happens in Houston -- I'm sorry, in Brownsville?

A    In Brownsville, I stay almost three months doing nothing in this house.

Q    And then what do you start doing?

A    In December my brother-in-law called me and said they -- if I want to do something.

Q    "Do something" meaning what?

A    Selling drugs.

Q    Okay.  And why were you going to get back into at least initially selling drugs?

A    Because I need to get some money because my daughter, Paloma, quinceanera is coming and I need some money.

Q    Okay.  Let's go into 2008.

     Do you have any other interactions with the defendant?

A    Two thousand eight?

Q    Yes.

A    I saw him one time.

Q    Okay.  All right.  Let's go to -- or do you have -- I mean

how many meetings do you have in 2008 with the defendant?

A     Well, my brother-in-law have the meetings with him.

Q     Okay.  Let's go to the first meeting.  Tell the jury about this first meeting.

        Do you recall, you know, was it spring, summer, fall approximately in 2008?

A     Approximately in the middle.

Q     In the middle of 2008?

A     In 2008.

Q     Okay.  Tell the jury what does Fernando tell you to do.

A     He told me that he need to talk to Mr. Rincon to go to talk to Costilla because they freezing Fernando Sanchez.

Q     When you say "freezing Fernando Sanchez" what are you talking about?

A     They not let him go work.

Q     Why is that?

A     Because they got some -- some family problem.

Q     Okay.  So what does Fernando ask you to do?

A     He told me "Come with me.  I need to talk to him."

Q     And where do you go?

A     To a restaurant.

Q     What -- do you recall what restaurant this was?

A     I don't remember what the restaurant was.

Q     When you -- do you go with Fernando or do you just meet Fernando there?

Jimenez-Mendoza - Direct / By Mr. Young          49

A      No, I went with Fernando.

Q      Okay.  When you go to the restaurant do you sit at tables or do you sit at a bar or do you stay outside?  What happens when you get to the restaurant?

A      Yea, I sit at a table with them.

Q      Okay.  And when you say "them" what happens?  Who comes in?

A      Me, Fernando, and Mr. Rincon showed up and I remember Mr. Fernando Sanchez say "Tell (speaks Spanish)" -- don't be mean with me and give me permission.

Q      And during this meeting are you present at the table or are you sitting somewhere else?

A      Yea, I was present in the table.

Q      So what further discussion did Fernando have with the defendant?

A      Well, they talking about the line from Guadalajara to --

Q      To where?

A      -- to Matamoras.

Q      Okay.  And when you say "a line" what are we talking about?

A      Bringing marijuana.

Q      And how much marijuana are we talking about?

A      One pound.

Q      And what was going to happen to the marijuana in Matamoras?

A    Okay.  Well, the marijuana come successful to Matamoras but he sold 500 kilos in Matamoras and there were 500 they busted in the house.

Q    And where was the 500?  Where the marijuana intended? Was it intended for the United States or to stay in Mexico?

A    Well, to sell it over there in Matamoras, that their intention.

Q    And then from there it could go anywhere?

A    Yea, they can go anywhere.

Q    And then was there anyone else present at this meeting besides you and Fernando Sanchez and the defendant?

A    No.

Q    All right.  Let's talk about a second meeting then.

     Was there a second meeting after this marijuana meeting or discussion about marijuana?

A    There was another meeting.  It was like three months later in my brother-in-law restaurant -- my sister's restaurant in Matamoras.

Q    And when you say "your sister's restaurant" who was your sister married to?

A    To Fernando Sanchez.

Q    Okay.  And where is your sister's restaurant?

A    In Matamoros on Contorse (phonetic) and Luna Santa Maria (phonetic).

Q    At this meeting what is -- why do you go there, to your

sister's restaurant?

A    Because my brother-in-law told me to come to Matamoras.

Q    Okay.  Do you arrive with him or do you arrive separately, if you recall?

A    Yea, I was there but they moved to another table.

Q    Okay.  But do you go with Fernando to the restaurant to get there or do you arrive -- do you go there --

A    No, I arrived to the restaurant.

Q    From who?

A    They are coming from Brownsville to Matamoras.

Q    All right.  When you go in the restaurant do you initially -- are you initially seated with Fernando?

A    Yea, I seated with Fernando.

Q    Okay.  And then what happens after that?

A    Mr. Rincon showed up and then they moved to another table.

Q    Okay.  And where did you stay?

A    I stayed -- I moved to the bar to get a drink.

Q    And what was the purpose of this meeting?

A    Because I told Fernando that I got a client in Brownsville.  He's waiting for kilos of cocaine, to bring it, to sell it to him.

Q    Okay.  And when you say "a client" what are we talking about?

A    A person who's going to buy it.

Q    What was his name?

A     Choo Chee (phonetic).

Q     Do you know -- what was his full name?

A     I don't know his full name.

Q     Okay.  So who approached -- so who approaches who?

Do you approach Fernando to try to get kilos of cocaine in the United States or does Fernando approach you with regards to this particular deal?

A     I told Fernando that I got a client waiting in Brownsville and he told me he don't have nothing but he gonna call Costilla to get some.

Q     Okay.  And so after he calls Costilla who shows up at the restaurant?

A     Mr. Rincon.

Q     Okay.  And when they meet by themselves at the other table are you able to hear the conversation?

A     No.

Q     Okay.  After the conversation is done does the defendant leave the restaurant?

A     Yes.

Q     Does Fernando come back to you?

A     Yes.

Q     Okay.  And what does he tell you about the deal?

A     He told me it was --

        MR. ZAYAS:  Objection, your Honor, requires hearsay in violation of the (indiscernible), your Honor.

**THE COURT:**   Overruled.

Q    What does Fernando tell you about the deal?

A    The deal comes -- we want to -- the next thing it was two days later I get the kilos.

Q    Okay.  And how many kilos approximately was it?

A    Approximately it was like 25.

Q    Okay.  And these are 25 kilos of what substance again?

A    Cocaine.

Q    And how do you get it across into Brownsville?

A    Well, somebody called me and -- oh, my brother-in-law called me and said "Hey, somebody gonna call you.  They want to give you something."

Q    And do you receive this cocaine in the United States?

A    Yes.

Q    Where at?

A    At the parking lot of a restaurant.

Q    And what do you do with the cocaine?

A    I sold it to Choo Chee.

Q    Okay.  And what do you do with the money that's for the sale of it?

A    I called Fernando and I call -- and I say "Hey, I got the money."  He come and get the money and they cross it to Matamoras.

Q    Okay.  And then do you know what happens to the money from there?

Jimenez-Mendoza - Direct / By Mr. Young          54

A     Well, they give it to -- to Costilla.

Q     All right.  Okay.  After this meeting and after this cocaine deal do you have any other interaction or any other sightings with the defendant?

A     Yea, I saw the car a couple of times but nothing big.

Q     Okay.  You were -- do you recall some of the locations you saw him at?

A     I saw him at a party.  Well, it was like you know something drinking on the side with Costilla.

Q     Okay.  Do you recall what year this was?

A     Two thousand and nine.

Q     Okay.  And when you say "a party," who do you see there at this party?

A     Mr. Costilla.

Q     And who else?

A     Mr. Rincon.

Q     Okay.  And who else do you see there if you recall?

A     I don't remember exactly who was there but it was people there.

Q     Did you see the defendant -- I mean with Costilla, you know, like walking around together or just that they both happened to be at the same party, that sort of thing?

A     Yea, at the same party.

Q     Okay.  All right.  And back in the day when you saw the defendant what was his general appearance?

Jimenez-Mendoza - Direct / By Mr. Young          55

A    He was bigger.

Q    "Bigger" meaning like -- I mean like body builder bigger or more weight?

A    More weight.

Q    And approximately how many times have you seen the defendant from about 2002 until I guess your arrest in January -- January 5th of 2011?  Approximately how many times did you see him?

A    Approximately like 20 less or more, something like that.

Q    Do you know an individual by -- through your activities through the Gulf Cartel were you aware of an individual named Wicho (phonetic)?

A    Yes.

Q    And who is Wicho?

A    Well, what I know, he was like a security of Costilla.

Q    Okay.  And did -- at some point did he do something else besides security?

A    He was a plaza boss.

Q    Do you know where approximately?

A    (Indiscernible) Ramirez.

Q    What's close to Ramirez?

A    Progreso, Rio Bravo.

Q    Are you familiar with the location Control?

A    Control Ramirez, (indiscernible) it's the same.

Q    Now in 2009 did you continue working with Fernando Sanchez

or did you start working elsewhere?

A     Okay.  I worked for Fernando Sanchez.  In 2009, I separated from Fernando.  I start to work for Compita (phonetic) by myself with Compita.

Q     And who did Compita work for?

A     Well, what I know, he's a seller for the Cartel.

Q     And do you know of a Rafael Cardenas?

A     Junior?

Q     Yes.

A     Yes.

Q     Okay.  And do you know what his role generally speaking in the Gulf Cartel is or was?

A     Well, he was in charge of San Fernando, plaza boss of San Fernando and Rio Bravo.

Q     Do you recall your last -- the last time you saw the defendant before you were arrested?

A     Who, Mr. Rincon?

Q     Yes.

A     The last time it was in 2010 in Matamoras.

Q     Do you recall where?

A     The liquor store outside.  He was walking, coming out from the truck.

Q     Did you have any conversation or --

A     No, just said "Hi."  I turned down the windows and that's it.

57

**MR. YOUNG:** Nothing further, your Honor.

**THE COURT:** All right. Let me go ahead and give the jury a break right now. It's 9:35.

Members of the jury, you will be in recess for 20 minutes. During this recess you're under my admonishment that you must not form or express any opinion about the facts of this case.

Thank you.

**THE MARSHAL:** Please rise for the jury.

**(Jurors exit courtroom at 9:36 a.m.)**

**THE COURT:** Thank you. Please be seated.

Mr. Castro, the assessment that you gave me yesterday about the lineup, is it pretty much still the case? Is it still a possibility that the evidence at least on the government's case-in-chief might conclude tomorrow?

**MR. CASTRO:** I think that's our target, maybe tomorrow afternoon. Probably -- if it does go, probably Friday before noon then.

**THE COURT:** Okay, all right, thank you.

**THE MARSHAL:** All rise.

**(Proceeding was recessed from 9:37 a.m. to 10:00 a.m.)**

**(Jurors enter courtroom at 10:00 a.m.)**

**THE MARSHAL:** All rise.

**THE COURT:** Thank you. Please be seated. Mr. Zayas? Oh, please bring in the witness.

**(Witness resumed his seat)**

Jimenez-Mendoza - Cross / By Mr. Zayas          58

THE COURT:  You may proceed.

MR. ZAYAS:  Thank you.

**CROSS EXAMINATION**

BY MR. ZAYAS:

Q    Good afternoon, Mr. Jimenez.

A    Good afternoon.

Q    You're here testifying on behalf of the government because you're trying to work yourself a good deal on the amount of time you're looking at; is that correct?

A    Yes.

Q    You've been caught three times -- you've been caught three times moving drugs?

A    Yes.

Q    And you're looking at anywhere from ten to life; is that correct?

A    Yes.

Q    And you're hoping that you get somewhere in the neighborhood of 15 years?

A    Yes.

Q    Do you know how the guideline system works?

A    Yes.

Q    You've been explained that when you get caught and you plead to your -- the crime that the probation officer makes a presentence report, correct?

A    Yes.

Q    And in this presence report there's a number system that comes up?

A    Yes.

Q    And you get more points if you have prior convictions, correct?

A    Yes.

Q    And you get more points for different types of things of your involvement?

A    Yes.

Q    Is that right?

A    Yes.

Q    And then you come to a total number of points, correct?

A    Yes.

Q    And that gives you a guideline range of what you're looking for in your sentencing, right?

A    Yes.

Q    And what you're -- what you're trying to work out with the government is a recommendation from them to the Court and let me -- strike that question.

       What court are you going to be sentenced by?

A    What court?

Q    What judge?

A    Ms. Tagle.

Q    Okay.  So then what you're -- what you're asking is that they're going to make a recommendation to the Court and you're

Jimenez-Mendoza - Cross / By Mr. Zayas                60

going to be asking for leniency from the Court because you

agreed to testify for the government, right?

A    Yes.

Q    Okay.  And when they say the low end of the guideline

range every point has a guideline range of months.

Let's say it could say 360 months to life; is that correct?

A    Yes.

Q    And so when they say a recommendation they're asking that

you get the low end of the guideline range, it would be the 360

months, correct?

A    Yes.

Q    And then they're also going to be recommending what they

call a 5K departure from the guideline range which would be up

to 1/3 off of that; is that correct?

A    Yes.

Q    And so you get the amount of months, you get a third off

of that, and whatever that calculates to is what you're asking

for; is that correct?

A    Yes.

Q    And it could be -- it could be a -- you coming to testify

today could save you anywhere from 25 years to 10 years

somewhere in that -- in that neighborhood.

          Would that correct?

A    That would be correct.

Q    When you -- did you give a statement to some officers

somewhere in the neighborhood of January 9th, 2012?

A     Two thousand twelve?

Q     Yes.

A     January, yes.

Q     January of 2000 -- of this year.

A     Yes.

Q     And in there you talked to them about meeting Mr. --
seeing Mr. Rincon at a party; is that right, in 2003?

A     Yes.

Q     And did you state to the officials that at that party
there was no conversation that went on about drugs.  You saw
who Mr. Rincon was with.

        Would that be correct?

A     Yes.

Q     I want to clarify one of the things that you mention in
your statement and I'm a little bit confused.

        You mentioned an address, 18 and Espana.

A     Espana.

Q     And Espana?

A     Uh-huh.

Q     Okay, 18th and Espana and then you also mention a mechanic
shop and a carwash.  Like -- hold on -- let me ask the
question.

        Is the carwash and the mechanic shop -- when you
refer to that are you referring to the same location?

Jimenez-Mendoza - Cross / By Mr. Zayas          62

A     No, no, okay.  Because I was -- when they asked me I was nervous and I was confused.

Q     Okay.

A     Let me put it clear.  The first meeting was in the -- in the shop of my brother-in-law.

Q     Okay.  And when you say "the shop" that's the mechanic shop?

A     The mechanic shop.

Q     Okay.  But not with a carwash?

A     Not a carwash.  The only one at the carwash is household mechanic.

Q     Okay.  I got it.  So which one of those two locations is located at 18th and Espana?

A     The one with the carwash.

Q     Okay.  Now you mention that that first meeting took place and just to get the record straight, was it at the carwash or the mechanic shop?

A     In 2000 --

Q     Three.

A     Okay.  The first one, it was in the mechanic shop.  The second one, it was in the carwash when I give him the bag.

Q     Okay.  So the first one was at the mechanic shop?

A     Uh-huh.

Q     And then the second one was at the carwash?

A     The first one is in the mechanic shop in Esperanza

(phonetic).

Q    Do you know the name of the other person that you testified assisted Mr. Rincon in counting the money at that first time that you said that he counted some money?

A    I don't who was the other guy but I know it was Mr. Costilla there.  It was Gaby Montez there because I remember Costilla told Mr. Montez "This money is supposed to be yours" because it was for the piso.

Q    Right.  But what I'm trying to say is do you know who the other gentleman was that was --

A    Huh-uh.

Q    -- assisting him?

A    I don't know.

Q    Do you remember what he looked like?

A    Not really.

Q    Do you remember what Mr. Rincon was wearing?

A    Not at that moment.

Q    No?

A    No.

Q    Now you mentioned that one time in December 2003 Mr. Rincon came over to Fernando's house to pick up some money?

A    Two thousand and three, yes.

Q    Okay.  And a suitcase was given to him?

A    Yes.

Q    Okay.

Jimenez-Mendoza - Cross / By Mr. Zayas          64

A    No, that was in 2004.  In 2003, we give him a bag.  In 2004, we give him the luggage.

Q    Okay.  In 2003, a bag?  What kind of bag?

A    Plastic bag.

Q    Like those trash bags?

A    Trash bag but bigger.

Q    Black?

A    Uh-huh.

Q    Okay.  And you personally saw Mr. Rincon pick it up?

A    Yes, I was outside of the house because I was sick that day and we are on the porch and I was in the garage and door was open and I hear him come right in the front of the house and my brother-in-law go there and come get the luggage and give it to him in the window.

Q    Okay.  So you -- was Mr. Rincon by himself?

A    Yes.

Q    Okay.  And he came to pick up a bag?

A    There was a -- the bag, the first one, it was the bag and the second one was the luggage.

Q    Okay.  Let's get it straight.  But on the first one, was the time you were sick?

A    Yes.  No, the first one is when I was sick in December.

Q    Okay.  And when you -- in December?

A    Uh-huh.

Q    You were sick and you were inside the house?

Jimenez-Mendoza - Cross / By Mr. Zayas                65

A    Right outside of the door.

Q    Okay.  You're at the door looking out?

A    Yes.

Q    And then Fernando went to the car?

A    To the truck.

Q    To the truck and gave it to Mr. Rincon?

A    Yes.

Q    Do you remember what Mr. Rincon was driving?

A    I don't remember.  It was a truck.  I don't remember.  It was at night.

Q    Okay.  And do you remember what color the truck was?

A    No, it was at night.  I don't remember what kind of color it was.

Q    Could you even see it was Mr. Rincon inside at night?

A    No, because the -- my brother-in-law told that it was Mr. Rincon but I assume -- I assume that it was him because he told me that.

Q    Okay.  So just to get it straight 'cause you're basing that it was Mr. Rincon because of what Fernando told you?

A    Uh-huh.

Q    But what you could see, you really couldn't see him in there?

A    It looked like him.

Q    It looked like him?

A    Uh-huh.

Jimenez-Mendoza - Cross / By Mr. Zayas          66

Q    But you couldn't positively identify him?

A    Well, it was kind of dark.

Q    Okay.  And in that case also you didn't see if Mr. Rincon looked to see what was in the bag, right?

A    He grabbed the bag.  I know why they talked -- they talked something and he drive off.

Q    Okay.  But you didn't see him open the bag to see what was inside the bag?

A    No, he put the bag inside.  I don't know if he see what was inside but I assume that he -- he know it was money because it was not too big.  It was like this big and you can feel that it was money.

Q    But you didn't see him look inside the bag?

A    No, I don't see him, he was looking like, you know, counting the money.

Q    Okay.  Now you said that you went up to Houston to pick up some money?

A    Yes.

Q    Is that correct?

A    That's in February.

Q    In February of 2004?

A    Two thousand four.

Q    And why do you remember that date specifically?

A    The day, no.  I don't remember exactly what day but I remember the -- the month.

Q    And why is that?

A    Because we start to using the boats because in January it was bad weather.  In February it was bad weather and I start to coming out -- run out -- run out of money; that's why I start -- I call Sergio and say "Go talk to Costilla."

Q    Okay.  And you went up with a friend of yours up to Houston to pick up the money?

A    Yes.

Q    What was the name of your friend?

A    Tony Garcia.

Q    And the idea was Tony was just going to drive you there and come back by himself?

A    No, no, no.  Tony -- Tony, he let me use his truck when I was in Houston.  Okay.  And I got a friend, he's a driver, he bring the money back.

Q    Okay.  Let's get this straight.

You didn't bring the money back yourself?

A    No.

Q    You had somebody in Houston bring it back?

A    Yes.

Q    How did you get to Houston?

A    By bus.

Q    Okay.  So you went to Houston and came back from Houston on a bus?

A    Yes.

Jimenez-Mendoza - Cross / By Mr. Zayas          68

Q    Okay.  And what was your job, just to go to the specific house --

A    Okay.

Q    -- to get the money?  I mean --

A    Mr. Costilla told me to go to Houston.  I called this number.  They want to give you suitcase or a bag of money.  You bring it back to Matamoras.

Q    I'm just going to try to walk you through it, okay?

A    Uh-huh.

Q    You got on a Greyhound bus?

A    Yes.

Q    And you went to Houston?

A    Yes.

Q    And what terminal did you get out of?  Do you remember?

A    I get out over in Richmond --

Q    Okay.

A    -- and 45.

Q    Are you familiar with Houston?

A    Yes.

Q    You've lived in Houston?  You said you worked at Pappas there for a year?

A    Yes.

Q    But you've driven through there many times I'm sure?

A    Yes.

Q    You're a truck driver?

Jimenez-Mendoza - Cross / By Mr. Zayas          69

A     Yes.  I used to have a city route.

Q     Well, then you're in Houston and you get off at the bus stop in Richmond?

A     Uh-huh.

Q     And for the ladies and gentlemen --

        **THE COURT:**  You have to answer yes or no.

        **THE WITNESS:**  Yes.

Q     And for the ladies and gentlemen of the jury, Richmond would be on the southwest side of town?

A     Yes.

Q     Okay.  Now where do you go to pick up the money?

A     Okay.  I call my friend, Tony.  He pick me up and we go to his house.  I left Tony there.  I called the guys and I go to -- it was 59 North.  I don't remember exactly what the street and I called the guys and we meet in a restaurant to give me -- they said "Wait here" and they took the truck.  They bring it back with -- with the suitcase.  They say "Hey, it's in the truck," and I drive off.  I go back to my friend's house and I called the driver.  He --

Q     Hold on a second.  So you went to 59 North.

        Did you go outside of the loop or you're still inside the loop?

A     I don't understand.  Inside the --

Q     Right, the 610 loop.

A     No, it was going to the airport but like four, three --

Jimenez-Mendoza - Cross / By Mr. Zayas                70

three, four entrances before.

Q    Before the airport?

A    Uh-huh.

Q    Okay.  And when you say "the airport," are you referring to the George Bush airport, correct?

A    Yes.

Q    All right.

A    International.

Q    Do you remember what restaurant you met those gentlemen at?

A    No, I don't remember.  It was a plain restaurant in Houston.

Q    Okay.  So then you do remember that you got -- you got the truck back from those gentlemen.

How many gentlemen were there?

A    Excuse me?

Q    How many people did you meet?

A    In Houston?

Q    Where you went to the restaurant to get the money.

A    Just one.

Q    There was just one person?

A    Yea, one person.

Q    Okay.  And he took off with your vehicle and then he came back?

A    Yea, he come back.

Q    Do you remember what he was driving?

A    No.

Q    Do you remember what he looked like?

A    He was young.  He was like 26, 27 years old.

Q    Was he a Hispanic male?

A    Yea, Hispanic.

Q    Hispanic.  Was he tall?

A    He's like 5'8", 5'9".

Q    Okay.  So then you leave the restaurant and you go to your friend's house?

A    Friend, Tony.

Q    Tony's house, right?

A    Uh-huh.

Q    And whose vehicle was it?  Was it Tony's vehicle?

A    Yes, a Range Rover.

Q    And Tony lived in Houston?

A    At that time, yes.

Q    And was Tony involved in the drug trade also?

A    Yes.

Q    Now what is Tony's real name?

A    Antonio Garcia.

Q    And where is Antonio Garcia today?

A    I think he's in jail.

Q    Now when you get the -- when you get the money.  You go to Antonio Garcia's house.  You open up the bag?

Jimenez-Mendoza - Cross / By Mr. Zayas                72

A     Yes, I open the suitcase.

Q     It's a suitcase?  What kind of suitcase was it?

A     It was luggage, this -- this big.

Q     Do you remember the color of the suitcase?

A     Black.

Q     It was a black suitcase.  Okay.

A     Black with tires and --

Q     Was it -- was it those kind that have like a canvas exterior?

A     Well, the one that you pull the --

Q     The handle and you pull it?

A     The handle, uh-huh.

Q     Okay.  So then you -- you open the suitcase and you start washing the outside of each of the bags in there?

A     I wash inside of the suitcase.  I wash every package, every one, and I put it back, everything.

Q     Okay.  And why did you do that?

A     Because the driver told me to do that because when I give it -- when I give it to him, he want to hide it.  I don't know where but he want it clean.

Q     Okay.  Do you wash the outside of the suitcase also or just --

A     Yes.

Q     -- the inside?

A     Inside, outside, everything.

Jimenez-Mendoza - Cross / By Mr. Zayas          73

Q    How long did you stay in Houston that time?

A    Okay.  One day to another and then I come back.

Q    How did you have the expenses -- expenses money to go there?

A    Because I have like 300 bucks in my property.

Q    Okay.  Now after you clean it and you head back what do you do with the actual suitcase itself?  Does it come with you?

A    No, I give it to the driver.  I gave it to him and he drove.

Q    And who is this driver that you give it to?

A    Well, his name is Sergio, Checo (phonetic).

Q    You know Sergio's last name?

A    I think it's Cantu but I don't remember exactly, it's a long time I don't see him.

Q    It's a long time since you have seen him?  Is that what you said?

A    Yea, uh-huh.

Q    How did you know Sergio?

A    How did I know?

Q    Yes, sir.

A    Because I used to be a driver and I used to work in custom broker for maybe like 13 years.

Q    Okay.

A    And I know a lot of drivers.

Q    He was a driver?

A     Yea.

Q     How did you know Antonio?

A     Antonio, he's from Brownsville, and I met -- I met him by another guy.

Q     Okay.  And Sergio, do you know where he is today?

A     I don't know.

Q     Now did you wake up the next morning and call Sergio? What did you do?

A     Okay.  I pick up the money.  I call Sergio.  He say "Hey, I'm gonna be there in like ten o'clock in the morning.  Be ready when I pass and give me the suitcase."

Q     Okay.  And you gave it -- you gave it to him?

A     Yea.  I told him it would be paper.  He know what is it, you know.  I told him paper.  He knows it some money.

Q     Okay.  Now you go to the bus stop?  Did Antonio take you to the bus stop?

A     Yea, he did.  It's like three blocks from Antonio's house.

Q     All right.  And you left that morning?

A     It was like one o'clock in the -- in the afternoon.

Q     All right.  And when did you get back to Brownsville?

A     I get here like eight, nine o'clock in the night.

Q     When you got here when was the next time you saw that bag again?

A     When the driver called me.  He was in Brownsville.

Q     Did you have to pay the driver?

Jimenez-Mendoza - Cross / By Mr. Zayas          75

A    No, because he owe me some favors because he doing things for me before.

Q    Okay.  So he just did it as a favor to you?

A    Yes.

Q    Okay.  And did you go pick it up at his house?  Where did you go?

A    No, I met him outside of the Whataburger.

Q    The one on 802, or the one on International, or which one?

A    The one on 802.

Q    All right.  And what time was that, more or less?

A    It was 10:00, 10:30, something like that.

Q    Had he made it down to Brownsville before you did?

A    Yea, he come first because I coming on Greyhound and Greyhound stop in every city.

Q    Right.  And so you get the bag from him, right?

A    Yea, the luggage.

Q    The luggage.  Do you go -- do you open it from there?

A    Yes, I open it because I need to count.  There was 28 packages.

Q    Okay.  And then from there you went home?

A    Okay.  My brother come to pick me up.  He drive with me to the Whataburger.  We pick up the money.  We put it inside of the hood and we crossed to Matamoras.

Q    Okay, and what is your brother's name?

A    Roberto Jimenez.

Q    Okay.  That's a different gentlemen, right?  It's not -- that's not your brother-in-law.  This is your brother?

A    No, my brother, my brother.

Q    You just -- how did you put it inside the -- the hood? Where underneath the hood did you put the money?

A    Okay.  You're familiar with a Chevy Cheyenne?

Q    A Chevy what?

A    A Chevy Cheyenne.

Q    Chevy Cheyenne?

A    Yea, the six cylinder, they're a small machine.

Q    Okay.

A    And you got plenty of empty room in the inside with the motor.

Q    Right.

A    Uh-huh and I put it there.

Q    When you -- when you put it inside your Chevy Cheyenne is it -- if an agent opened up the -- the hood would he be able to easily see that there's a luggage there?

A    Yes.

Q    So it's not hidden?

A    No, no, you just put it inside -- inside the motor and you close.

Q    Okay. And then you crossed to Matamoras?

A    Yes.

Q    Now you go straight to your brother-in-law's house,

Fernando's house?

A     Yes.

Q     And you give him the money?

A     Yea, I give him the luggage and he counted it, the 28 packages.

Q     Okay.  And then you leave?

A     No, my brother left and I waited over there and he call Mr. Costilla or I don't know whether he call, who call.

Q     You don't know who called?

A     No, and the next person that come to pick up, that was Mr. Rincon.

Q     Okay.  Now you say Mr. Rincon came to pick up the money and this is at night?

A     At night.

Q     What time is it about?

A     Eleven something, eleven forty-five, something like that.

Q     It's before midnight?

A     Yes.

Q     When you say "eleven something" you mean p.m., right?

A     Yea, in the night.

Q     And does Fernando give him the money or you give him the money?

A     No, Fernando.

Q     Okay.  When Fernando gives him the money where are you?

A     Outside of the house, or inside but I'm coming out of the

Jimenez-Mendoza - Cross / By Mr. Zayas          78

-- of the door.

Q    Okay.  And Fernando goes up to the truck?

A    Yes.

Q    And hands it to him and Mr. Rincon's in the truck?

A    No, he go first and come back, get the luggage, and give it to him -- give it in the window and he drive off.

Q    Mr. Rincon did not get out of his vehicle?

A    No.

Q    And it's night again, right?

A    Yes.

Q    And what color of vehicle is Mr. Rincon in?

A    I don't know, it was in the night.

Q    Do you even know what kind of vehicle he had?

A    No.

Q    So you couldn't --

A    It was a truck.

Q    You couldn't identify the vehicle.  You couldn't identify Mr. Rincon either, could you?

A    Yea, but what I see and what my brother-in-law told me, it was Mr. Rincon.

Q    Okay.  So your brother-in-law told you it was Mr. Rincon but you personally didn't see Mr. Rincon.

        Would that be a fair statement?

A    Yes.

Q    And then -- so then if you couldn't even see Mr. Rincon

Jimenez-Mendoza - Cross / By Mr. Zayas                79

you definitely didn't see what Mr. Rincon did with the bag itself?

        Would that be a fair statement?

A    Excuse me?

Q    If you could not see Mr. Rincon, physically couldn't see him, it would be fair to say you couldn't see what he did with the bag either, correct?

A    I don't know what he did with the bag but what I see they put it inside of the truck.

Q    Okay.  Now you mentioned something about having a meeting with Fernando, with Mr. Rincon, at your sister's restaurant in Matamoras.

A    Yes.

Q    Is that right?

A    Yes.

Q    And you mentioned something about a seizure of some -- of some drugs; is that correct?

A    With what?  Excuse me?

Q    A seizure of some marijuana.

A    A seizure?  No.  Where they talked it was -- they were -- my brother-in-law want to make a line from Guadalajara to Matamoras.

Q    Were you present when they were talking about that or you said you were at the bar, right?

A    No, at the first meeting I was sitting with them.  The

Jimenez-Mendoza - Cross / By Mr. Zayas          80

second one I was in the bar.

Q    Okay.  Fernando had a bust of some narcotics at his house, correct?

A    At one of his house.

Q    And half of it went through and half of it didn't?

A    Yes.

Q    It was after that bust that Mr. Rincon talked to Mr. -- Mr. Fernando Sanchez -- it was after that, correct?

A    They talked first about the marijuana but he don't know about the bust and the second time they talking about the cocaine.

Q    Okay.  But on the first time that they talked was after the marijuana was seized; is that correct?

A    Excuse me?

Q    Did you tell the agents that Mr. Rincon and Mr. Fernando or Mr. Sanchez -- Fernando Sanchez is the same person, right?

A    Uh-huh, yes.

Q    Okay.  Did you tell the agents that Mr. Rincon and Fernando Sanchez had a conversation about moving a ton of marijuana after the seizure at Mr. Fernando Sanchez's house?

A    No.

Q    That's not what you told them?

A    No, no.  I told them that Mr. Fernando Sanchez want to talk to Costilla to get permission to come with a ton of marijuana.  They don't have no business to talk about they want

Jimenez-Mendoza - Cross / By Mr. Zayas          81

to move it.  He wants to permission to bring it to Matamoras.

Q    Okay.  And what you mean by that, he wants permission to be able to move through Matamoras plaza, right?

A    Yes.

Q    And he wants permission and in doing that he pays a piso to go through there?

A    No, he no pay piso.  My brother-in-law, he never pay piso.

Q    Okay.  He just wanted to permission to go through?

A    Yea, because they having some -- they're upset, Costilla and Fernando, they're upset and Costilla frisked Fernando, stopped Fernando working and he wanted the okay from Costilla to keep him working.

Q    Okay.  So he just wanted the permission to go through. He wasn't going to pay any piso or anything of that nature?

A    No, he never pay piso.

Q    He never paid piso because he was the cousin?

A    He was the cousin.

Q    So he got a free pass?

A    Yes.

Q    Okay.  And basically, Mr. Fernando Sanchez was making his own arrangements for passing the drugs into the United States? Would that be a fair --

A    No.  He don't want to pass it -- pass it to United States. He wanted just to bring to Matamoras.

Q    Okay.

Jimenez-Mendoza - Cross / By Mr. Zayas          82

A     And from there, you know --

Q     Whatever --

A     Whatever.  He want to sell it there but sometime when he bring things he'll call me.  He'll say "Hey, do you want to sell it or not?"  It all depends.

Q     Okay.  So would it be fair to say then, the way I understood it is Fernando Sanchez wanted to bring drugs to Matamoras --

A     Uh-huh.

Q     -- and he will -- he had his own client.

          Would that be fair to say?

A     Yes, in Matamoras.

Q     In Matamoras that would buy the ton of marijuana?

A     Yes.

Q     And he was asking Costilla for the ability to do that without paying a piso?

A     Yes.

Q     Now you also testified that you have seen Rincon on or off about -- Mr. Rincon on and off about 20 times; is that right?

A     More or less.

Q     Do you remember the agents giving you a lineup when you gave that statement on -- on January 9th and do you remember having a hard time identifying Mr. Rincon from the lineup?

A     Yes, because I don't have my glasses that day.

Q     Okay.

Jimenez-Mendoza - Redirect / By Mr. Young       83

A     And I --

Q     But you do remember having a hard time identifying him,

correct?

A     No, I don't have a hard time.  I say this too because I

don't have my glasses that day and I told them that it looked

like, uh-huh.

Q     But you weren't sure, right?

A     Yes.

          MR. ZAYAS:  I'll pass the witness.

          MR. YOUNG:  A few questions.

          THE COURT:  Mr. Young?

          MR. YOUNG:  I'm sorry, your Honor.  Yes, just a few

questions.

                    **REDIRECT EXAMINATION**

**BY MR. YOUNG:**

Q     Mr. Jimenez, with regards to the photo lineup the agents

showed you did -- how many people did you select out of six

people?

A     Two.

Q     Okay. And was one of them the defendant?

A     Yes.

Q     Okay.  With regards to the conversations that Fernando

Sanchez had with the defendant, based on your conversations

with Fernando is it apparent that Fernando had meetings with

the defendant that you weren't part of?

Jimenez-Mendoza - Redirect / By Mr. Young          84

A    Fernando have meetings with him?

Q    Yes.

A    He told me, yea, they had some meetings or they looked you know sometimes at engines and raced around or -- in the street.

Q    So besides the meetings you've talked about here, some of which you were present in person and some of which you weren't, is it apparent to you through your conversations with Fernando over time that he had separate meetings with the defendant that you weren't part of?

A    Yea, Fernando told me.

Q    Now with regards to your ability to see the defendant during these money pick ups, did you see the defendant with Costilla at that party when you handed the piso for that second load in 2003?

A    Yes.

Q    Was it well lit?

A    Yes.

Q    Okay.  Was there any problems seeing the defendant with Costilla during that money drop off?

A    Yes, because Costilla give the bag to him in hand.

Q    And do you recall testifying about receiving $5,000 back in exchange for bringing that large -- the suitcase down from Houston of money for Costilla?

A    Yes.

Q    Do you recall testimony about being handed $5,000 from

your brother-in-law?

A    Yes.

Q    Were you present -- did you see how your brother-in-law got that money?

A    Yes, cash.

Q    And who did he get it from?

A    From Mr. Rincon in Fernando's house right in the window front and he put down the window, they talk, and he give him the money, and my brother-in-law do this, "Here's the money. This is yours."

Q    Okay.  Were you standing back near the porch area like you were on the other occasions or were you up near the car?

A    No, I was outside next to Fernando, like two or three --

Q    Was it day or night.

A    It was like eight o'clock, something like that.

Q    Were you close enough to actually see the defendant this time?

A    Yes.

Q    Did you have to rely on Fernando's, you know, word who it was or did, you know, or maybe your eyes -- did you have to rely on him or were you able to see this?

A    Yea, I seen it, I seen it.

Q    Paper -- when you mention the term "paper" what is that kind of a nickname for?

A    Paper, that's for money.

Q    Now I think Mr. Zayas asked you some questions again about the carwash on I think 18th versus the mechanic shop of your brother-in-law's.

A    On Esperanza.

Q    Okay.  Did the mechanic shop at your brother-in-law's place, did it do anything else besides work on cars or was it just a mechanic shop?

A    Okay.  At that time, he used to have a tienditas in Esperanza.

        **MS. SPEAKER:**  A little store.

A    A little store that we called tienditas for a (indiscernible) house.

Q    What about -- I think you had testified that -- would people wash cars at the mechanic shop too or not?

A    In the carwash, yes.

Q    Well, I'm talking about the mechanic shop.

A    Yes, sometimes.

Q    Okay.  But this other carwash we're talking about, was that other carwash like a business business or was it --

A    It's a business, uh-huh.  One is a mechanic shop, business, mechanic shop, and the other one is a carwash and they do mechanic too.

        **MR. YOUNG:** One minute, your Honor.

Q    What is the address, if you recall, of your brother-in-law's mechanic shop?

Jimenez-Mendoza - Recross / By Mr. Zayas          87

A     Mechanic shop is in Esperanza.

Q     And what is the -- what is the location again of the business that's a carwash that you were talking about that's separate from your brother-in-law's business?

A     It's (speaks Spanish Espana).

**MR. YOUNG:**  Nothing further, your Honor.

**THE COURT:**  Mr. Zayas?

**RECROSS EXAMINATION**

**BY MR. ZAYAS:**

Q     When Mr. Rincon came back to give the $5,000 to Fernando do you know how long after the delivery of the money that was?

A     How long?

Q     Yes.

A     They talk like one minute something right there and he give him the money and he gave it to me and they talked like a few words and then he left.

Q     Maybe you misunderstood my question, I'm sorry.

A     Okay.

Q     How long after the delivery of the suitcase?  Was it the next day?

A     No, two days later.

Q     It was two days later?

A     Uh-huh.

Q     And on that day you personally saw Mr. Rincon?

A     Yes.

Jimenez-Mendoza - Redirect / By Mr. Young          88

Q    Do you remember what he was driving?

A    It was a white truck.

Q    Was it a truck?  Was it a Tahoe?  Was it a --

A    No, a truck, a pickup truck.

Q    Did it have four doors?  Did it have two doors?

A    Two doors.

Q    Okay.  Did it have an extended cab?

A    No.

Q    Okay.  What brand was it, do you know?

A    It was a Chevrolet.

Q    Was Mr. Rincon by himself?

A    Yes.

        MR. ZAYAS:  I'll pass the witness.

        THE COURT:  Mr. Young?

                FURTHER REDIRECT EXAMINATION

BY MR. YOUNG:

Q    Mr. Jimenez, did you ask Fernando after the luggage was given to the defendant when you were going to get paid?

A    Yes.

Q    And is it your understanding that's why the defendant came back and --

A    Yes.

Q    -- Fernando and you met with him?

A    Yes.

        MR. YOUNG:  Okay.  Nothing further, your Honor.

89

MR. ZAYAS:  Nothing further.

MR. CASTRO:  Nothing further.

THE COURT:  All right, sir, you may step down.

(Witness excused)

(Testimony and transcription concluded at 10:41 a.m.; proceeding continued)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          May 10, 2013_

TONI HUDSON, TRANSCRIBER

EXCEPTIONAL REPORTING SERVICES, INC